# FROMMER LAWRENCE & HAUG LLP

745 FIFTH AVENUE   NEW YORK, NEW YORK 10151

TEL: (212) 588-0800   FAX: (212) 588-0500

FILED IN CHAMBERS
THOMAS W. THRASH JR.
U.S.D.C. Atlanta

OCT 21 2004

LUTHER D. THOMAS, Clerk
By: /s/
Deputy Clerk

WILLIAM S. FROMMER
WILLIAM F. LAWRENCE
EDGAR H. HAUG
MATTHEW K. RYAN
BARRY S. WHITE
THOMAS J. KOWALSKI
JOHN R. LANE
DENNIS M. SMID*
DANIEL G. BROWN
STEVEN M. AMUNDSON
MARILYN MATTHES BROGAN
JAMES K. STRONSKI
CHARLES J. RAUBICHECK
GRACE L. PAN*
MARK W. RUSSELL*
JEFFREY A. HOVDEN
RONALD R. SANTUCCI
RICHARD E. PARKE
LEONARD J. SANTISI
PORTER F. FLEMING
JOHN G. TAYLOR
KEVIN F. MURPHY
ARTHUR L. HOAG
SANDRA KUZMICH, PH.D.

A. THOMAS S. SAFFORD
BARBARA Z. MORRISSEY
Of Counsel

BRUNO POLITO
ROBERT E. COLLETTI
DEENA LEVY WEINHOUSE
DARREN M. SIMON
DAVID A. ZWALLY
SAMUEL H. MEGERDITCHIAN
PEARL TENG LING SIEW
STEPHEN J. LIEB
FRANCINE S. ADLER, DPM
HANS R. MAHR*
SEAN J. GRYCIEL
WENDY R. STEIN
JOYCE W. LUK
DILLON KIM
LESLIE C. ALLEN*
NATHAN D. WEBER
SAMUEL S. LEE*
PAMELA FEKETE
MAGALI ROZENFELD
H. SARAH PARK
SCOTT A. CLARK
THOMAS F. PRESSON
BRIAN J. MALKIN*
ROBERT T. HENDRIX
JOHN J. MOLENDA
SEAN E. RYDER
*Admitted to a Bar
other than New York

October 19, 2004

**BY HAND**

The Honorable Thomas W. Thrash, Jr.
United States District Judge
2188 Richard B. Russell Federal Building
   and United States Courthouse
75 Spring Street, S.W.
Atlanta, Georgia 30303-3309

**Received in Chambers**

OCT 20 2004

Thomas W. Thrash, Jr.
United States District Judge

Re:   Unimed Pharms., Inc. et al. v. Watson Pharms., Inc.
      Civil Action No. 1:03-CV-2501-TWT
      Unimed Pharms., Inc. et al. v. Paddock Labs., Inc.
      Civil Action No. 1:03-CV-2503-TWT

Dear Judge Thrash:

We represent Watson Pharmaceuticals, Inc. ("Watson"), the defendant in one of the actions referenced above. We write to address the issues raised in Plaintiffs' October 14, 2004 letter.

Plaintiffs' letter is the culmination of their efforts to manufacture discovery disputes so that they could submit a letter to the Court in retaliation for Watson's September 23, 2004 letter regarding Plaintiffs' attempt to avoid its electronic document production obligations. The letter is also a thinly veiled excuse to present and argue Plaintiffs' views of the law and the merits of the case under the guise of a motion to compel.

Moreover, with a monopoly in the testosterone gel market yielding hundreds of millions of dollars in revenue per year, it is in Plaintiffs' interest to delay the resolution of this case for as long as possible. It is also in Plaintiffs' interest, therefore, to create disputes at this late point in discovery as a prelude to seeking an extension of the December 17, 2004 fact-discovery deadline.

**I.   FACTUAL BACKGROUND**

Plaintiffs mischaracterize these actions as cases about alternative forms of testosterone replacement therapy products. They are not. These actions concern testosterone gels, not testosterone products generally.

Plaintiffs have accused the defendants of infringing Plaintiffs' U.S. Patent No. 6,503,894 ("the '894 patent"). Plaintiffs filed the application for the '894 patent on August 30, 2000 and it issued on January 7, 2003. The '894 patent claims a testosterone **gel**. *See* Ex. A to Plaintiffs' October 14, 2004 letter ("Pl. Ltr.").

Plaintiffs sell a product named AndroGel®, which—as its name implies—is a testosterone **gel**. Plaintiffs submitted a New Drug Application ("NDA") for AndroGel® to the U.S. Food and Drug Administration ("FDA") in April 1999 seeking the Agency's approval to market the product in the United States. FDA approved Plaintiffs' NDA in February 2000, and Plaintiffs began marketing AndroGel® in June 2000.

