# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| UNIMED PHARMACEUTICALS, INC., ) | | |
| a Delaware corporation, and ) | | |
| LABORATORIES BESINS ) | | |
| ISCOVESCO, a Delaware corporation, ) | | |
| ) | | |
| Plaintiffs, ) | CIVIL ACTION FILE | |
| ) | | |
| v. ) | NO. 1:03-cv-2501-TWT | |
| ) | | |
| WATSON PHARMACEUTICALS, INC., ) | | |
| a Nevada corporation, ) | | |
| ) | | |
| Defendant. ) | | |

## <u>WATSON'S PRINCIPAL CLAIM-CONSTRUCTION BRIEF</u>

**David A. Rabin**
**MORRIS, MANNING & MARTIN, LLP**
**Georgia Bar No. 591469**
**1600 Atlanta Financial Center**
**3343 Peachtree Road, NE**
**Atlanta, Georgia 30326**
**Telephone: (404) 233-7000**
**Facsimile: (404) 365-9532**

Of Counsel:

Barry S. White
Steven M. Amundson
John G. Taylor
Joyce W. Luk
Jennifer Chung
**FROMMER LAWRENCE
   & HAUG LLP**
**745 Fifth Avenue**
**New York, New York 10151**
**Telephone: (212) 588-0800**
**Facsimile: (212) 588-0500**

**Attorneys for Defendant**
**Watson Pharmaceuticals, Inc.**

**July 25, 2005**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iv

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 2

    Procedural Background ................................................................................. 2

    Factual Background ....................................................................................... 3

    Drafting and Prosecution of the '894 Patent .................................................. 6

    The Task Before the Court ............................................................................ 7

ARGUMENT ...................................................................................................... 7

    I.     Claim-Construction Principles ............................................................. 7

    II.    The Court Should Adopt Watson's Proposed Claim
          Constructions Because They Comport with the Intrinsic
          Evidence, While Unimed's Do Not .................................................... 15

          A.     The Phrase "Pharmaceutical Composition" in Claims 1,
                10, 18, and 31 ......................................................................... 15

          B.     The Term "Hydroalcoholic" in Claim 9 ................................... 23

          C.     The Phrase "Hydroalcoholic Gel Formulation" in Claim
                9 ............................................................................................ 23

          D.     The Phrase "Consisting Essentially Of" in Claims 1, 9,
                 10, 18, and 31 ......................................................................... 25

          E.     The Term "Isopropanol" in Claims 1, 18, and 31 ................... 27

          F.     The Term "Ethanol" in Claims 1, 9, 10, 18, 22, and 31 ........... 28

G.  The Term "Sodium Hydroxide" in Claims 1, 9, 10, and 18 ...................................................................28

H.  The Term "About" in the Context of the Formulation Constituents ...............................................................31

I.  The "Sodium Hydroxide" Limitation in Claims 1, 9, 10, and 18 as Issued .......................................................33

    1.  The Phrase "About 1% to About 5% Sodium Hydroxide" in Claims 1, 10, and 18 as Issued ..............33

    2.  The Phrase "About 1% to About 3% Sodium Hydroxide" in Claim 9 as Issued ...................................33

J.  The "Sodium Hydroxide" Limitation in Claims 1, 9, 10, and 18 as "Corrected" ..............................................34

    1.  The Phrase "About 1% to About 5% 0.1 N Sodium Hydroxide" in Claims 1, 10, and 18 as "Corrected" ......34

    2.  The Phrase "About 1% to About 3% 0.1 N Sodium Hydroxide" in Claim 9 as "Corrected"...........................37

K.  The Phrase "Gelling Agent" in Claims 1, 6, 8, 10, 16-18, 23, 25, 31, 36, and 38................................................38

L.  The Phrase "Polyacrylic Acid…in a Concentration of About 1%" in Claims 8, 25, and 38 ..........................................39

M.  The Term "Gel" in Claims 7, 13, 24, and 37 ...........................40

N.  The Phrase "Isopropyl Myristate . . . in a Concentration . . . of About 0.5%" in Claims 4-5, 15, 21, and 34 ...................41

O.  The Phrase "Isopropyl Myristate . . . in a  Concentration . . . of About 1%" in Claim 4 .....................................42

P.  The Phrase "Amount Sufficient" in Claims 18 and 31.............42

Q.  The Phrase "Daily Dose" in Claims 18, 26-29, 31, and
    39-41 ..........................................................................................43

R.  The Phrase "Applied in a Single or in Divided Doses" in
    Claims 30 and 42........................................................................44

S.  The Phrase "Achieve…Within at Least About 36 Hours"
    in Claim 18 .................................................................................44

T.  The Phrase "Substantially Maintained…for at Least 24
    Hours" in Claims 26-29 and 31 .................................................45

U.  The Phrase "Maintained…for at Least 24 Hours" in
    Claims 39-41 ..............................................................................46

V.  The Phrase "At Least 2 Consecutive Days" in Claims 26
    and 31 ..........................................................................................46

W.  The Phrase "At Least 30 Consecutive Days" in Claims
    27-29 and 39-41 .........................................................................47

CONCLUSION .......................................................................................47

#1298510 v1 - Watson's Claim Constr Brief

# TABLE OF AUTHORITIES

## Cases

Ashland Oil, Inc. v. Delta Resins & Refacs., Inc.,
    776 F.2d 281 (Fed. Cir. 1985) ........................................................................36

Bristol-Myers Squibb Co. v. Royce Lab., Inc.,
    69 F.3d 1130 (Fed. Cir. 1995) ........................................................................3

C.R. Bard, Inc. v. U.S. Surgical Corp.,
    388 F.3d 858 (Fed. Cir. 2004) ......................................................................14

CAE Screenplates Inc. v. Heinrich Fiedler GmbH,
    224 F.3d 1308 (Fed. Cir. 2000) ............................................................. 16, 25

Chef Am., Inc. v. Lamb-Weston, Inc.,
    358 F.3d 1371 (Fed. Cir. 2004) ....................................................................31

Comark Communs., Inc. v. Harris Corp.,
    156 F.3d 1182 (Fed. Cir. 1998) ....................................................................10

Cybor Corp. v. FAS Techs., Inc.,
    138 F.3d 1448 (Fed. Cir. 1998) ..................................................................7, 8

Exxon Chem. Patents, Inc. v. Lubrizol Corp.,
    64 F.3d 1553 (Fed. Cir. 1995) ......................................................................35

Housey Pharms., Inc. v. AstraZeneca UK Ltd.,
    366 F.3d 1348 (Fed. Cir. 2004) ......................................................................9

In re Dossel,
    115 F.3d 942 (Fed. Cir. 1997) ........................................................................8

Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,
    381 F.3d 1111 (Fed. Cir. 2004) ......................................................................8

Jack Guttman, Inc. v. Kopykake Enters., Inc.,
302 F.3d 1352 (Fed. Cir. 2002) ....................................................................12

Jonsson v. Stanley Works,
903 F.2d 812 (Fed. Cir. 1990) .....................................................................13

Liebel-Flarsheim Co. v. Medrad, Inc.,
358 F.3d 898 (Fed. Cir. 2004) .....................................................................10

Markman v. Westview Instrs., Inc.,
52 F.3d 967 (Fed. Cir. 1995) (en banc),
aff'd 517 U.S. 370 (1996).......................................................................... passim

Merck & Co. v. Teva Pharms. USA, Inc.,
395 F.3d 1364 (Fed. Cir. 2005) ....................................................................47

Microsoft Corp. v. Multi-Tech. Sys., Inc.,
357 F.3d 1340 (Fed. Cir. 2004) ............................................................. 11, 13

Middleton, Inc. v. Minn. Mining & Mfg. Co.,
311 F.3d 1384 (Fed. Cir. 2002) ....................................................................13

Nystrom v. Trex Co., Inc.,
374 F.3d 1105 (Fed. Cir. 2004) ....................................................................47

Phillips v. AWH Corp.,
Nos. 03-1269 2005 WL 1620331 (Fed. Cir. July 12, 2005)................. passim

Phonometrics, Inc. v. N. Telecom Inc.,
133 F.3d 1459 (Fed. Cir. 1998) ....................................................................10

PPG Indus. v. Guardian Indus. Corp.,
156 F.3d 1351 (Fed. Cir. 1998) ............................................................. 25, 26

Prima Tek II, L.L.C. v. Polypap , S.A.R.L.,
No. 04-1411 WL 1459332, (Fed. Cir. June 22, 2005) ..................................47

Smith v. Snow,
294 U.S. 1 (1935)..........................................................................................11

#1298510 v1 - Watson's Claim Constr Brief

Teleflex, Inc. v. Ficosa N. Am. Corp.,
 299 F.3d 1313 (Fed. Cir. 2002) ............................................................. 12, 47

Transmatic, Inc. v. Gulton Indus., Inc.,
 53 F.3d 1270 (Fed. Cir. 1995) ...............................................................11

Vitronics Corp. v. Conceptronic, Inc.,
 90 F.3d 1576 (Fed. Cir. 1996) ........................................................... passim

W.E. Hall Co. v. Atlanta Corrugating, LLC,
 370 F.3d 1343 (Fed. Cir. 2004) ...............................................................12

Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.,
 239 F.3d 1225 (Fed. Cir. 2001) ...............................................................10

**Statutes**

21 U.S.C. § 355(j)(5)(B)(iii) ...................................................................3

28 U.S.C. § 1292(a)(1) ...........................................................................3

35 U.S.C. § 112, ¶ 1 ..............................................................................8

35 U.S.C. § 112, ¶ 2 ..............................................................................8

**Rules**

Fed. R. Civ. P. 65 .................................................................................3

**Regulations**

37 C.F.R. § 1.75(c).................................................................................9

#1298510 v1 - Watson's Claim Constr Brief

# INTRODUCTION

A patent's claims delimit the patentee's right to exclude. Courts construe patent claims to determine their legally operative meaning and scope, thus establishing bounds on the right to exclude. Absent a manifest or explicit restriction or exclusion in the patent, a court should assign claim language its ordinary and customary meaning. Dictionaries assist in determining the conventional meaning of words.