Watson sells a product named Androderm®. Androderm® is a testosterone **patch**. Watson developed Androderm in the late 1980s and early 1990s. Watson submitted an NDA for Androderm® to FDA in September 1994 and it was approved in September 1995. Watson began marketing Androderm® in November 1995.

Watson has also obtained several patents relating to its Androderm® formulation and **patch** delivery system. *See* Pl. Ltr. at 2 n.3. These patents all issued between 1989 and 1992.

## II.   THE DOCUMENTS SOUGHT BY PLAINTIFFS

### A.   The Androderm® Documents

Plaintiffs' First Set of Requests for Production of Documents to Watson included the following:

Request for Production No. 48:

All documents concerning any alternative composition, formulation, process or design to the claimed invention.

Request for Production No. 49:

All documents concerning any actual or proposed commercial alternatives to the claimed invention.

Ex. A at 39-40. Watson objected to these requests, *inter alia*, as "oppressive, overly broad, and unduly burdensome and as calling for documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence." *Id.*

Because these requests are so exceedingly broad—encompassing tens of thousands of documents relating to Androderm®, including laboratory notebooks, reports, memoranda, correspondence, clinical trial materials, etc.—we asked Plaintiffs during telephone conferences in April and May 2004 to identify the specific types of Androderm® documents they were interested in and to explain why they believed those documents were relevant. Plaintiffs advised us that they were interested in documents that might relate to the secondary considerations of nonobviousness, such as commercial success, failure of others, long-felt need, and copying. As examples of the types of documents that might relate to these issues, Plaintiffs identified sales data, market analyses and forecasts, marketing strategies, promotional materials, reports of adverse events, customer complaints and correspondence with prescribers of Androderm®. **Watson agreed to produce and has produced these documents.**

The documents Plaintiffs seek concerning the development of Androderm® do not relate to the secondary considerations. They are not evidence of commercial success because they do not concern sales. They are not evidence of failure of others or long-felt need because they concern the **successful** development of a **different** product. And they are not evidence of copying because they concern work done to develop a **patch** product years **before** Plaintiffs' developed their testosterone **gel** product.

In a July 8, 2004 letter, Plaintiffs complained that Watson had not produced its NDA for Androderm®. Ex. B at 1. We replied in a July 16, 2004 letter that the material in Watson's NDA was not relevant, but that, as a compromise, we would produce the table of contents of the NDA. Ex. C at 2. We asked Plaintiffs to identify the sections of the NDA that they believed were relevant and to explain why, and we would consider producing those sections. *Id.* In a September 1, 2004 letter, Plaintiffs identified five sections of the NDA but did not explain their relevance. Ex. D. **Watson produced these sections anyway, which include substantial information concerning Watson's development of Androderm® and clinical trials.**

In another September 1, 2004 letter, Plaintiffs asked if Watson would produce all documents relating, *inter alia*, to Watson's project number 103, which was the code number for the project to develop the Androderm® patch. Ex. E at 1. In a September 16, 2004 letter, we reiterated Watson's position that documents relating to the development of Androderm® are not relevant to the issues and defenses in this action. Ex. F at 1. In response, Plaintiffs stated in a September 21, 2004 letter that the parties "appear to be at an impasse concerning the Androderm® documents." Plaintiffs also summarily stated that "[w]ith the exception of manufacturing

documents, **all** documents relating to Androderm® have **potential** relevance to issues in this litigation." Ex. G at 1 (emphasis added). Plaintiffs did not offer any explanation as to how **all** documents concerning Androdem® could be relevant.

In a September 29, 2004 letter, Plaintiffs argued that they had explained why **all** documents concerning Androderm® were relevant in their September 21 letter because they had identified examples of **some** relevant documents, such as the secondary consideration documents that Watson has produced. Ex. H at 1. Of course, identifying examples of **some** relevant Androderm® documents, on the one hand, and demonstrating the relevance of **all** documents concerning Androderm®, on the other hand, differ markedly.

During a meet and confer telephone conference on October 8, 2004, we once again asked Plaintiffs to explain why **all** documents concerning the development of Watson's Androderm®—a patch developed years before Plaintiffs' gel—are relevant. Plaintiffs stated that documents concerning the development of Androderm® are "potentially" relevant because of the simple fact that it is a testosterone product that competes with Plaintiffs' AndroGel® product.

During the October 8 meet and confer, Plaintiffs also argued that any difficulties Watson encountered in developing its Androderm® **patch** might show that the **gel** is a better delivery system—a nonobviousness argument. Plaintiffs repeat that argument in their October 14 letter. *See* Pl. Ltr. at 3. But the types of documents that might show whether or not the gel is an improvement are the secondary consideration documents discussed above. And Watson has already produced those documents. Other documents that could bear on the issue of whether the gel is an improvement are comparisons between Androderm® and AndroGel®. Watson has already produced many such documents and expects to produce its remaining comparison documents within a week.