Focusing on the patent in suit (the '894 patent), Watson construes the claims according to the ordinary and customary meaning as understood by a person of ordinary skill in the art at the time of the invention. Unimed ignores the ordinary and customary meaning of the claim language and repeatedly attempts to import limitations into the claims that it should have explicitly included if that is what it really meant to say. Because patent claims serve a public-notice function—setting limits on the right to exclude—courts should not redraft claims to sustain their validity or make them operable. Moreover, courts should not read limitations from a patent's written description into its claims. Because Watson's proposed definitions adhere to these principles and Unimed's do not, this Court should accept Watson's definitions and reject Unimed's.

The accompanying appendix includes the patent in suit and the other exhibits mentioned below.  For convenient reference, the pages have been numbered, with "WA" used as a prefix.  The entire patent specification and claims appear as Ex. 1.  The claims alone—with the disputed language highlighted in yellow—appear as Ex. 2.

## BACKGROUND

Procedural Background

In May 2003, Watson Pharmaceuticals, Inc., through its wholly owned subsidiary, Watson Laboratories, Inc. (collectively "Watson"), submitted ANDA No. 76-737 to obtain FDA approval to market a generic testosterone gel.  In August 2003, Unimed Pharmaceuticals, Inc. and Laboratories Besins Iscovesco (collectively "Unimed") filed suit against Watson, alleging that Watson's proposed product will infringe U.S. Patent No. 6,503,894 ("the '894 patent").  The parties have completed fact and expert discovery.

Watson submitted its ANDA to the FDA pursuant to procedures established by the Hatch-Waxman Act.[1]  Because Watson noted in its ANDA that the '894

---

[1]  The Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355 (1994)

#1298510 v1 - Watson's Claim Constr Brief

patent is invalid and/or not infringed, Unimed, simply by filing suit, invoked a provision of the Act that prohibits the FDA from approving Watson's ANDA for a period of 30 months.  21 U.S.C. § 355(j)(5)(B)(iii).  The 30-month stay of FDA approval has been likened to an injunction because the FDA may not approve the ANDA—and the applicant may not lawfully market its generic product—during that time.  See Bristol-Myers Squibb Co. v. Royce Lab., Inc., 69 F.3d 1130, 1131-32 (Fed. Cir. 1995).  Unlike an injunction, however, no substantive or procedural safeguards act to curb abuse.  For instance, the ANDA applicant has no right to a hearing, an interlocutory appeal, or security, as it would with a preliminary injunction.  See 28 U.S.C. § 1292(a)(1); Fed. R. Civ. P. 65.  The FDA may, however, approve an ANDA before the 30-month period expires if a court decides that the patent is invalid or not infringed.  21 U.S.C. § 355(j)(5)(B)(iii)(I).  In sum, Watson seeks to make a generic testosterone gel available to the public, and Unimed, by filing this suit, prevented Watson from doing so.

Factual Background

Testosterone—the major circulating androgen in men—affects the development and maintenance of secondary sex characteristics.  (Ex. 1, col. 1, ll. 1,

---

and 35 U.S.C. § 271(d)-(h) (1995)).  That legislation is often called the Hatch-Waxman Act, and sometimes called the Waxman-Hatch Act.

12, 30-31 [WA51])  Normal adult males have serum testosterone levels between approximately 300 and 1050 ng/dL.  (Ex. 1, col. 2, Table 1, l. 10 [WA51])  Male "hypogonadism" results in serum testosterone levels below the normal range, as do a variety of other diseases and disorders.  (Ex. 1, col. 2, ll. 30-33 [WA51])

Testosterone has been administered to men since the 1940s.  (Ex. 1, col. 4, ll. 7-50 [WA52])  For many years, various methods of delivering testosterone have been available.  These methods include intramuscular injections, oral replacement, subdermal implants, and transdermal patches.  (Ex. 1, col. 3, ll. 29-31 [WA52]) Subdermal implants have been used as a method of testosterone replacement since the 1940s.  (Ex. 1, col. 4, ll. 8-9 [WA52])  Since the 1950s, researchers have injected testosterone in various forms to increase serum testosterone levels in men. (Ex. 1, col. 4, ll. 51-58 [WA52])  In the 1970s, researchers began using oral and sublingual (or buccal) preparations of androgens (such as 17α-methyl-testosterone and testosterone undecanoate) as a means for testosterone replacement.  (Ex. 1, col. 5, ll. 22-25 [WA53])  Researchers have also used sublingual administration of testosterone-hydroxypropyl-beta-cyclodextrin inclusion complexes.  (Ex. 1, col. 5, ll. 25-28 [WA53])  The oral, sublingual, and buccal delivery mechanisms have all successfully increased serum testosterone levels in men.  (Ex. 1, col. 5, ll. 35-53 [WA53])

More recent testosterone delivery systems have involved transdermal patches containing testosterone in a gel.  (Ex. 1, col. 5, ll. 55-56 [WA53])  In the 1990's, three testosterone patches were approved and marketed in the United States: Testoderm®, Testoderm® TTS, and Watson's Androderm®.  (Ex. 1, col. 5, ll. 56-58 [WA53])  The transdermal patches pioneered across-the-skin delivery of testosterone and offer a pharmacokinetic profile that demonstrates successful achievement and substantial maintenance of serum testosterone levels in the normal range.  (Ex. 18 [WA3244-45]; Ex. 20 [WA3248-51])  In the past few years, gels that provide testosterone by across-the-skin delivery were also marketed in the United States and Europe.  (Ex. 16 [WA3239-41]; Ex. 17 [WA3243]; Ex. 19 [WA3246-47])  These include Unimed's AndroGel® and Auxilium Pharmaceutical's Testim®.  (Ex. 17 [WA3243])  Testim® gel competes with AndroGel®.

Testosterone products have been prescribed to treat a variety of conditions and disorders.  Those ailments include delayed sexual development and puberty, transsexualism, frigidity and impotence, artificial menopause, sexual dysfunction–female, rheumatoid arthritis, osteoporosis, infertility–male, malaise and fatigue, alopecia, vaginitis and vulvovaginitis, ovarian failure, and pituitary dwarfism. (Ex. 15 [WA3232-38])

#1298510 v1 - Watson's Claim Constr Brief

The '894 patent claims concern (i) pharmaceutical compositions containing testosterone, (ii) pharmaceutical testosterone compositions in unit-dose or multiple-dose packets, and (iii) methods of achieving specified serum testosterone levels using pharmaceutical compositions containing testosterone.  (Ex. 2, col. 49, l. 59 to col. 52, l. 59 [WA79-82])

Drafting and Prosecution of the '894 Patent

The '894 patent issued on January 7, 2003 and identifies Unimed as the assignee.  Unimed's trial counsel—the Mayer, Brown firm—drafted and prosecuted the application that resulted in the patent.  After the patent issued—and after Watson submitted its ANDA to the FDA—Unimed sought a certificate of correction from the Patent Office to change the scope of claims 1, 9, 10, and 18.  In particular, the certificate of correction added "0.1 N" before "sodium hydroxide" in claims 1, 9, 10, and 18.

Watson believes the certificate of correction was obtained improperly and that the language of claims 1, 9, 10, and 18 as issued should control.  But because the propriety of the certificate of correction is not yet before the Court for decision, we address below the construction of the "sodium hydroxide" limitation both as issued (Section II.I) and as "corrected" (Section II.J).  Because the Federal Circuit

reviews claim construction <u>de novo</u>, this Court should construe both versions of the "sodium hydroxide" limitation.

<u>The Task Before the Court</u>

The parties have agreed that 25 claim terms or phrases require construction. Therefore, this Court should decide what they mean as a matter of law.

**ARGUMENT**

I.   <u>Claim-Construction Principles</u>

Because patent claims define the invention and delimit the right to exclude, a district court construes patent claims as a matter of law to determine their meaning and scope.  <u>Markman v. Westview Instrs., Inc.</u>, 52 F.3d 967, 976, 980 (Fed. Cir. 1995) (en banc), <u>aff'd</u> 517 U.S. 370 (1996); <u>Cybor Corp. v. FAS Techs., Inc.</u>, 138 F.3d 1448, 1455 (Fed. Cir. 1998) (en banc).

In <u>Phillips v. AWH Corp.</u>, Nos. 03-1269, -1286, 2005 WL 1620331 (Fed. Cir. July 12, 2005), the Federal Circuit, sitting en banc, recently discussed claim-construction principles in detail and provided guidance for district courts to follow when construing claims.  Among other things, the Federal Circuit indicated that it adheres to the approach to claim construction that it outlined in <u>Markman</u>, in <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576 (Fed. Cir. 1996), and in <u>Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.</u>, 381 F.3d 1111 (Fed.

– 7 –

Cir. 2004).  Phillips, 2005 WL 1620331, at *4.  Also, it expressly left undisturbed its prior en banc decision in Cybor.  Id. at *20.