Plaintiffs also contend that all documents relating to the development of Androderm® are relevant because the Androderm® patents are prior art. Pl. Ltr. at 3. But the development documents, which constitute confidential, internal Watson materials, are not prior art. Section 102 defines the scope of the prior art, and it includes, *inter alia*, patents and printed publications. 35 U.S.C. § 102. The Androderm® development documents do not satisfy any of sections 102's requirements for prior art. *See Oddzon Products, Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1402 (Fed. Cir. 1997) (prior art is information that is "available to the public," that is "when it is described in the world's accessible literature, including patents") (*quoting Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1453 (Fed.

00225721

Cir. 1984)). **Watson has produced the prosecution file histories for the Androderm® patents.**

Plaintiffs also argue that the mere fact that **Plaintiffs** cited Watson's Androderm® patents during the '894 patent's prosecution "provides an independent justification" for the relevance of all Androderm® development documents. *See* Pl. Ltr. at 3. But Plaintiffs provide absolutely no authority for this proposition. Nor did the patent examiner cite to or rely on the Androderm® patents. Moreover, Plaintiffs cited over 400 patents and other publications during the '894 patent's prosecution. Ex. I at 1-10. Plaintiffs do not suggest—nor could they reasonably contend—that all documents reflecting the underlying work described in those 400 prior-art references are relevant.

Plaintiffs further urge that the inventive steps Watson took in conceiving and reducing Androderm® to practice show the unpredictably of the underlying science. Pl. Ltr. at 3. The unpredictability of underlying science is not a secondary consideration and Plaintiffs do not explain the relevance here of documents concerning the development of a different product many years before Plaintiffs developed their gel product. The case cited by Plaintiffs', *In re O'Farrell*, does not support their argument because it concerned the obviousness of a claimed invention in light of prior art publications. *In re O'Farrell*, 853 F.2d 894, 902-04 (Fed. Cir. 1988). The Androderm® development documents are not prior art.

Finally, Plaintiffs contend that Watson's efforts to improve Androderm® is evidence of failure of others that supports the nonobviousness of Plaintiffs' gel formulation. Pl. Ltr. at 3. This makes no sense. Efforts to improve the Androderm® **patch** are not evidence of the abandonment of the **patch** in favor of a **gel**.

Watson has produced thousands of documents relating to Androderm® where Plaintiffs have provided some explanation of the documents' relevance—and even where they have not. Plaintiffs have failed to provide a basis for putting Watson through the enormous time and expense of locating and producing all the documents relating to Androderm's® development.

### B.   Documents Relating to Watson's Penetration Enhancers

As with documents relating to the development of Androderm®, Plaintiffs try to justify their request for **all** documents relating to Watson's studies of penetration enhancers by making these actions about something that they are not. The '894 patent claims only one penetration enhancer: isopropyl myristate.

In a letter dated August 11, 2004, Plaintiffs complained that Watson had not produced **all** documents relating to its studies of the penetration enhancers methyl laurate, lauryl alcohol, glycerol monooleate, oleic acid, glycolic acid and polydimethylsiloxane (Sentry NF 350). Ex. J at 2. The letter also identified a number of Watson patents relating to penetration enhancers. *Id.* These patents, however, all issued between 1989 and 1992 and did not relate in any way to Watson's efforts to develop a testosterone gel. Those efforts did not begin until the mid 1990s. Although such studies are not relevant to this litigation, to avoid a dispute Watson agreed in an August 26, 2004 letter to produce the prosecution file histories for these patents. Ex. K at 1.

Unsatisfied, Plaintiffs asked in one of their September 1 letters whether Watson would produce all documents relating to its studies of penetration enhancers other than isopropyl myristate—the only penetration enhancer at issue here. Ex. E at 1. In our September 16 letter, we advised Plaintiffs that we did not understand how such documents could be relevant. Ex. F at 2.

Plaintiffs responded in their September 21 letter by stating, "we are now at an impasse with respect to Watson's work involving alternative penetration enhancers, which is clearly relevant to issues of secondary considerations." Ex. G at 1. Unfortunately, the letter did not explain the relevance. When we pointed out the lack of an explanation of relevance, Plaintiffs tried to provide one in their September 29 letter. They asserted—without support—that the studies' potential relevance is if they "taught away from the invention embodied in the '894 patent." Ex. H at 1.

Because obviousness is evaluated from the perspective of a hypothetical ordinarily skilled artisan, however, only prior art, such as patents or publications, may teach or teach away from a claimed invention. *See In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994) (holding that a prior-art reference teaches away when those skilled in the art, upon reading it, would be discouraged from following the path set out in the reference or would be led in a direction divergent from the path followed by the inventor). As discussed above, Watson's internal documents concerning its studies of penetration enhancers are not prior art. Watson's internal documents can neither teach nor teach away from the invention claimed in the '894 patent.