A district court should construe claim language to discern the meaning it would have to a person of ordinary skill in the art at the time of the invention. Innova, 381 F.3d at 1116.  Broadly speaking, guidance as to the meaning of claim language comes from two sources: intrinsic evidence and extrinsic evidence. Vitronics, 90 F.3d at 1581-83.  The intrinsic evidence consists of two components: the patent and its prosecution history.  Id. at 1582.  A patent contains two parts: first, the drawings (if any) and the text forming the patent's body, called the written description; second, the claims.  Although a patent's specification includes both the written description and the claims, the word "specification" often—used colloquially—refers to the patent's body other than the claims.  See In re Dossel, 115 F.3d 942, 944-45 (Fed. Cir. 1997); 35 U.S.C. § 112, ¶¶ 1-2.  The prosecution history—the rest of the intrinsic evidence—contains the record of the proceedings before the Patent Office and includes the prior art cited during examination. Phillips, 2005 WL 1620331, at *9; Vitronics, 90 F.3d at 1582.  Extrinsic evidence consists of all evidence external to the patent and its prosecution history, such as dictionaries, treatises, inventor testimony, and expert testimony.  Markman, 52 F.3d at 980.

Patent claims typically include three sections: first, a preamble, which generally sets out the context for the type of invention claimed; second, a transition, which often uses the words "comprising" or "consisting of" to introduce the elements of the claim; third, one or more elements in the body of the claim, also called "limitations," that define the scope of the claim by, for example, its components, ingredients, or steps.  (Ex. 32, <u>Cases & Materials on Patent Law</u> (2d Ed. 2003), by Martin J. Adelman et al., at 541-43 [WA3451-53])  Patent claims may be independent or dependent.  An independent claim by itself defines an invention and does not refer to another claim.  A dependent claim refers to and includes all the limitations of the associated independent claim.  37 C.F.R. § 1.75(c).

A patent's claims define the invention and the patentee's right to exclude. <u>Innova</u>, 381 F.3d at 1115.  Accordingly, a district court should look to the words of the claims themselves to ascertain the scope of the patented invention.  <u>Vitronics</u>, 90 F.3d at 1582.  And a court should generally assign claim language the ordinary and customary meaning it would have to a person of ordinary skill in the art at the time of the invention, i.e., as of the effective filing date of the patent application. <u>Phillips</u>, 2005 WL 1620331, at *5; <u>see</u> <u>Housey Pharms., Inc. v. AstraZeneca UK Ltd.</u>, 366 F.3d 1348, 1352 (Fed. Cir. 2004).

In construing claims, a court should consider the other claims in the same patent, whether or not the patentee asserts them. <u>Vitronics</u>, 90 F.3d at 1582; <u>see</u> <u>Phillips</u>, 2005 WL 1620331, at *7. Under the doctrine of claim differentiation, the presence of a dependent claim that adds a particular limitation to an independent claim raises a presumption that the independent claim lacks the dependent claim's particular limitation. <u>Liebel-Flarsheim Co. v. Medrad, Inc.</u>, 358 F.3d 898, 910 (Fed. Cir. 2004); <u>see</u> <u>Phillips</u>, 2005 WL 1620331, at *7. Absent persuasive evidence that a dependent claim should be regarded as redundant with an independent claim, a court should preserve a difference in their meaning and scope. <u>See, e.g.</u>, <u>Comark Communs., Inc. v. Harris Corp.</u>, 156 F.3d 1182, 1187 (Fed. Cir. 1998).

Claim construction requires examination of the patent's written description. <u>Phonometrics, Inc. v. N. Telecom Inc.</u>, 133 F.3d 1459, 1464 (Fed. Cir. 1998). The ordinary meaning of claim language is the meaning it would have to those skilled in the art after reading the entire patent, including the written description. <u>Phillips</u>, 2005 WL 1620331, at *5.

While the written description should be considered, "it is improper to read limitations from the written description into a claim." <u>Wenger Mfg., Inc. v.</u> <u>Coating Mach. Sys., Inc.</u>, 239 F.3d 1225, 1237 (Fed. Cir. 2001). This has long

been the law.  Years ago, the Supreme Court held that "the claims of the patent, not

its specifications, measure the invention."  See Smith v. Snow, 294 U.S. 1, 11

(1935) (reversing the improper use of language from a patent's written description

to limit the patent's claims).  More recently, the Federal Circuit reiterated that the

language in the claims, not the written description, defines the limits of the

patentee's right to exclude.  Markman, 52 F.3d at 980.  For this reason, the Federal

Circuit in Phillips again warned against importing limitations from the written

description into the claims.  Phillips, 2005 WL 1620331, at *16.

Only where the written description makes clear that the invention excludes a

particular feature should a court deem that feature outside the scope of the claims.

Microsoft Corp. v. Multi-Tech. Sys., Inc., 357 F.3d 1340, 1347 (Fed. Cir. 2004).

Thus, a court should exercise caution when reviewing the written description

because the written description's preferred embodiments or examples usually do

not limit claim scope.  See, e.g., Transmatic, Inc. v. Gulton Indus., Inc., 53 F.3d

1270, 1277-78 (Fed. Cir. 1995).  In Phillips, the Federal Circuit repeated its

admonition against restricting claim scope to a patent's preferred embodiments or

examples.  2005 WL 1620331, at *16.  Focusing on an extremely narrow written

description as an example, the court said, "[W]e have expressly rejected the

contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." Id. at *16.

A patentee may act as a lexicographer by clearly setting forth in the written description an explicit definition for a claim term. See, e.g., Jack Guttman, Inc. v. Kopykake Enters., Inc., 302 F.3d 1352, 1360 (Fed. Cir. 2002). But the patentee must demonstrate an intent to deviate from a term's ordinary and customary meaning by expressing a different meaning in the written description "with reasonable clarity, deliberateness, and precision." See, e.g., Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1325, 1327 (Fed. Cir. 2002). Vague or ambiguous statements in the written description do not suffice to alter a term's ordinary meaning. W.E. Hall Co. v. Atlanta Corrugating, LLC, 370 F.3d 1343, 1353 (Fed. Cir. 2004).

Claim construction requires consideration of the patent's prosecution history. Markman, 52 F.3d at 980. The prosecution history limits the interpretation of claims so as to exclude any interpretation that was disavowed during prosecution in order to obtain claim allowance. Teleflex, 299 F.3d at 1326. A narrowing of claim scope during prosecution occurs where the patentee characterized the invention using words or expressions of manifest exclusion or restriction. Id. But a court should not narrow claim scope unless the patentee's

prosecution statements clearly and unmistakably surrendered claimed subject matter.  <u>Middleton, Inc. v. Minn. Mining & Mfg. Co.</u>, 311 F.3d 1384, 1388 (Fed. Cir. 2002).

The prosecution history for a related patent application (e.g., continuation, continuation-in-part, and divisional applications) may also supply evidence of the meaning of disputed claim language.  <u>See, e.g.</u>, <u>Jonsson v. Stanley Works</u>, 903 F.2d 812, 818-19 (Fed. Cir. 1990).  Even a related patent application filed after patent issuance may provide evidence for claim-construction purposes.  <u>See</u> <u>Microsoft</u>, 357 F.2d at 1349-50.

A district court may consider extrinsic evidence to assist it in understanding scientific principles and the technology at the time of the invention.  <u>See</u> <u>Markman</u>, 52 F.3d at 980.  And a court may employ extrinsic evidence for claim-construction purposes.  <u>Phillips</u>, 2005 WL 1620331, at *10.  But a court should not use extrinsic evidence to vary or contradict the meaning of claim language where the intrinsic evidence determines the meaning.  <u>Vitronics</u>, 90 F.3d at 1583-85.

Because dictionaries and treatises—although categorized as extrinsic evidence—provide insight into the ordinary and customary meaning of claim language, the Federal Circuit noted that they are "often useful" in claim interpretation.  <u>Phillips</u>, 2005 WL 1620331, at *15.  In <u>Phillips</u>, the Federal Circuit

#1298510 v1 - Watson's Claim Constr Brief

confirmed that a district court may freely consult a dictionary "at any time" in order to understand the technology or construe claim language as long as the dictionary definition does not contradict the definition derived from the intrinsic evidence.  Id.

Summarizing its instruction in Phillips, the Federal Circuit noted that there is no "magic formula" for conducting claim construction and instead identified a hierarchy for using intrinsic and extrinsic evidence to discern the meaning of claim language.  2005 WL 1620331, at *16.   It said that "the claims themselves provide substantial guidance…."  Id. at 7.  It then stated that a court may "rely heavily on the written description for guidance as to the meaning of the claims."  Id. at 9.  It later indicated that the prosecution history may be "less useful" for claim-construction purposes than the written description.  Id.  It then explained that extrinsic evidence is "less significant than the intrinsic record for determining 'the legally operative meaning of the claim language.'"  Id. at 10 (quoting C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 862 (Fed. Cir. 2004)).

II.    The Court Should Adopt Watson's Proposed Claim
Constructions Because They Comport with the Intrinsic
Evidence, While Unimed's Do Not

A.    The Phrase "Pharmaceutical Composition" in Claims 1, 10, 18, and 31

The phrase "pharmaceutical composition" has its conventional meaning and means "a composition that affects well-being." The '894 patent does not define expressly or by implication the phrase "pharmaceutical composition." In these instances, dictionary definitions are often useful to assist in understanding the conventional meaning of the words. Merriam Webster's Collegiate Dictionary (10th Ed. 1994)("Webster's 10th"), at 870-71, defines "pharmaceutical" as "of, relating to, or engaged in pharmacy," where "pharmacy" means "the art, practice, or profession of preparing, preserving, compounding, and dispensing medical drugs." (Ex. 29 at 870, #1 [WA3431], 871, #1 [WA3432]). Also, Webster's 10th defines "medical" as "of, relating to, or concerned with physicians or the practice of medicine," where "medicine" means "something that affects well-being." (Ex. 29 at 722, #1, 1b [WA3430]) Thus, the phrase "pharmaceutical composition" means "a composition that affects well-being."