In addition, the only penetration enhancer claimed in the '894 gel patent is isopropyl myristate. Accordingly, even if they were prior art, only Watsons' studies involving isopropyl mystirate would be relevant because only studies involving isopropyl myristate could teach away from **its** use as a penetration enhancer. **Watson has produced documents concerning isopropyl myristate.**

The Honorable Thomas W. Thrash, Jr.
October 19, 2004
Page 7

Plaintiffs offer nothing new in their October 14 letter to justify Watson's production of all documents relating to studies of penetration enhancers other than isopropyl myristate. Plaintiffs argue that "the fact that Watson attempted to develop a testosterone **gel** using formulations other than the patented formulation (and which relied on different penetration enhancers) is probative of non-obviousness." Pl. Ltr. at 4 (emphasis added). But Watson has produced its documents relating to its efforts to develop a testosterone gel, including experiments with penetration enhancers other than isopropyl myristate.

Finally, Plaintiffs argue that the "fact that Watson has chosen to copy Plaintiffs' patented formulation (including Plaintiff's penetration enhancer) rather than rely on its own extensive work with penetration enhancers is probative of non-obviousness." Pl. Ltr. at 5. Watson's work with other penetration enhancers years **before** Plaintiffs developed their gel formulation has no bearing on the question of copying. Plaintiffs' AndroGel® product was unavailable when Watson did that work. And Plaintiffs' '894 patent application had not even been filed—much less issued—when Watson did that work.

Moreover, Plaintiffs are certainly free to make their copying argument, but they do not explain how the production of all of Watson's documents relating to studies of other penetration enhancers unrelated to Watson's development of a testosterone gel—*i.e.* **not** copying—will help to advance that argument.

### C. Charts in Watson's Laboratory Notebooks

Plaintiffs' representation to the Court that Watson has refused to produce legible and color copies of charts in its laboratory notebooks is outrageous and by raising this as an issue in their October 14 letter, Plaintiffs are effectively accusing Watson's counsel of lying. Pl. Ltr. at 5. It is also the clearest demonstration of Plaintiffs creating disputes where none exist to justify sending a letter to the Court.

In one of their September 1 letters, Plaintiffs asked if Watson would produce more legible copies of the notebook pages Watson had already produced with all graphs reproduced in color. Ex. E at 1. In our September 16 letter, we asked Plaintiffs to identify the specific notebook pages by production number that they found illegible and we would try to produce more legible copies. Ex. F at 1. We similarly asked Plaintiffs to identify the specific graphs they needed in color. *Id.*

Although many, if not the majority, of the notebook pages that Watson had produced were completely legible, Plaintiffs stated in their September 21 letter that they needed all pages to be reproduced as they "are all difficult if not impossible to read"

The Honorable Thomas W. Thrash, Jr.
October 19, 2004
Page 8

and that they needed all graphs reproduced in color "because they cannot be interpreted." Ex. G at 1. After consulting with our client, we advised Plaintiffs in a September 24, 2004 letter that Watson would try to produce more legible copies of the notebook pages that had been produced and that no color copies were available because the original graphs are in black and white. Ex. L at 1.

Despite our September 24 letter, Plaintiffs asked us during the October 8 meet and confer telephone conference whether Watson was reproducing the laboratory notebook pages. We stated unequivocally that we were. Plaintiffs also asked us whether Watson was reproducing the color graphs in color. We explained to Plaintiffs that they had misinterpreted our September 24 letter as indicating that some of the graphs were in color. We stated several times that the original graphs are all in black and white and explained that the bars on the graphs were differentiated with shading and cross-hatching. We thought the issue was resolved.

On October 15, 2004, we reproduced all of the Watson laboratory notebook pages that had previously been produced—just as we said we would. Enclosed as Exhibit M are the reproduced copies of the pages Plaintiffs enclosed with their October 14 letter as evidence that some of the graphs had to be in color. *See* Pl. Ltr., Ex. D. It is clear from these reproduced copies that the bars on the graphs are differentiated by shading and cross-hatching—not color—just as we said. Ex. M.

### III. CONCLUSION

For the foregoing reasons, Watson respectfully asks the Court to deny Plaintiffs' request for the production of **all** documents relating to the development of Androderm® and **all** documents relating to Watson's studies of penetration enhancers other than isopropyl myristate. Regarding the reproduction of Watson's laboratory notebook pages, we believe Watson's production on October 15 resolves this issue.

Very respectfully,

John G. Taylor

Enclosures

cc: Jerry B. Blackstock, Esq. (by hand)        Daniel A. Ladow, Esq. (by facsimile)
    James R. Ferguson, Esq. (by facsimile)    Mark G. Trigg, Esq. (by facsimile)

00225721