Unimed, however, attempts to import additional limitations into the definition of "pharmaceutical composition" by defining the term to require the

#1298510 v1 - Watson's Claim Constr Brief

composition to be "a stable hydroalcoholic testosterone gel formulation that is safe and effective."  (Ex. 33, 4/25/05 Barr Report, ¶ 26 [WA3462])

Under Unimed's proposed construction of "pharmaceutical composition," the preamble in claims 1, 10, 18, and 31 would have the same meaning as the preamble in claim 9.  Claims 1, 10, 18, and 31 expressly recite a "pharmaceutical composition," not a "hydroalcoholic gel."  Only claim 9 expressly recites a "hydroalcoholic gel."  (Ex. 2, col. 49, l. 59 to col. 50, l. 2, col. 50, ll. 27-35, col. 50, ll. 38-47, col. 51, ll. 1-12, col. 52, ll. 3-14 [WA79-82])  None of the claims in the patent require a "stable" or "safe" or "effective" product.  Had Unimed meant the "pharmaceutical composition" to mean "hydroalcoholic gel," as it now says, it could have—and should have—used the phrase "hydroalcoholic gel."  Thus, the phrase "pharmaceutical composition" does not mean "hydroalcoholic gel" because a court should generally accord different phrases different scope and because different language connotes different meaning.  See CAE Screenplates Inc. v. Heinrich Fiedler GmbH, 224 F.3d 1308, 1317 (Fed. Cir. 2000).

The written description in the patent uses "pharmaceutical composition" as a generic expression that encompasses a "hydroalcoholic gel," which is a specific type (or subset) of pharmaceutical composition.  (Ex. 1, col. 1, ll. 6-8, col. 11, ll. 54-57 [WA51-56])  It states, "The present invention is directed to a

pharmaceutical composition comprising testosterone in a gel formulation…."
(Ex. 1, col. 1, ll. 6-7 [WA51])  It also states, "The present invention is directed to a
pharmaceutical composition for percutaneous administration comprising at least
one active pharmaceutical ingredient (e.g., testosterone) in a hydroalcoholic gel."
(Ex. 1, col. 11, ll. 54-57 [WA56])

In addition, the phrase "pharmaceutical composition" does not necessarily
mean a "gel" because dependent claims 7, 13, 24, and 37 add the limitation "gel"
to claims 1, 10, 18, and 31, respectively.  (Ex. 2, col. 50, ll. 22-23, 53-54, col. 51,
ll. 37-38, col. 52, ll. 38-39 [WA80-82])  "The presence of a dependent claim that
adds a particular limitation gives rise to a presumption that the limitation in
question is not present in the independent claim."  Phillips, 2005 WL 1620331,
at *7.  Thus, "pharmaceutical composition" does not necessarily mean "gel."

"Pharmaceutical composition" also does not necessarily mean "gel" because
claims 1, 10, 18, and 31 merely require a "gelling agent."  The "gelling agent"
(defined below in Section II.K) recited in these claims does not always form a gel.
As Unimed agrees, carbomers function as suitable gelling agents.  (Ex. 34, 5/13/05
Bowman Report, ¶¶ 17-18 [WA3503])  Many liquid or semisolid pharmaceutical
formulations employ carbomers as suspending or viscosity-increasing agents, that
is, as thickeners.  (Ex. 25, Handbook of Pharmaceutical Excipients (3rd Ed. 2000),

at 71 [WA3320])  Carbomers can form creams, gels, ointments, lotions, and

shampoos for use in topical preparations.  (Ex. 25, at 71 [WA3320]; Ex. 22,

Carbopol® ETD Polymers: Formulation Tips, Noveon (2002), at 2 [WA3293])

Creams, gels, and ointments are all semisolids.  (Ex. 27 at 2217-19 [WA3395-97])

Thus, the phrase "pharmaceutical composition" in claims 1, 10, 18, and 31 is not

properly defined as a "gel."

Furthermore, Unimed's construction improperly attempts to impose

requirements for stability, safety, and efficacy on "pharmaceutical composition."

Stability, safety, and efficacy for treating a particular disorder are not recited

anywhere in the '894 patent claims.  Claims 1 and 10 do not include any stability,

safety, or efficacy requirements.  Claims 18 and 31 recite an efficacy parameter but

only insofar as they specify serum testosterone levels within certain ranges.  (Ex. 2,

col. 51, ll. 13-19, col. 52, ll. 15-22 [WA81-82])  Claims 18 and 31, however, do

not specify any particular disorder.

Moreover, in claims 18 and 31, the context in which the phrase

"pharmaceutical composition" is used is highly instructive.  Claims 18 and 31

separately describe an efficacy parameter in conjunction with the phrase

"pharmaceutical composition," i.e., serum testosterone levels within certain ranges.

(Ex. 2, col. 51, ll. 13-19, col. 52, ll. 15-22 [WA81-82])  This suggests that the

phrase "pharmaceutical composition," on its own, does not imply anything about effectiveness.  Again, had Unimed meant to include "effective" in every claim where "pharmaceutical composition" is used, it could have—and should have—said so.

Stability is not referenced in the '894 patent claims or written description, and nothing in the prosecution history indicates that the applicants or the examiner understood the phrase "pharmaceutical composition" as Unimed now contends.  To the contrary, given the broader scope of the claims in the application as originally filed—which specifically recited safety and efficacy parameters identified in the written description—and in view of the detailed clinical data that the written description provides (with no corresponding reference in the claims), the phrase "pharmaceutical composition" does not require stability, safety, or efficacy.

The prosecution history also supports a definition of the phrase "pharmaceutical composition" without the additional limitations of stability, safety, or efficacy now advanced by Unimed.  The prosecution history demonstrates that Unimed disclaimed all stability, safety, or efficacy parameters mentioned in the written description except for serum testosterone levels.

In particular, the original application included claims directed to many of the safety and efficacy parameters discussed in the written description.  (Ex. 3, 8/30/00

New Application Transmittal, at 2-4, claims 19-30 [WA324-26])  Application

claims 19-30 recited safety and efficacy parameters, such as increased DHT

concentration, increased bone mineral density, increased libido, improved sexual

performance, improved mood, increased muscle strength, improved body

composition, and negligible skin irritation.  (Ex. 3, 8/30/00 New Application

Transmittal, at 2-4, claims 19-30 [WA324-26])  But Unimed withdrew from

prosecution all claims directed to these safety and efficacy parameters.  (Ex. 3,

12/21/01 Amendment, at 1 [WA480])  Instead, Unimed separately filed for

divisional, continuation, and continuation-in-part applications directed to the safety

and efficacy parameters mentioned above.  (Ex. 4, U.S.S.N. 09/703,753 [WA935-

40]; Ex. 5, U.S.S.N. 10/033,101 [WA1082-90]; Ex. 6, U.S.S.N. 10/046,454

[WA1218-25]; Ex. 7, 10/098,232 [WA1465-71]; Ex. 8, 10/273,484 [WA1566-72];

Ex. 9, 10/248,267 [WA2286-93]; Ex. 10, 10/787,071 [WA2529-34]; Ex. 11,

10/825,540 [WA2637-44]; Ex. 12, 10/828,678 [WA2771-79]; Ex. 13, 10/829,618

[WA2998-3004]; Ex. 14, 10/867,445 [WA3176-86])

Unimed also contends that the phrase "pharmaceutical composition" means

a composition used in treating hypogonadism.  Although the written description

discusses the treatment of hypogonadism as an example, it also defines treatment

broadly to refer to any "human condition or disease."  (Ex. 1, col. 13, l. 65 to

col. 14, l. 6 [WA57])  In addition to the treatment of testosterone disorders in

humans, the written description also refers to the treatment of testosterone

disorders in "humans and animals of any kind."  (Ex. 1, col. 14, ll. 7-12 [WA57])

On top of that, the prosecution history demonstrates that Unimed intended

that the claims should have broader applicability than for hypogonadal men.  As

originally filed, application claims 11-16 and 18-31 included claims specifically

directed to treating hypogonadism.  (Ex. 3, 8/30/00 New Application Transmittal,

at 2-4, claims 11-16, 18-31 [WA324-26])  Application claims 32-34 included the

limitation of administering a transdermal testosterone gel to hypogonadal men.

(Ex. 3, 8/30/00 New Application Transmittal, at 2-4, claims 11-16, 18-31 [WA324-

26])  Unimed, however, withdrew application claims 11-16 and 18-34 from

prosecution and only prosecuted the claims not reciting the treatment of

hypogonadism or administration to hypogonadal men.  (Ex. 3, 12/21/01

Amendment, at 1 [WA480])  Instead, Unimed separately filed for continuation,

continuation-in-part, and divisional applications directed to treatment of

hypogonadism.  (Ex. 5, U.S.S.N. 10/033,101 [WA1082-90]; Ex. 6, 10/046,454

[WA1218-25]; Ex. 7, U.S.S.N. 10/098,232 [WA1465-71]; Ex. 8, 10/273,484

[WA1566-72]; Ex. 9, U.S.S.N. 10/248,267 [WA2286-93]; Ex. 10, 10/787,071

[WA2529-34]; Ex. 11, 10/825,540 [WA2637-44]; Ex. 12 10/828,678 [WA2771-

79]; Ex. 14, 10/867,445 [WA3176-86])  Thus, the phrase "pharmaceutical composition" in claims 1, 10, 18, and 31 of the '894 patent does not refer to the treatment of hypogonadism.

Unimed, therefore, improperly attempts to limit claim scope to the preferred embodiments and examples disclosed in the '894 patent.  That attempt contravenes settled law.  <u>See, e.g.</u>, <u>Phillips</u>, 2005 WL 1620331, at *16.  Furthermore, the prosecution history shows the impropriety of that attempt.

What's more, that attempt conflicts with the '894 patent's express provisions.  It states, "The present invention is further illustrated by the following examples, which should not be construed as limiting in any way."  (Ex. 1, col. 14, ll. 14-16 [WA57])  It also states that "Although the invention has been described with respect to specific embodiments and examples, it should be appreciated that other embodiments utilizing the concept of the present invention are possible without departing from the scope of the invention. Th [*sic*] present invention is defined by the claimed elements, and any and all modifications, variations, or equivalents that fall within the true spirit and scope of the underlying principles."  (Ex. 1, col. 49, ll. 50-57 [WA75])  Accordingly, the Court should reject Unimed's definition and adopt Watson's.

B.    The Term "Hydroalcoholic" in Claim 9

The term "hydroalcoholic" means a combination of water and alcohol.  The
meaning of "hydroalcoholic" is apparent from the claim language.  Claim 9
explicitly recites the ingredient of "water in an amount sufficient to make the
formulation 100%."  (Ex. 2, col. 50, ll. 34-35 [WA80])  It also explicitly recites an
amount of "ethanol"—an alcohol—in the claimed formulation.  (Ex. 2, col. 50, l.
30 [WA80])  Webster's 10th also supports the definition of the term
"hydroalcoholic" as articulated above.  The term "hydroalcoholic" is derived from
"hydro" and "alcoholic."  Webster's 10th defines "hydro" as "water" and defines
"alcoholic" as "containing alcohol."  (Ex. 29 at 27 #1b [WA3419], 567 #1a
[WA3426])  Thus, the phrase "hydroalcoholic" means a combination of water and
alcohol.

C.    The Phrase "Hydroalcoholic Gel Formulation" in Claim 9

The phrase "hydroalcoholic gel formulation" has its ordinary meaning and
means "a formulation containing a combination of water and alcohol in a semisolid
system consisting of either suspensions made up of small inorganic particles or
large organic molecules interpenetrated by a liquid."  (Ex. 24, Remington's: The
Science & Practice of Pharmacy (20th Ed. 2000) ("Remington's"), at 745-47
[WA3313-15])  The patent's written description does not define expressly or by

implication the phrase "hydroalcoholic gel formulation."  In these instances, a

dictionary is often useful to assist in understanding the common meaning of the

words.  As discussed above, the adjective "hydroalcoholic" means a combination

of alcohol and water.  See supra § II.B, p. 23.  Remington's defines "gel"

according to the United States Pharmacopeia/National Formulary ("USP/NF")

definition: a "semisolid system[] consisting of either suspensions made up of small

inorganic particles or large organic molecules interpenetrated by a liquid."  (Ex. 24

at 745 [WA3313])  Gels may be made from large organic molecules like

carbomers.  (Ex. 24 at 745 [WA3313])  Thus, the phrase "hydroalcoholic gel

formulation" means "a formulation containing a combination of water and alcohol

in a semisolid system consisting of either suspensions made up of small inorganic

particles or large organic molecules interpenetrated by a liquid."

Unimed defines "hydroalcoholic gel formulation" like it does

"pharmaceutical composition" and attempts to import the requirement that

"hydroalcoholic gel formulation" be "stable, safe, and effective."  In essence,

Unimed asserts that "hydroalcoholic gel formulation" means the same as

"pharmaceutical composition."  But as discussed earlier, a court should generally

accord different phrases different scope because different language connotes

#1298510 v1 - Watson's Claim Constr Brief

different meaning.  See CAE Screenplates, 224 F.3d at 1317.  Unimed advances

inadequate grounds for disregarding this principle.

D.      The Phrase "Consisting Essentially Of" in Claims 1, 9, 10, 18, and 31

         In every one of the 42 claims in the '894 patent, Unimed employs the

transition phrase "consisting essentially of" to define the claimed product.  This

choice profoundly affects what the claims do—and do not—mean.

         The different transitions used in patent claims denote differences in claim

scope.  The transition word "comprising" means "including the following elements

but not excluding others."  (Ex. 31, Landis on Mechanics of Patent Claim Drafting

(4th Ed. 2002), by Robert C. Faber ("Landis"), § 7 at II-12 and II-13 [WA3443-45])

The transition phrase "consisting of" means that the claim covers products

containing the specified ingredients and excludes products with more than traces of

other ingredients.  (Ex. 31, Landis, § 8 at II-15 [WA3446])  And the transition

phrase "consisting essentially of" occupies a middle ground between "comprising"

and "consisting of."  (Ex. 31, Landis, § 8 at II-16 [WA3447]); PPG Indus. v.

Guardian Indus. Corp., 156 F.3d 1351, 1354 (Fed. Cir. 1998).  In particular,

"consisting essentially of" means that the claim covers products containing the

specified ingredients as well as products containing unspecified ingredients

provided that the unspecified ingredients do not "materially affect the basic and

novel characteristics of the claimed invention."  (Ex. 31, <u>Landis</u>, § 8 at II-16 and

II-17 [WA3447-48]); <u>PPG Indus.</u>, 156 F.3d at 1354.  Determining whether an

unspecified ingredient will materially affect an invention's basic and novel

properties is a factual inquiry.  <u>PPG Indus.</u>, 156 F.3d at 1355.

Here, the "basic and novel properties" of the product—i.e., the invention

defined by the "consisting essentially of" language—are the physical properties of

the product, e.g., viscosity, and its drug-delivery characteristics.  For example, the

product's drug-delivery characteristics determine whether sufficient amounts of the

active ingredient can be supplied transdermally to achieve particular serum

testosterone levels.  (Ex. 1, col. 8, ll. 3-4, col. 13, ll. 45-48, col. 14, ll. 28-31

[WA54-57])  The written description, among other things, contrasts the serum

testosterone levels achieved with AndroGel® to those achieved with the prior art.

(Ex. 1, col. 21, ll. 19-29 [WA61])  In addition, the prosecution history

demonstrates that Unimed viewed the product's drug-delivery characteristics as

significant.  In urging patentability, for instance, Unimed relied upon the product's

"relatively constant" serum testosterone levels and pointed to its unique

pharmacokinetic profile.  (Ex. 3, 10/29/01 Amendment, at 14-15 [WA442-43])

Accordingly, the "basic and novel properties" defined by the "consisting

#1298510 v1 - Watson's Claim Constr Brief

essentially of" language are the physical properties of the product and its drug-delivery characteristics.

E.     The Term "Isopropanol" in Claims 1, 18, and 31

The term "isopropanol" means isopropyl alcohol containing not less than 99.0 percent $C_3H_8O$.  The written description does not define expressly or by implication the term "isopropanol."  In these instances, a dictionary is often useful to assist in understanding the common meaning of the word.  The terms "isopropanol" and "isopropyl alcohol" are synonymous and refer to a commonly used alcohol in the pharmaceutical and chemical industry.  (Ex. 25 at 263 [WA3340A])  Webster's 10th defines "isopropyl alcohol" as "a volatile flammable alcohol $C_3H_8O$ used especially as a solvent and rubbing alcohol."  (Ex. 29 at 622 [WA3427])  Similarly, the USP/NF monograph for isopropanol defines the term as "isopropyl alcohol contain[ing] not less than 99.0 percent $C_3H_8O$."  (Ex. 27 at 958 [WA3390])  The ordinary meaning of "isopropanol" comports with the use of that term in the written description.  (Ex. 1, col. 12, ll. 17-19 [WA56])  Thus, the term "isopropanol" refers to and means isopropyl alcohol containing not less than 99.0 percent $C_3H_8O$.

F.     The Term "Ethanol" in Claims 1, 9, 10, 18, 22, and 31

The term "ethanol" means the pure chemical, $C_2H_5OH$.  Ethanol is a commonly used alcohol in pharmaceutical formulations and cosmetics.  The written description does not define expressly or by implication the term "ethanol" so a dictionary can aid in understanding the common meaning of the word.  Webster's 10th defines "ethanol" as "a colorless volatile flammable liquid $C_2H_5OH$ that is the intoxicating agent in liquors and is also used as a solvent."  (Ex. 29 at 398 [WA3425])  There is no USP/NF monograph for "ethanol."

The written description's use of the term "ethanol" aligns with the ordinary meaning of "ethanol" explained above.  In particular, Table 5 in the written description distinguishes non-pure ethanol from pure ethanol.  Table 5 refers to non-pure ethanol as "ethanol (95% w/w)" and refers to pure ethanol as simply "ethanol."  (Ex. 1, col. 13, ll. 22-35 [WA57])  Claims 1, 9, 10, 18, 22, and 31 use the word "ethanol" and do not refer to "ethanol (95% w/w)."  Thus, the term "ethanol" means the pure chemical, $C_2H_5OH$.

G.     The Term "Sodium Hydroxide" in Claims 1, 9, 10, and 18

The term "sodium hydroxide" means the solid material with the chemical formula NaOH.  The written description does not expressly or implicitly define the term "sodium hydroxide."  In these instances, a dictionary is often useful to assist

– 28 –

in understanding the common meaning of the word.  The <u>USP/NF</u> monograph for sodium hydroxide describes this material as a solid.  (Ex. 27 at 2619 [WA3405]) <u>Remington's</u> describes it as "fused masses, small pellets, flakes, sticks, and other forms, hard and brittle."  (Ex. 24 at 1047 [WA3317])  The <u>Handbook of Pharmaceutical Excipients</u> also describes sodium hydroxide as "a white or nearly white fused mass…available in small pellets, flakes, sticks, and….It is hard and brittle and shows a crystalline fracture."  (Ex. 26 at 566 [WA3380])  These definitions show that "sodium hydroxide" ordinarily refers to a solid material with a particular chemical formula.

Unimed now attempts to define "sodium hydroxide" to mean a 0.1 N solution of sodium hydroxide because Table 5 in the '894 patent provides an example of a formulation containing a 0.1 N solution of sodium hydroxide.  "N" means normality and is defined as the number of equivalents of solute per liter of solution.  (Ex. 28, <u>Chemistry: The Central Science</u> (2nd Ed. 1981), at 348 [WA3413])  One equivalent of sodium hydroxide amounts to 40 g of sodium hydroxide.  Thus, a 1.0 N solution of sodium hydroxide is one in which 40 g of sodium hydroxide are dissolved in enough water to form one liter of solution.  A 0.1 N solution, then, is one in which 4 g of sodium hydroxide are dissolved in enough water to form one liter of solution.

#1298510 v1 - Watson's Claim Constr Brief

Contrary to Unimed's litigation-inspired assertion, the prosecution history demonstrates that Unimed intended to express the ranges of sodium hydroxide in the '894 patent claims in terms of solid sodium hydroxide.  In February 2002, Unimed filed a second supplemental amendment to its patent application.  (Ex. 3, 2/8/02 Supplemental Amendment C [WA496-541])  This amendment, among other things, changed all of the independent application claims but one (nos. 47, 61, 78, and 97 [new] but not 110 [new]) to recite ranges for sodium hydroxide, i.e., "about 1% to about 5%" and "about 1% to about 3%."  (Ex. 3, 2/8/02 Amendment, at 15-19 [WA510-14])  As support for these newly claimed ranges for sodium hydroxide, Unimed cited Table 5 in the written description and said, "Note that 4.72g of 0.1N NaOH = about 1.8g NaOH in 100g of gel, or about 1.8%."  (Ex. 3, 2/8/02 Amendment, at 26 [WA521])  Unimed's conversion of grams of 0.1 N sodium hydroxide to grams of solid sodium hydroxide shows that it intended to express the ranges of sodium hydroxide in the claims in terms of solid sodium hydroxide rather than a 0.1 N solution of sodium hydroxide.

Unimed further argues that one of ordinary skill in the art would recognize that 1% to 5% of solid sodium hydroxide in the claimed compositions would highly irritate or even burn the skin.  (Ex. 36, 5/13/05 Weiner Report, ¶ 7 [WA3583-84])  The Federal Circuit, however, construes a claim as written, not as

the patentee wishes it was written.  Chef Am., Inc. v. Lamb-Weston, Inc., 358 F.3d 1371, 1374 (Fed. Cir. 2004).  Even a nonsensical result that excludes the patent's preferred embodiments and examples does not require a court to redraft claims.  Id. The Federal Circuit has repeatedly and consistently recognized that courts may not redraft claims, whether to make them operable or to sustain their validity.  Id.

Thus, because the '894 patent specification does not define sodium hydroxide and the prosecution history of the '894 patent demonstrates that the inventors intended the term "sodium hydroxide" to refer to solid sodium hydroxide, the Court should reject Unimed's definition and accept Watson's.

H.     The Term "About" in the Context of the Formulation Constituents

The term "about" in the context of the formulation constituents allows for, at most, a variation of 10% by weight.[2]  (Ex. 21 at 5-6 [WA3259-60])  The written description does not define expressly or by implication the term "about."  In these instances, a dictionary is often useful to assist in understanding the common meaning of the word.  The dictionaries define the term "about" to allow for, at most, a 10% variation.  (Ex. 21 at 5-6 [WA3259-60])

---

[2] All of the independent claims use the phrase "weight to weight" to express the percentage of each component in the composition as a whole.  Therefore, it is

#1298510 v1 - Watson's Claim Constr Brief

The <u>USP/NF</u>, for example, typically allows for a 10% deviation for active ingredients.  (Ex. 37, 5/12/05 Zatz Report, at 30-31 [WA3648-49])  In addition, according to the FDA's <u>SUPAC-SS</u>[3] Guidance for Industry, up to a 5% variation of an inactive ingredient (called an "excipient") is "unlikely to have any detectable impact on the formulation quality and performance" while a 10% variation "could have a significant impact on formulation quality and performance."  (Ex. 21 at 5-6 [WA3259-60])  Although the <u>SUPAC-SS</u> guidance applies to deliberate changes in approved products, it shows the expectations for the impact of changes in formulation component concentrations.  Thus, the term "about" in the context of the formulation constituents allows for, at most, a 10% variation.  (Ex. 21 at 5-6 [WA3259-60])

---

undisputed that the phrase "weight to weight" means the weight of a given component relative to the weight of the entire composition.

[3] <u>Guidance for Industry, Nonsterile Semisolid Dosage Forms, Scale-Up and Postapproval Changes: Chemistry, Manufacturing, and Controls; In Vitro Release Testing and In Vivo Bioequivalence Documentation</u>, U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER) (May 1997) (Ex. 21 [WA3252-91])

I.      The "Sodium Hydroxide" Limitation in
        <u>Claims 1, 9, 10, and 18 as Issued</u>

    1.      The Phrase "About 1% to About 5% Sodium
            <u>Hydroxide" in Claims 1, 10, and 18 as Issued</u>

The phrase "about 1% to about 5% sodium hydroxide" in claims 1, 10, and

18 as issued means "0.9% to 5.5% solid sodium hydroxide."  The written

description does not expressly or implicitly define the phrase "about 1% to about

5% sodium hydroxide."  As discussed above, "about" allows for, at most, a 10%

variation and "sodium hydroxide" means the solid material with the chemical

formula NaOH.  <u>See</u> <u>supra</u> §§ II.G-II.H, pp. 28-32.  Therefore, the phrase "about

1% to about 5% sodium hydroxide" in claims 1, 10, and 18 as issued means "0.9%

to 5.5% solid sodium hydroxide."

    2.      The Phrase "About 1% to About 3% Sodium
            <u>Hydroxide" in Claim 9 as Issued</u>

The phrase "about 1% to about 3% sodium hydroxide" in claim 9 as issued

means "0.9% to 3.3% solid sodium hydroxide."   The same principles that apply to

the sodium hydroxide limitation in claims 1, 10, and 18 discussed above apply to

the sodium hydroxide limitation in claim 9.  In short, the word "about," when

referring to a constituent in a formulation, means ± 10%, while "sodium

hydroxide" refers to the solid material with the chemical formula NaOH.  <u>See</u>

<u>supra</u> §§ II.G-II.H, pp. 28-32.  Therefore, the phrase "about 1% to about 3%

#1298510 v1 - Watson's Claim Constr Brief

sodium hydroxide" in claim 9 as issued means "0.9% to 3.3% solid sodium

hydroxide."

J.     The "Sodium Hydroxide" Limitation in
       Claims 1, 9, 10, and 18 as "Corrected"

       1.     The Phrase "About 1% to About 5% 0.1 N Sodium
              Hydroxide" in Claims 1, 10, and 18 as "Corrected"

Unimed changed claims 1, 10, and 18 by obtaining a certificate of correction

from the Patent Office.  That certificate altered these claims by inserting "0.1 N"

before "sodium hydroxide."  (Ex. 1 [WA77-78])  Watson, however, maintains that

Unimed obtained that certificate in violation of the applicable statutory

requirements and intends to file a partial summary-judgment motion on the

question.

The phrase "about 1% to about 5% 0.1 N sodium hydroxide" itself means

"0.9% to 5.5% of a 0.1N solution of sodium hydroxide."  The written description

does not define expressly or by implication the phrase "about 1% to about 5% 0.1

N sodium hydroxide."  As explained above, the term "about" means at most, $\pm$

10%.  See supra § II.H, pp. 31-32.  Thus, the phrase "about 1% to about 5% 0.1 N

sodium hydroxide" in claims 1, 10, and 18 as "corrected" means "0.9% to 5.5% of

a 0.1 N solution of sodium hydroxide."

Moreover, claims 1, 10, and 18 as "corrected" are product claims (and not process claims or product-by-process claims) drawn to particular compositions containing "about 1% to about 5% 0.1 N sodium hydroxide." The phrase "about 1% to about 5% 0.1 N sodium hydroxide," therefore, is a recited component in a product, not simply a component used to make a product. See Exxon Chem. Patents, Inc. v. Lubrizol Corp., 64 F.3d 1553, 1557 (Fed. Cir. 1995). This means that the phrase "about 1% to about 5% 0.1 N sodium hydroxide" refers to the amount of a 0.1 N solution of sodium hydroxide contained in the final composition.

Unimed asserts that in most, if not all, cases the composition made with a gelling agent, like a carbomer, and a 0.1 N solution of sodium hydroxide will not result in a finished product that still includes a 0.1 N sodium-hydroxide solution due to neutralization. (Ex. 34, 5/13/05 Bowman Report, ¶ 21 [WA3505]) A carbomer is an acid that is neutralized by sodium hydroxide. (Ex. 34, 5/13/05 Bowman Report, ¶ 21 [WA3505]) Upon neutralization, carbomer and sodium hydroxide form a salt, which means that the solution of sodium hydroxide no longer exists in the finished product. (Ex. 34, 5/13/05 Bowman Report, ¶ 21 [WA3505]) Based on that, Unimed urges the Court to reject Watson's definition to the extent that it requires a 0.1 N solution of sodium hydroxide to be present in

the final composition.  But if Unimed had intended its claims to cover the weight

percent of solid sodium hydroxide present in the final composition, it had an

opportunity to say so when it prepared and submitted the certificate of correction.

In any event, if the Court declines to construe the "0.1 N sodium hydroxide"

limitation as Watson proposes, then the 0.1 N solution of sodium hydroxide recited

should be viewed as the normality of the sodium hydroxide with which the

composition must be made.  The only meaningful interpretation of including a

specific normality in the recitation of a composition, particularly in view of the

written description, is that the composition must be made with a sodium-hydroxide

solution of the recited normality.

The Federal Circuit has never embraced the concept of "immaterial"

limitations in patent claims.  See, e.g., Ashland Oil, Inc. v. Delta Resins & Refacs.,

Inc., 776 F.2d 281, 295 (Fed. Cir. 1985) ("Each element of the claim is material.").

Accordingly, the Court should not, as Unimed proposes, interpret the "0.1 N

sodium hydroxide" limitation to cover the infinite number of ways of achieving the

desired sodium hydroxide content.  (Ex. 35, 4/20/05 Weiner Report, ¶ 45

[WA3537-38])  To do so would ignore both the plain language of the claims and

Unimed's own showing that the sodium hydroxide content is achieved in a very

specific manner.  (Ex. 1, col. 13, l. 32 [WA57])  Unimed chose to revise the claims

to specify the normality of a sodium-hydroxide solution used to prepare the

composition disclosed in Table 5.  Thus, in the alternative, the phrase "about 1% to

about 5% 0.1 N sodium hydroxide" refers to the concentration of sodium

hydroxide that must be used to make the claimed compositions and does not refer

to the weight percentage of 0.1 N sodium hydroxide in a finished product.

> 2.     The Phrase "About 1% to About 3% 0.1 N
>        Sodium Hydroxide" in Claim 9 as "Corrected"

The phrase "about 1% to about 3% 0.1 N sodium hydroxide" in claim 9 as

changed by the certificate of correction means "0.9% to 3.3% of a 0.1N solution of

sodium hydroxide."  The written description does not define expressly or by

implication the phrase "about 1% to about 3% 0.1 N sodium hydroxide."  For the

reasons set forth above, the term "about" in this phrase allows for, at most, a 10%

variation.  See supra § II.H, pp. 31-32.  Thus, the phrase "about 1% to about 3%

0.1 N sodium hydroxide" in claim 9 as "corrected" means "0.9% to 3.3% of a 0.1

N solution of sodium hydroxide."

Unimed changed the "sodium hydroxide" limitation in claim 9 to recite "0.1

N" at the same time it changed the "sodium hydroxide" limitation in claims 1, 10,

and 18.  The same principles discussed above regarding the normality of a solution

apply to the "about 1% to about 3% 0.1 N sodium hydroxide" limitation in claim 9

as for the "about 1% to about 5% 0.1 N sodium hydroxide" limitation in claims 1,

#1298510 v1 - Watson's Claim Constr Brief

10, and 18.  See supra § II.J.1, pp. 34-37.  Thus, the "about 1% to about 3% 0.1 N

sodium hydroxide" phrase in claim 9 also refers to the amount of a 0.1 N solution

of sodium hydroxide contained in the final composition.  In the alternative, it refers

to the concentration of sodium hydroxide that must be used to make the

formulation recited in claim 9 as "corrected."

K.     The Phrase "Gelling Agent" in Claims
       1, 6, 8, 10, 16-18, 23, 25, 31, 36, and 38

       As used in the patent's written description, the phrase "gelling agent" is

synonymous with "thickener."  (Ex. 1, col. 12, ll. 16-21, 60-67 [WA56])  The

written description states that the thickeners used in the invention may include

"anionic polymers such as polyacrylic acid (CARBOPOL®…),

carboxymethylcellulose and the like….**Additional thickeners**…may generally be

found in United States Pharmacopeia/National Formulary (2000); Remington's

The Science and Practice of Pharmacy, Meade Publishing Co."  (Ex. 1, col. 12,

ll. 60-67 [WA56]) (emphasis added).  Thickeners such as Carbopol®—a brand of

carbomers—can form lotions, creams, gels, and ointments for use in topical

preparations.  (Ex. 23 at 4-5 [WA3300-01])  Thus, "gelling agent" means

"thickener."

#1298510 v1 - Watson's Claim Constr Brief

L.      The Phrase "Polyacrylic Acid…in a Concentration
        of About 1%" in Claims 8, 25, and 38

The phrase "polyacrylic acid…in a concentration of about 1%" has its

ordinary meaning and means "0.9% to 1.1% $(CH_2CHCOOH)_x$, an acrylic or

acrylate resin formed by the polymerization of acrylic acid."  Polyacrylic acid

functions as a gelling agent and may, when used in sufficient quantity, cause a gel

to form.  (Ex. 1, col. 12, ll. 60-62 [WA56])

The written description does not define expressly or by implication the

phrase "polyacrylic acid…in a concentration of about 1%."  In these instances, a

dictionary is often useful to assist in understanding the common meaning of the

words.  McGraw-Hill Dictionary of Scientific & Technical Terms (5th Ed. 1994)

("McGraw-Hill"), at 26, 1541, defines "polyacrylic acid" as "$(CH_2CHCOOH)_x$, an

acrylic or acrylate resin formed by the polymerization of acrylic acid," where

"acrylic resin" means "a thermoplastic synthetic organic polymer made by the

polymerization of acrylic derivatives such as acrylic acid" and "acrylate resin"

means acrylic acid or ester polymer with —$CH_2$—CH(COOR)— structure."

(Ex. 30 at 26, 1541 [WA3440])  McGraw-Hill defines "acrylic acid" as

"$CH_2CHCOOH$, an easily polymerized, colorless, corrosive liquid used as a

monomer for acrylate resins."  (Ex. 30 at 26 [WA3439])  The term "about" as

discussed above allows for, at most, a 10% variation.  See supra § II.H, pp. 31-32.

– 39 –

Thus, the phrase "polyacrylic acid…in a concentration of about 1%" means "0.9% to 1.1% of $(CH_2CHCOOH)_x$, an acrylic or acrylate resin formed by the polymerization of acrylic acid."

The patent's written description supports the ordinary definition of "polyacrylic acid" and gives Carbopol®, a brand of carbomers marketed by Noveon, Inc., as an example of a polyacrylic acid.  (Ex. 1, col. 12, ll. 60-62 [WA56]; Ex. 22 [WA3292-94])

M.    The Term "Gel" in Claims 7, 13, 24, and 37

The term "gel" has its ordinary meaning and means a "semisolid system[] consisting of either suspensions made up of small inorganic particles or large organic molecules interpenetrated by a liquid."  The written description does not define expressly or by implication the term "gel."  In these instances, a dictionary is often useful to assist in understanding the common meaning of the words. Remington's defines "gel" according to the USP/NF definition, which is a "semisolid system[] consisting of either suspensions made up of small inorganic particles or large organic molecules interpenetrated by a liquid."  (Ex. 24 at 745 [WA3313]); Ex. 27 at 2217-19 [WA3395-97])  Gels may be made from large organic molecules like carbomer.  (Ex. 24 at 745 [WA3313])  Thus, the ordinary meaning of the phrase "gel" is a "semisolid system[] consisting of either

suspensions made up of small inorganic particles or large organic molecules interpenetrated by a liquid."

N.    The Phrase "Isopropyl Myristate…in a Concentration
      …of About 0.5%" in Claims 4-5, 15, 21, and 34

The phrase "isopropyl myristate…in a concentration…of about 0.5%" means "isopropyl myristate in a concentration of 0.45% to 0.55%."  The written description does not define expressly or by implication the phrase "isopropyl myristate…in a concentration…of about 0.5%."  In these instances, a dictionary is often useful to assist in understanding the common meaning of the words.  For the reasons set forth above, the term "about" in this phrase allows for, at most, a 10% variation.  See supra § II.H, pp. 31-32.

In addition, other patent claims, e.g., claim 1, support at most a 10% deviation for the term "about" used in the phrase "isopropyl myristate…in a concentration…of about 0.5%."  Claim 1 recites the isopropyl myristate range as "about 0.1% to about 5%" indicating a perceived significance in measuring to the tenth of a percent.  (Ex. 2, col. 49, l. 64 [WA79])  Thus, the phrase "isopropyl myristate…in a concentration…of about 0.5%" means "isopropyl myristate in a concentration of 0.45% to 0.55%."

#1298510 v1 - Watson's Claim Constr Brief

O.    The Phrase "Isopropyl Myristate…in a
      <u>Concentration…of About 1%" in Claim 4</u>

The phrase "isopropyl myristate…in a concentration…of about 1%" means "isopropyl myristate in a concentration of 0.9% to 1.1%."  The written description does not define expressly or by implication the phrase "isopropyl myristate…in a concentration…of about 1%."  For the reasons discussed above, the term "about" in this phrase should be construed to allow for a 10% variation (at most).  <u>See</u> <u>supra</u> § II.H, pp. 31-32.  Thus, the phrase "isopropyl myristate…in a concentration…of about 1%" means "isopropyl myristate in a concentration of 0.9% to 1.1%."

P.    <u>The Phrase "Amount Sufficient" in Claims 18 and 31</u>

The phrase "amount sufficient" has its ordinary meaning and means "a quantity that is enough to meet the needs of a situation or a proposed end."  The written description does not define expressly or by implication the phrase "amount sufficient."  A dictionary aids in understanding the common meaning of the words.  <u>Webster's 10th</u> defines "amount" as "the total number or quantity."  (Ex. 29 at 39, #1a [WA3420])  "Sufficient" means "enough to meet the needs of a situation or a proposed end."  (Ex. 29 at 1177, #1a [WA3435])  Thus, the ordinary meaning of the phrase "amount sufficient" is "a quantity that is enough to meet the needs of a situation or a proposed end."

Q.    The Phrase "Daily Dose" in Claims 18, 26-29, 31, and 39-41

The phrase "daily dose" has its ordinary meaning and means "the measured quantity of a therapeutic agent to be taken during the period of a day."  The written description does not define expressly or by implication the phrase "daily dose." Accordingly, the Court may resort to a dictionary.  Webster's 10th defines "daily" as "covering the period of…a day."  (Ex. 29 at 291, #2b [WA3422])  "Dose" means "the measured quantity of a therapeutic agent to be taken at one time." (Ex. 29 at 346, #1a [WA3424])  Thus, the ordinary meaning of the phrase "daily dose" is "the measured quantity of a therapeutic agent to be taken during the period of a day."

Unimed attempts to define "daily dose" to mean "the total amount of a pharmaceutical composition…that is administered each day to a human subject in need of testosterone replacement therapy."  (Ex. 33, 5/13/05 Barr Report, ¶ 25 [WA3461])  The '894 patent's written description and prosecution history provide no support for interpreting "daily dose" to mean anything narrower than its ordinary meaning.  The written description actually contradicts Unimed's proposed definition by explaining that "treatment" encompasses many conditions and diseases and by referring broadly to testosterone disorders in humans as well as "animals of any kind."  (Ex. 1, col. 13, l. 65 to col. 14, l. 16 [WA57])

– 43 –

R.     The Phrase "Applied in a Single or in Divided Doses" in Claims 30 and 42

The phrase "applied in a single or in divided doses" has its ordinary meaning and means "the measured quantity of a therapeutic agent to be applied in one part or separated into several parts."  The written description does not define expressly or by implication the phrase "applied in a single or in divided doses."  Consequently, a dictionary can assist in understanding the common meaning of the words.  Webster's 10th defines "single" as "consisting of or having only one part, feature, or portion."  (Ex. 29 at 1095, #3a(1) [WA3433])  "Divided" means "separated into parts or pieces."  (Ex. 29 at 340, #1a [WA3423])  As discussed above, "dose" means "the measured quantity of a therapeutic agent to be taken at one time."  See supra § II.Q, p. 43.  Thus, the ordinary meaning of the phrase "applied in a single or in divided doses" is "the measured quantity of a therapeutic agent to be applied in one part or separated into several parts."

S.     The Phrase "Achieve…Within at Least About 36 Hours" in Claim 18

The phrase "achieve…within at least about 36 hours" has its ordinary meaning and means "to attain a desired end before the end of a minimum time frame that is reasonably close to 36 hours."  The written description does not define expressly or by implication the phrase "achieve…within at least about 36 hours."  Accordingly, a dictionary can help in understanding the common meaning

of the words.  Webster's 10th defines "achieve" as "to attain a desired end or aim."

(Ex. 29 at 9, vi. [WA3418])  "Within" means "before the end of" and "at least"

means "at the minimum."  (Ex. 29 at 663, #1 [WA3428], 1359, prep. #2a

[WA3436])  "About" in this context means "reasonably close to."  (Ex. 29 at 3,

adv. #1a [WA3417])  Thus, the ordinary meaning of the phrase "achieve…within

at least about 36 hours" is "to attain a desired end before the end of a minimum

time frame that is reasonably close to 36 hours."

T.     The Phrase "Substantially Maintained…for at
       Least 24 Hours" in Claims 26-29 and 31

       The phrase "substantially maintained…for at least 24 hours" has its ordinary

meaning and means "largely but not wholly keeping in an existing state for a

minimum period of 24 hours."  The written description of the '894 patent does not

define expressly or by implication the phrase "substantially maintained…for at

least 24 hours."  As before, a dictionary can help in understanding the common

meaning of the words.  Webster's 10th defines "substantially" as "being largely but

not wholly that which is specified."  (Ex. 29 at 1174, #5 [WA3434])  "Maintained"

means "to keep in an existing state."  (Ex. 29 at 702, #1 [WA3429])  As discussed

above, "at least" means "at a minimum."  See supra, § II.S, pp. 44-45.  Thus, the

ordinary meaning of the phrase "substantially maintained…for at least 24 hours" is

"largely but not wholly keeping in an existing state for a minimum period of 24 hours."

U.    The Phrase "Maintained…for at Least 24 Hours" in Claims 39-41

The phrase "maintained…for at least 24 hours" has its ordinary meaning and means "keeping in an existing state for a minimum period of 24 hours."  The written description does not define expressly or by implication the phrase "maintained…for at least 24 hours."  As discussed above, "maintained" means "to keep in an existing state" and "at least" means "at a minimum."  See supra, §§ II.S-II.T, pp. 44-46.  Thus, the ordinary meaning of the phrase "maintained…for at least 24 hours" is "keeping in an existing state for a minimum period of 24 hours."

V.    The Phrase "At Least 2 Consecutive Days" in Claims 26 and 31

The phrase "at least 2 consecutive days" has its ordinary meaning and means "a minimum of 2 days following one after the other in order."  Again, a dictionary can aid in understanding the common meaning of the words.  As discussed above, "at least" means "at a minimum."  See supra, §§ II.S-II.T, pp. 44-46.  Webster's 10th defines "consecutive" as "following one after the other in order."  (Ex. 29 at 246 [WA3421])  Thus, the ordinary meaning of the phrase "at least 2 consecutive days" is "a minimum of 2 days following one after the other in order."

#1298510 v1 - Watson's Claim Constr Brief

W.    The Phrase "At Least 30 Consecutive Days" in Claims 27-29 and 39-41

The phrase "at least 30 consecutive days" has its ordinary meaning and means "a minimum of 30 days following one after the other in order."  As discussed above, "at least" means "at a minimum" and "consecutive" means "following one after the other in order."  See supra, §§ II.S, II.V, pp. 44-45 and 46. Thus, the ordinary meaning of the phrase "at least 30 consecutive days" is "a minimum of 30 days following one after the other in order."

## CONCLUSION

As explained above, Watson's claim constructions adhere to the principle that a court should assign claim language its ordinary and customary meaning as understood by those skilled in the art as of the effective application date.  See, e.g., Nystrom v. Trex Co., Inc., 374 F.3d 1105, 1111 (Fed. Cir. 2004); Teleflex, 299 F.3d at 1325.  Unimed's claim constructions depart from that principle because Unimed desires to thwart invalidity determinations by wrongly limiting claim scope.  Toward that end, Unimed asks the Court to read unstated limitations into the claims.  The Federal Circuit has consistently rejected such efforts to restrict claim scope.  See, e.g., Prima Tek II, L.L.C. v. Polypap , S.A.R.L., Nos. 04-1411, -1421, 2005 WL 1459332, *3-4 (Fed. Cir. June 22, 2005); Merck & Co. v. Teva Pharms. USA, Inc., 395 F.3d 1364, 1369-71 (Fed. Cir. 2005).

Watson's claim constructions rely on the ordinary meaning of the disputed claim language.  That ordinary meaning should control.  See <u>Markman</u>, 52 F.3d at 980.

MORRIS, MANNING & MARTIN, LLP
Attorneys for Defendant
Watson Pharmaceuticals, Inc.

Dated:  July 25, 2005

/s David A. Rabin
David A. Rabin
Georgia Bar No. 591469

1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, Georgia 30326
Telephone: (404) 233-7000
Fax: (404) 365-9532

<u>Of Counsel:</u>

Barry S. White, Esq.
Steven M. Amundson, Esq.
John G. Taylor, Esq.
Joyce W. Luk, Esq.
Jennifer Chung, Esq.
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, New York  10151
Telephone: (212) 588-0800
Fax: (212) 588-0500

 #1298510 v1 - Watson's Claim Constr Brief

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNIMED PHARMACEUTICALS, INC.,** | ) | |
| **a Delaware corporation, and** | ) | |
| **LABORATORIES BESINS** | ) | |
| **ISCOVESCO, a Delaware corporation,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION FILE** |
| | ) | |
| **v.** | ) | **NO. 1:03-cv-2501-TWT** |
| | ) | |
| **WATSON PHARMACEUTICALS, INC.,** | ) | |
| **a Nevada corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on July 25, 2005, a true and correct copy of the foregoing document was filed electronically via CM/ECF in the United States District Court for the Northern District of Georgia, with notice of same being electronically served by the Court, addressed to:

> Jerry B. Blackstock, Esq.
> Leslie B. Zacks, Esq.
> Hunton & Williams, LLP
> 4100 Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia 30308-2216

James R. Ferguson, Esq.
Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, Illinois 60606

/s David A. Rabin
_____
David A. Rabin
Georgia Bar No. 591469

MORRIS, MANNING & MARTIN, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326-1044
(404) 233-7000

#1298510 v1 - Watson's Claim Constr Brief