# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNIMED PHARMACEUTICALS, INC.,  )
a Delaware corporation, and    )
LABORATORIES BESINS            )
ISCOVESCO, a Delaware corporation,  )
                               )
      Plaintiffs,        )
                               )
v.                             )   Nos.  1:03-CV-2501 TWT
                               )          1:03-CV-2503 TWT
WATSON PHARMACEUTICALS,        )
INC., a Nevada corporation, and  )
PADDOCK LABORATORIES, INC., a  )
Minnesota corporation,         )
                               )
      Defendants.        )

## PLAINTIFFS' MEMORANDUM ON CLAIM CONSTRUCTION

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

I.     INTRODUCTION ............................................................................1

II.    THE CLAIMED INVENTION .......................................................4

III.   THE PATENT IN SUIT .................................................................10

IV.   PRINCIPLES OF CLAIM CONSTRUCTION ............................12

V.    THE PATENT CLAIMS INCLUDE EMBODIMENTS
CONTAINING WATER ................................................................13

     A.    Claim 1 is Broader than Claim 9 and Includes Embodiments
Containing Water ...............................................................13

     B.    Water Does Not Affect the Basic and Novel Properties of the
Invention ............................................................................17

VI.   THE PTO CORRECTLY ISSUED THE CERTIFICATE OF
CORRECTION .............................................................................19

     A.    The Certificate of Correction Is Valid ..............................20

     B.    The Certificate Applies to This Litigation .......................24

     C.    Even if the Certificate Did Not Apply to This Case, the Court
Can Correct the Error ........................................................27

VII.  "ABOUT 1% TO ABOUT 3% SODIUM HYDROXIDE" ........30

VIII. CLAIM 31 INCLUDES EMBODIMENTS WITH SODIUM
HYDROXIDE................................................................................36

IX.   CONCLUSION.............................................................................38

# TABLE OF AUTHORITIES

**Page**

## Cases

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
  960 F.2d 1020 (Fed. Cir. 1992)..............................................................25

*AK Steel Corp. v. Sollac*,
  344 F.3d 1234 (Fed. Cir. 2003)..................................................... 18, 37

*Arthrocare Corp. v. Smith & Nephew, Inc.*,
  406 F.3d 1365 (Fed. Cir. 2005)..................................................... 22, 23

*Augustine Med., Inc. v. Progressive Dynamics, Inc.*,
  194 F.3d 1367 (Fed. Cir. 1999)..................................................... 25, 26

*Bayer AG v. Elan Pharm. Research Corp.*,
  212 F.3d 1241 (Fed. Cir. 2000)................................................. 2, 24, 25

*I.T.S. Rubber Co. v. Essex Rubber Co.*,
  272 U.S. 429 (1926)...........................................................................27

*Johns Hopkins Univ. v. Cellpro, Inc.*,
  152 F.3d 1342 (Fed. Cir. 1998)..........................................................25

*Lemelson v. General Mills, Inc.*,
  968 F.2d 1202 (Fed. Cir. 1992)..........................................................27

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996) .................................................................... 17, 37

*Merck & Co. v. Teva Pharm., USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005)..........................................................30

*Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*,
  75 F.3d 1545 (Fed. Cir. 1996)............................................... 30, 31, 34

*Novo Indus., L.P. v. Micro Molds Corp.*,
  350 F.3d 1348 (Fed. Cir. 2003)..................................................... 27, 28

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Pall Corp. v. Micron Separations, Inc.*,
    66 F.3d 1211 (Fed. Cir. 1995) ...................................................................... 26, 30

*Phillips v. AWH Corp.*,
    __ F.3d __ 2005 WL 1620331 (Fed. Cir. Jul. 12, 2005) (*en banc*) .....................12

*PPG Indus. v. Guardian Indus. Corp.*,
    156 F.3d 1351 (Fed. Cir. 1998) ......................................................... 13, 17, 36, 37

*Southwest Software, Inc. v. Harlequin, Inc.*,
    226 F.3d 1280 (Fed. Cir. 2000) ............................................................................24

*Superior Fireplace Co. v. Majestic Products Co.*,
    270 F.3d 1358 (Fed. 2001) ...................................................................... 20, 21, 22

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ........................................................................ 2, 16

## Regulations and Statutes

21 U.S.C. § 355 (2005) .............................................................................................1

35 U.S.C. § 255 (2005) ........................................................................... 3, 20, 21, 22

35 U.S.C. § 271 (2005) ..................................................................................... 1, 24

## I.     INTRODUCTION

This patent infringement case involves a transdermal testosterone gel known as AndroGel®, which is the commercial embodiment of United States Patent No. 6,503,894 (the "'894 Patent") owned by Plaintiffs Unimed Pharmaceuticals, Inc. and Laboratories Besins Iscovesco.  AndroGel® was the first testosterone gel ever approved by the Food and Drug Administration ("FDA"), and it is now the therapy of choice for the vast majority of physicians treating hypogonadal males.

The case arises under the Hatch-Waxman Act, which authorizes generic manufacturers to obtain expedited FDA approval of generic versions of drugs previously approved by the FDA.  *See* 21 U.S.C. § 355(j).  To obtain the expedited review, the manufacturer must submit an Abbreviated New Drug Application ("ANDA"), which shows that the active ingredients of the generic copy are "bioequivalent" to the active ingredients in the previously-approved drug.  21 U.S.C. § 355(j)(2)(A)(iv).

The Act further provides that an act of patent infringement occurs whenever a manufacturer submits an ANDA for a patented drug.  35 U.S.C. § 271(e)(2)(A). In such a case, the patent owner can suspend approval of the ANDA by filing a patent infringement lawsuit within 45 days of receiving notice of the ANDA filing. 21 U.S.C. § 355(j)(5)(B)(iii).   In the patent infringement case, the district court

1

determines if the Defendants' *future* sales of its generic product will infringe the claims of the patent. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247-50 (Fed. Cir. 2000).

In this case, Plaintiffs filed a consolidated infringement action after Defendants Watson Pharmaceuticals, Inc. ("Watson") and Paddock Laboratories, Inc. ("Paddock") filed separate ANDAs to sell generic copies of AndroGel®. To determine if the Defendants' generic copies infringe the '894 Patent, this Court must first construe the meaning of the claims of the '894 Patent and then compare the ANDAs to the properly-construed claims. Because the ANDAs establish that Defendants' generic copies are virtually identical to AndroGel®, Defendants must assert that none of the claims of the '894 Patent applies to AndroGel® – even though the patent plainly identifies AndroGel® as a preferred embodiment of the invention. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (a construction that excludes a preferred embodiment "is rarely, if ever, correct").

To this end, Defendants make two major arguments. First, Defendants assert that the claims of the '894 Patent generally do not cover *any* testosterone gel formulation that contains water (including AndroGel®). This argument is without merit. As shown below, in the relevant claims, the '894 Patent sets forth the

2

ingredients of the formulation in amounts that do not add up to 100% – and that therefore necessarily require an additional ingredient.  The specification of the patent repeatedly teaches that, in such a case, water should be added to balance the composition to 100%.  This, indeed, is the specific teaching of the AndroGel® formulation, which the patent identifies as a preferred embodiment of the invention.  Accordingly, under well-settled principles of claim construction, the claims of the '894 Patent include embodiments containing water.

Second, Defendants assert that the Patent and Trademark Office ("PTO") improperly issued a Certificate of Correction that added a term that had been inadvertently omitted from the language of some of the claims in the issued patent. This argument is also without merit.  The omitted term was an obvious error that is immediately apparent to one skilled in the art.  As such, the PTO properly exercised its authority under 21 U.S.C. § 255 to correct the claim. Furthermore, this Court has the authority to make the same correction because the error resulted from an obvious clerical mistake.

In addition to these arguments, Defendants raise several other issues concerning the construction of specific terms appearing in individual claims. Accordingly, the proper construction of each of these terms is set forth below.

3

## II.    THE CLAIMED INVENTION

As noted above, AndroGel® is the first testosterone gel ever approved by the FDA, and the first gel ever shown to produce normal levels of testosterone in hypogonadal men over a sustained period.   Male hypogonadism is a chronic clinical condition that affects an estimated 4 million men in the United States.  (Ex. B, at 5).  It is characterized by low levels of serum testosterone and a variety of symptoms, including depression, fatigue, decreased bone density, reduced lean body mass, decreased libido and regression of secondary sexual characteristics. (Ex. A, 2:33-36; Ex. B, at 6).

Prior to the development of AndroGel®, physicians relied primarily on testosterone injections or transdermal patches to increase serum testosterone levels in hypogonadal patients.   The testosterone patches utilize an external, "rate-limiting membrane" to regulate both the rate of delivery and the quantity of testosterone that penetrates the skin.   (Ex. C, at ¶ 21-23).   The rate-limiting membrane is a key feature of the patch system because it prevents the testosterone from being immediately absorbed into the skin and then traveling directly to the bloodstream.   (*Id*.).   If the testosterone is immediately absorbed into the bloodstream, the patient receives only a few hours of benefit because of testosterone's short half-life (approximately 60 minutes) in the body.  (*Id*.).

4

In contrast to the patch, AndroGel® is a testosterone gel that does not utilize an external, rate-limiting membrane. (*Id.*). Instead, AndroGel® surprisingly facilitates the ability of the skin to act as its own "patch" by retaining the testosterone in the outer layer known as the stratum corneum. (*Id.*). In particular, AndroGel® enables testosterone to penetrate the stratum corneum which then acts as a "reservoir" for the hormone until it slowly diffuses through the remaining layers of the skin. (*Id.*). The testosterone then gradually diffuses into the circulatory system where it is ultimately transported to other areas of the body. (*Id.*). The formulation thus produces a prolonged release of testosterone into the bloodstream – *i.e.*, a sustained-release effect – as shown below:









In clinical trials on hypogonadal men, AndroGel® was shown to produce "steady-state" testosterone levels within the normal physiologic range over a sustained period of time. (Ex. A, 14:25-25:48). The maintenance of this "steady-state" profile over a prolonged treatment period represented a remarkable technological achievement. (Ex. C, at ¶ 23). It showed that the daily use of AndroGel® not only increased testosterone to normal levels, but also maintained those levels by replacing testosterone at approximately the same rate as the hormone was being used (and eliminated) by the body. (*Id.*). If the formulation had produced testosterone levels below the normal range (*i.e.*, "sub-therapeutic" levels), it would have had no clinical value, but if it had produced levels above the normal range (*i.e.*, "supraphysiologic" levels), it would have raised significant questions of safety. (Ex. C, at ¶ 24). Indeed, just two years ago, the FDA rejected the application of a competitive testosterone gel because it produced supraphysiologic levels of testosterone that could not be safely managed through dose titration. (*Id.*).

AndroGel®'s efficacy in the treatment of hypogonadism is a direct result of its unique formulation. In that formulation, an active ingredient (testosterone) is administered transdermally through a combination of an alcohol (ethanol) and a so-called "penetration enhancer" known as isopropyl myristate. (*Id.*, at ¶ 14). This

8

penetration-enhancing system is directly responsible for the steady-state blood levels that result from the daily administration of AndroGel®. (*Id*). The formulation is administered in the form of a gel which results when sodium hydroxide (NaOH) neutralizes a gelling agent in the presence of water. The formulation thus consists of six ingredients in the following concentrations:

**AndroGel®**

| Testosterone | 1% |
|---|---|
| Alcohol (Ethanol) | 72.5% |
| Isopropyl Myristate | 0.5% |
| 0.1 N NaOH | 4.72% |
| Gelling Agent | 0.9% |
| Water | 20.38% |

(Ex. A, 13:25-35).

This formulation is the subject of the claims of the '894 Patent.

## III.   THE PATENT IN SUIT

The '894 Patent is directed to a pharmaceutical composition comprising testosterone in a gel formulation and to methods of using the composition.  In the Abstract and elsewhere, the specification of the patent generally describes the gel as comprising testosterone, an alcohol, a penetration enhancer and water.  (Ex. A, at 1; 11:57; 12:16-19; 13:24-35).  In Table 5, the specification expressly sets forth the AndroGel® formulation as a preferred embodiment of the claimed invention. (*Id.*, 13:24-35).  In addition, the specification contains 18 pages of clinical data and 40 tables, figures and drawings based on clinical trials testing the safety and efficacy of AndroGel®.  (*Id.*, 14:25-49:20).  Finally, the specification also makes clear that the intended purpose of the pharmaceutical composition disclosed in the patent is the treatment of hypogonadism.  Indeed, the very title of the '894 Patent is "Pharmaceutical Composition and Method for Treating Hypogonadism."  (*Id.*, at 1).

Consistent with its title, the '894 Patent sets forth two broad categories of claims:  Claims 1-17 are directed to the pharmaceutical composition, and Claims 18-42 are directed to methods for using the composition.  Claim 1 is the broadest independent formulation claim, both in terms of the identity of the ingredients and the ranges of their concentration.  (*Id.*, 59-67).  Claims 9 and 10 are also

10

independent formulation claims, but they contain narrower ranges and additional limitations:  Claim 9 requires the presence of water in all of its embodiments, while Claim 10 requires the use of a "unit dose packet" in all of its embodiments.  (*Id.*, 50:27-48).

Claims 18-42 are "method" claims that disclose specific blood levels of testosterone resulting from a daily dose of the composition.  (*Id.*, 51:1-52:60). Claim 18 is an independent method claim that describes the ingredients of the composition almost exactly like Claim 1, but with the additional limitation of certain specified blood levels.  (*Id.*, 51:1-20).  Claim 31 is also an independent method claim that differs from Claim 18 in that Claim 31 does not recite sodium hydroxide as a required element, and it discloses different blood levels for different periods of time.  (*Id.*, 52:3-23).

## IV.   PRINCIPLES OF CLAIM CONSTRUCTION

In construing patent claims, a court must first consider the intrinsic evidence, starting with the language of the claims. *Phillips v. AWH Corp.*, _ F.3d _, 2005 WL 1620331 (Fed. Cir. Jul. 12, 2005) (*en banc*).  The court should generally give the words of claims their "ordinary and customary meaning," as determined by one of ordinary skill in the art. *Id*. at *5.  In addition, the court should construe the claims "so as to be consistent with the specification of which they are a part." *Id*. at *7.  As a result, the specification is "always highly relevant to the claim construction analysis." *Id*.  Indeed, in most cases, the specification is "dispositive" because it is the "single best guide to the meaning of a disputed term." *Id*.

The court may also find the prosecution history useful in determining the meaning of a claim term, particularly if the history shows that the applicant disavowed a particular meaning of that term. *Id.* at *9.  In most cases, however, the prosecution history "lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

Finally, in interpreting claims, a court may also consider extrinsic evidence, such as expert testimony, which can be useful to show that a claim term has a particular meaning to one skilled in the art. *Id*. at *10.  Whether a court relies on such evidence is within the sound discretion of the court. *Id.* at *10-11.

## V.   THE PATENT CLAIMS INCLUDE EMBODIMENTS CONTAINING WATER

A major issue in this case is whether all of the claims of the '894 Patent include embodiments containing water.  As noted earlier, Defendants assert that the '894 Patent does not cover AndroGel®, even though the patent identifies AndroGel® as a preferred embodiment.  To this end, Defendants note that Claim 9 specifically identifies "water" as a listed ingredient, while other claims do not.  On this basis, Defendants assert that, unlike Claim 9, the other claims should be construed to exclude any embodiments containing water – including, of course, AndroGel®.  As shown below, this argument is contrary to both the language of the claims and the intrinsic record.[1]

### A.   Claim 1 is Broader than Claim 9 and Includes Embodiments Containing Water

Claim 1 and Claim 9 both disclose formulations "consisting essentially of" certain specifically-identified ingredients.  In patent law, the phrase "consisting essentially of" indicates that the invention necessarily includes the listed ingredients, but can also include certain unlisted ingredients that do not materially affect the basic and novel properties of the invention.  *PPG Indus. v. Guardian*

_____

[1]   For convenience, the following discussion focuses on Claim 1 – the broadest claim in the patent – but its conclusions also apply to the other claims as well.

13

*Indus. Corp.,* 156 F.3d 1351, 1354 (Fed. Cir. 1998). In this case, the formulation disclosed in Claim 1 and Claim 9 "consists essentially of" the following ingredients:

| CLAIM 1 | |
|---|---|
| Testosterone | 0.5-10% |
| Alcohol | 30-98% |
| Isopropyl Myristate | 0.1-5% |
| 0.1 N NaOH | 1-5% |
| Gelling Agent | 0.1-5% |

| CLAIM 9 | |
|---|---|
| Testosterone | 1-2% |
| Alcohol (Ethanol) | 50-75% |
| Isopropyl Myristate | 0.5-2% |
| 0.1 N NaOH | 1-3% |
| Polyacrylic Acid | 0.5-2% |
| Water | balance to 100% |

As the above tables reveal, one difference between Claim 1 and Claim 9 is that Claim 9 requires the addition of water to balance the formulation to 100%. This difference results from the fact that Claim 9 lists the other, "non-water" ingredients in amounts that are not sufficient to total 100%. As a result, in every embodiment of Claim 9, water is needed to balance the formulation to 100%. (Ex. F, at ¶ 28).

By contrast, in Claim 1, the range of concentrations for the listed ingredients is much greater. As a result, Claim 1 has a far broader scope than Claim 9. Most notably, unlike Claim 9, Claim 1 covers formulations in which the listed

14

ingredients total 100% without the need for separately-added water[2] – for example, a combination of 96% alcohol, 1% testosterone, 1% gelling agent, 1% isopropyl myristate and 1% 0.1 N sodium hydroxide. (*Id*., at ¶ 27).

At the same time, Claim 1 also covers formulations in which the listed ingredients do *not* total 100% – for example, a combination of 75% alcohol, 1% testosterone, 1% gelling agent, 1% isopropyl myristate and 5% 0.1 N sodium hydroxide. (*Id*.). As to these embodiments, there is clearly a need for an additional ingredient to bring the composition to 100%. (*Id*.).

In such a case, the patent teaches that the additional ingredient is water. This is clear not only from the Abstract of the patent (which specifically describes the claimed invention as including water), but also from the repeated references to water that appear in other parts of the specification. (Ex. A, 11:57; 12:16-19; 13:24-35). Indeed, the specification expressly discloses the AndroGel® formulation – which contains more than 20% water – as the preferred embodiment of the claimed invention. (*Id*., 13:24-35).

_____

[2]    The phrase "separately-added water" refers to the water that must be added to balance the formulation to 100%, as distinguished from the water that is inherently present in other ingredients such as "alcohol" or "0.1 N sodium hydroxide." (Ex. F, at ¶ 26). Pharmaceutical grade alcohol, *i.e*., "Alcohol USP," is a mixture of ethanol and water. Sodium hydroxide 0.1 N is a solution of water and sodium hydroxide. (*Id*.).

Thus, in light of the teachings of the specification (including the Abstract and the preferred embodiment), a skilled artisan would read Claim 1 to include embodiments in which water must be added to balance the formulation to 100%. (Ex. D, at ¶ 51; Ex. F, at ¶ 27-31). This is particularly true since the use of water to balance a formulation to 100% is a common practice in the pharmaceutical industry, as Paddock's own chemist has admitted. (*Id*.; Ex. G, at 41).

This construction is also consistent with the well-established rule that patent claims should be construed to include the preferred embodiment of the claimed invention. The Federal Circuit has repeatedly held that a construction that excludes a preferred embodiment "*is rarely, if ever, correct.*" *Vitronics Corp.,* 90 F.3d at 1583 (emphasis added). As noted above, the specification in this case identifies the AndroGel® formulation containing more than 20% water as a preferred embodiment. Similarly, the Examiner clearly understood the claims of the '894 Patent to cover AndroGel® since she ultimately allowed the claims after finding that the clinical trials of AndroGel® did not constitute an invalidating "public use." (Ex. N, at 3). As a result, Claim 1 should be construed to include embodiments containing separately-added water, since any different construction would exclude the preferred embodiment disclosed by the patent.

16

Finally, this construction is consistent with the use of the transitional phrase "consisting essentially of" in both Claim 1 and Claim 9. As noted earlier, the phrase "consisting essentially of" indicates that the invention must include the listed ingredients, but can also include other unlisted ingredients if they do not materially affect the basic and novel properties of the invention. *PPG Indus.*, 156 F.3d at 1354. Consistent with this rule, Claim 9 identifies separately-added water as a required element because every embodiment of Claim 9 requires water to balance the formulation to 100%. (Ex. F, at ¶ 29). By contrast, Claim 1 does not identify separately-added water as a required element because water is not needed in every embodiment to balance the formulation to 100%. (*Id.*, at ¶ 28).

## B.     Water Does Not Affect the Basic and Novel Properties of the Invention

Defendants nevertheless assert that water cannot be an unlisted ingredient for purposes of Claim 1's "consisting essentially of" clause because water allegedly affects the "basic and novel properties of the invention." *PPG Indus.*, 156 F.3d at 1354. This issue is generally not appropriate for resolution in a *Markman* proceeding if the patent is silent on the unlisted ingredient. *Id.* at 1354-55. In such a case, the issue must be decided as part of the factual inquiry underlying the infringement analysis. *Id.*

17

In this case, however, the rule does not apply because the patent is not silent on the unlisted ingredient. *AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1240-41 (Fed. Cir. 2003).   In particular, in its description of the preferred AndroGel® embodiment, the specification makes clear that water should be used whenever necessary to "qsf" the formulation – *i.e.*, whenever necessary to balance the formulation to 100%.  (Ex. A, 13:34).  In addition, the specification repeatedly refers to water as one of the ingredients of the claimed invention.  (*See*, *e.g*., *id*., at 1 ("Abstract")).

In light of the unambiguous teachings of the specification, Plaintiffs respectfully request that this Court hold as a matter of claim construction that Claim 1 includes embodiments containing separately-added water.  Alternatively, if the Court concludes that the '894 Patent is silent on whether water affects the "novel and basic properties of the invention," Plaintiffs respectfully request that this issue be decided in the infringement stage of the proceeding.

## VI.   THE PTO CORRECTLY ISSUED THE CERTIFICATE OF CORRECTION

A second major issue concerns a Certificate of Correction issued by the PTO for the '894 Patent.  (Ex. H).  This issue relates to Claims 1-30, but does not affect Claims 31-42.

The PTO issued the Certificate following the discovery of an error that occurred when the applicants submitted amended claims during the prosecution of the patent.  In the amended claims, the applicants attempted to disclose a range of sodium hydroxide that included the sodium hydroxide concentration in the AndroGel® formulation, as set forth in Table 5 of the specification.  (Ex. I).  In that table, the specification described the relevant concentration using the term "0.1 N" to show a *diluted* form of sodium hydroxide – *i.e.*, a concentration of sodium hydroxide in water.  (Ex. A, 13:32).

In the amended claims, however, the applicants failed to include the term "0.1 N" before the phrase "sodium hydroxide" in the listed ranges.  As a result, the originally-issued patent contained four independent claims (Claims 1, 9, 10 and 18) that recited a concentration of "about 1% to about 5%" (or "about 1% to about 3%") of *pure* sodium hydroxide – amounts that would be extremely caustic if actually applied to human skin.  (Ex. F, at ¶ 20).

19

Accordingly, on December 16, 2003, the PTO recognized this obvious clerical error and issued a certificate to correct the error by inserting the term "0.1 N" before the phrase "sodium hydroxide."  (Ex. H).  Defendants now assert that the PTO improperly issued the Certificate of Correction, and that, even if the Certificate is valid, it does not apply to the instant case.  Both claims are wrong. Furthermore, even if the PTO never issued a Certificate of Correction, it is well-settled that a district court can correct clerical and ministerial errors in the language of patent claims.

### A.    The Certificate of Correction Is Valid

The PTO issued the Certificate in this case pursuant to 35 U.S.C. § 255, which authorizes the Director of the PTO to correct a "mistake of a clerical or typographical nature, or of minor character," as long as the correction does not constitute "new matter" or require re-examination.  35 U.S.C. § 255.  The statute specifically provides that the corrected patent shall have the same effect on "the trial of actions for causes thereafter arising as if the same had been originally issued in such corrected form."  *Id.*

The law is clear that any challenge to the validity of a Certificate of Correction must satisfy the "clear and convincing" standard of persuasion. *Superior Fireplace Co. v. Majestic Products Co.*, 270 F.3d 1358, 1367 (Fed.

2001).   This rigorous standard of review reflects the courts' recognition that the PTO is presumed to have properly "done its job" in the issuance of Certificates of Correction.  *Id*. at n.1.

Defendants, however, assert that the PTO did not "do its job" in issuing the Certificate of Correction here.  This argument fails for several reasons.  To begin with, the error in this case was plainly a mistake of a "clerical or typographical nature" within the meaning of § 255.  The Federal Circuit has construed such mistakes to "include simple mistakes such as obvious misspellings that are immediately apparent."  *Superior Fireplace*, 270 F.3d at 1370.

In this case, the originally-listed ranges for pure sodium hydroxide were just such an obvious mistake.  Indeed, a person skilled in the art would immediately recognize that a concentration of 1%-5% of pure sodium hydroxide would be far too caustic to be used in a formulation for a transdermal gel.  (Ex. D, ¶ 44).  This was acknowledged by Defendants' own chemist, who recognized that the originally-listed range must refer to a *solution* of sodium hydroxide and water, rather than to pure sodium hydroxide:

> Q.    If you had 5% sodium hydroxide in a gel that was going to be applied to the human skin, would you expect there to be some side effects to that?
>
> A.    If it was straight sodium hydroxide, yes.

Q.      It would burn the skin?

A.      Yes.

Q.      That's why you questioned originally whether it meant solution?

A.      Correct.

(Ex. G, at 89).

Defendants do not seriously dispute that the applicants made an obvious error when they submitted amended claims listing ranges of "about 1% to about 5%" of pure sodium hydroxide. Instead, Defendants assert that the PTO impermissibly broadened the scope of the claims by issuing the Certificate of Correction.

The Federal Circuit, however, has squarely held that § 255 permits a broadening correction of a ministerial error when it is "clearly evident from the specification, drawings, and prosecution history how the error should appropriately be corrected." *Arthrocare Corp. v. Smith & Nephew, Inc.*, 406 F.3d 1365, 1375 (Fed. Cir. 2005); *Superior Fireplace*, 270 F.3d at 1371. Under these decisions, a Certificate of Correction is valid even if it broadens the scope of the patent unless the accused infringer can show by clear and convincing evidence that a skilled artisan would not understand how to correct the error. *Arthrocare*, 406 F.3d at 1375.

22

Thus, in *Arthrocare*, the Federal Circuit upheld the validity of the Certificate of Correction even though the Certificate unquestionably resulted in a broadening of the scope of the patent. *Id*. In reaching this result, the Court first noted that the patent would not "make sense" if it were interpreted to contain the erroneous information. *Id*. The Court then found that the prosecution history provided clear guidance on how the error should be corrected. *Id*. On these facts, the Court concluded that the accused infringer failed to show by clear and convincing evidence that a skilled artisan would not understand how to correct the errors. *Id*.

The same logic applies here. As in *Arthrocare*, the patent in this case does not "make sense" if the concentrations of sodium hydroxide are not corrected, since such amounts would be far too caustic for use on human skin. (Ex. D, at ¶ 44). In addition, the patent specification provides clear guidance on how the error should be corrected. (Ex. E, at ¶ 10). Indeed, Table 5 specifically identifies "0.1 N" as a proper measure of the concentration of sodium hydroxide in a preferred embodiment of the invention. (*Id.*; Ex. A, 13:32).

Accordingly, Defendants cannot show by clear and convincing evidence that a skilled artisan would not understand how to correct the applicants' mistake in omitting the concentration of sodium hydroxide solution in the AndroGel® formulation. *Arthrocare*, 406 F.3d at 1375.

23

**B.     The Certificate Applies to This Litigation**

It is well-settled that a Certificate of Correction is only effective for causes of action arising after the Certificate has issued.  *Southwest Software, Inc. v. Harlequin, Inc.*, 226 F.3d 1280, 1294 (Fed. Cir. 2000).  In this case, Plaintiffs filed their request for a Certificate of Correction before they filed the instant lawsuit or even knew that the two Defendants were planning to market a generic version of AndroGel®.[3]   (*See* Ex. O).   The PTO, however, did not actually issue the Certificate until December 16, 2003 – four months after Plaintiffs filed the complaints in the instant case.  (Ex. H).  Based on these facts, Defendants assert that the Certificate of Correction does not apply to this litigation.

This argument misconceives the nature of Plaintiffs' action, which is not an action for damages based on past acts of infringement.  Rather, this action arises under the Hatch-Waxman Act, which focuses on *future* acts of infringement. *Bayer AG*, 212 F.3d at 1249.  To be sure, the statute provides that the filing of an ANDA is itself considered an artificial act of infringement.   35 U.S.C. § 271 (e)(2)(A).  This "act," however, is merely a vehicle to provide the court with

---

[3]     Plaintiffs filed their request for the Certificate of Correction on June 12, 2003, and they received notice that Defendants were seeking FDA approval to sell generic versions of AndroGel® on July 7, 2003.  (*See* Ex. O).

jurisdiction so that it can resolve a "dispute concerning *an infringement that will happen in the future*." *Bayer AG,* 212 F.3d at 1349 (emphasis added). In particular, the focus of the infringement inquiry under the statute is on the "product that will be sold *after* the FDA's approval of the ANDA." *Id.* (emphasis added). In this case, for example, Plaintiffs seek to enjoin Defendants from selling any generic form of AndroGel® after Defendants have obtained the necessary FDA approval – which will necessarily occur long after the December 16, 2003 issuance of the Certificate of Correction.

Consequently, in determining whether an injunction should issue, the Court must determine whether Defendants' *future* sales will infringe the then-existing patent – *i.e.*, the patent as corrected by the December 16, 2003 Certificate of Correction. This follows from the well-settled rule that each sale of an infringing product constitutes a separate cause of action that does not arise until the sale has actually occurred. *Augustine Med., Inc. v. Progressive Dynamics, Inc.*, 194 F.3d 1367, 1371 (Fed. Cir. 1999); *Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1366 (Fed. Cir. 1998); *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1031 (Fed. Cir. 1992). Because the cause of action will not arise until the date of the future sale, the infringement inquiry must be based on the then-existing patent — *i.e.*, the patent as corrected.

Furthermore, even if this action did not relate to future acts of infringement, the Certificate of Correction would still be applicable.  The courts have long held that patent infringement is a continuing tort.  *Augustine Med.*, 194 F.3d at 1371; *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1221-22 (Fed. Cir. 1995). Consistent with these holdings, the Federal Circuit has made clear that a course of conduct can become culpable even if it originally begins as an "innocent" action – *and even if it becomes culpable only after a lawsuit is filed*:

> [P]atent infringement is a continuing tort, and an action even if innocently begun does not automatically retain its purity as circumstances change.  *The filing of a lawsuit does not stop the clock insofar as culpability may arise from continuing disregard of the legal rights of the patentee.*

*Pall Corp.*, 66 F.3d at 1221-22 (emphasis added).

The same rationale applies here, particularly since Defendants have continued to pursue their ANDAs in disregard of Plaintiffs' legal rights. (*See*, *e.g.*, Exs. J, K).  For example, Defendant Paddock submitted six amendments to its ANDA between April 8 and October 22, 2004, while Defendant Watson submitted amendments on December 30, 2003 and June 30 and September 17, 2004.  (*Id.*). Accordingly, the Certificate of Correction applies to Defendants' continuing infringement of Plaintiffs' patent in the period following the issuance of the Certificate on December 16, 2003.

26

**C.    Even if the Certificate Did Not Apply to This Case, the Court Can Correct the Error**

Even if the Certificate of Correction did not apply to the instant action, the underlying error is so basic – and so obvious – that it can be readily corrected by this Court.   For more than 80 years, the courts have corrected typographical or clerical errors in patents when such errors were apparent in light of the claims, the specification and the file history.   For example, in *I.T.S. Rubber Co. v. Essex Rubber Co*., 272 U.S. 429, 442 (1926), the Supreme Court upheld the authority of a trial court to construe a patent claim to include a critical term that had been omitted "through a clerical error due to oversight."   In so doing, the Court stressed that it was "merely giving to [the claim] the meaning which was intended by the applicant and understood by the examiner."   *Id*. at 442.

The Federal Circuit has reached the same result in cases involving manifest errors in claim language.   For example, in *Lemelson v. General Mills, Inc.*, 968 F.2d 1202, 1204 n.3 (Fed. Cir. 1992), the Court construed a claim to include the word "toy" when the omission of the word was clearly an "inadvertent error."   *See also Novo Indus., L.P. v. Micro Molds Corp*., 350 F.3d 1348, 1356-57 (Fed. Cir. 2003).   In these cases, the Court has held that a district court can correct a patent when two conditions are met:   (1) the correction is not subject to reasonable debate

27

based on the claim language and the specification; and (2) the prosecution history does not suggest a different interpretation of the claims. *Id.* at 1357.

Both conditions are met here. There can be no "reasonable debate" that (1) the original designation of "about 1% to about 5%" pure sodium hydroxide was an error; and (2) the error could be corrected by simply inserting the term "0.1 N" before the phrase "sodium hydroxide." To be sure, Defendants assert that the selection of the term "0.1 N" was "arbitrary" because the concentration of sodium hydroxide could be expressed in a variety of ways. This argument, however, ignores the clear teachings of the preferred embodiment disclosed in Table 5, which expressly refers to "0.1 N sodium hydroxide." (Ex. A, 13:32). Accordingly, a skilled artisan would not disregard the unambiguous teachings of Table 5 in determining how to correct the error. (Ex. E, at ¶ 7).

Nor does the prosecution history suggest a different interpretation of the claims. On the contrary, the prosecution history makes unmistakably clear that the applicants *intended* to claim a range that included the concentration of sodium hydroxide in the AndroGel® formulation. During prosecution, the applicants specifically referred to the concentration of sodium hydroxide in the AndroGel® formulation (*i.e.*, 4.72% as set forth in Table 5) as falling within the range of "about 1% to about 5%." (Ex. I, at 26) ("Table 5 . . . Note that 4.72g of 0.1 N

28

NaOH = about 1.8g of NaOH in 100g of gel or about 1.8%."). In so doing, however, the applicants made a decimal error in calculating the amount of pure sodium hydroxide as 1.8% instead of the correct amount of 0.018%. (Ex. E, at ¶ 9).

The circumstances of the decimal error thus make clear that the applicants intended to claim a range that included the concentration of sodium hydroxide in the AndroGel® formulation, as set forth in Table 5 of the specification. This was also the understanding of the Examiner, who plainly construed the claims to cover AndroGel®. (Ex. N). Finally, the specification discloses how the ministerial error could be corrected – *i.e.*, by simply inserting the term "0.1 N" before "sodium hydroxide," as shown by Table 5. In light of these facts, this Court can make the same correction that the PTO did by construing Claims 1, 9, 10 and 18 to include the term "0.1 N" before the phrase "sodium hydroxide."

## VII.   "ABOUT 1% TO ABOUT 3% SODIUM HYDROXIDE"

Another issue involving claim construction concerns the meaning of "about 3 percent" as that phrase is used in corrected Claim 9 to mark the upper limit of the relevant sodium hydroxide range.  This issue arises because Defendants assert that the concentrations of 0.1 N sodium hydroxide in their generic versions of AndroGel® (    and      percent respectively) do not fall within the scope of the "about 3 percent" limitation of Claim 9.

The Federal Circuit has held that the term "about" should be construed to mean "approximately" when the term is used to describe a range in patent claims. *Merck & Co. v. Teva Pharm., USA, Inc.,* 395 F.3d 1364, 1369 (Fed. Cir. 2005). Such a construction effectively broadens the claimed range by avoiding a "strict numerical boundary to the specified parameter."  *Pall Corp.,* 66 F.3d at 1217.

The extent to which the term "about" broadens the range of a specific patent claim can rarely be given a "precise limit."  *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1554 (Fed. Cir. 1996).  Rather, in each case, the court must determine a "reasonable scope" of the broadened range based on the relevant technology and the effects that any variances in the parameters of the range will have on the claimed invention.  *Pall Corp.,* 66 F.3d at 1217.   In many cases, moreover, the court will have to determine the scope of "about" by referring

30

REDACTED

specifically to the allegedly-infringing product – *i.e.*, does the accused product "meet a reasonable meaning of 'about' in the particular circumstances?" *Modine*, 75 F. 3d at 1554.

In this case, the concentration of 0.1 N sodium hydroxide can be varied over a relatively broad range and still serve its intended function.  As noted earlier, sodium hydroxide is not a critical ingredient in the claimed formulation because it plays no role in obtaining the "steady state" testosterone levels disclosed in the patent.  (Ex. F, at ¶ 58).  Rather, the sole function of sodium hydroxide is to react with the gelling agent to produce a suitable pH for the formation of a gel.[4]  (*Id*., at ¶ 23-24; Ex. L, at ¶ 89).

One skilled in the art would recognize that different concentrations of 0.1 N sodium hydroxide will produce a suitable range of pH for the formation of the gel claimed in the '894 Patent.  (Ex. L, at ¶ 31).  Indeed, Defendant Paddock has conducted experiments showing that a range of about 3 percent to about 8 percent 0.1 N sodium hydroxide will produce a suitable pH for the formation of the claimed gel.  (*Id*.).  Consistent with these results, Defendants have told the FDA that their generic drugs (which contain          and          percent 0.1 N sodium

---

[4]     Because sodium hydroxide is a base, it neutralizes the acidic gelling agent and produces a change in pH (which measures the acidity of a solution).

hydroxide) are bioequivalent to Androgel® (which contains 4.72 percent of the same excipient).

The breadth of the above ranges results from the fact that a solution of 0.1 N sodium hydroxide consists almost entirely of water and contains only a tiny fraction of pure sodium hydroxide.  For example, the amount of pure sodium hydroxide in 3% 0.1 N sodium hydroxide is only 0.012 grams.  This means that the concentration of pure sodium hydroxide in the ranges claimed in the '894 Patent is far less than *one half of 1% of the overall formulation*, as the following chart shows:

| % of 0.1 N Solution | Amount of Pure NaOH | % of Pure NaOH in Formulation |
|---|---|---|
| 1% | 0.004g | 0.004% |
| 2% | 0.008g | 0.008% |
| 3% | 0.012g | 0.012% |
| 4% | 0.016g | 0.016% |
| 5% | 0.020g | 0.020% |

Thus, the difference of a single percentage of 0.1 N sodium hydroxide is only 0.004 grams of pure sodium hydroxide, which represents only 0.004% of the total formulation.  This miniscule difference explains why concentrations falling in the range of "about 1 percent to about 5 percent" 0.1 N sodium hydroxide produce the same result when neutralizing the gelling agent in the claimed formulation.

32

It also explains why the claims of the '894 Patent express the ranges of 0.1 N sodium hydroxide in terms of *whole* numbers (*e.g.*, "about 1 percent to about 3 percent"), rather than in terms of any smaller units such as tenths of a percent. If the patent used smaller units, it would result in indistinguishable differences in the concentration of pure sodium hydroxide. Thus, while Claim 9 expresses the range in the concentration of the gelling agent and isopropyl myristate in terms of tenths of a percent, it expresses the range the concentration of 0.1 N sodium hydroxide in only whole numbers. (Ex. A, 50:31-34).

Accordingly, one skilled in the art would construe "about 3%" to include concentrations up to (but not including) 4% 0.1 N sodium hydroxide. (Ex. M, at pgs. 273-274). Such a construction rests on several factors. First, it incorporates the distinction drawn by the '894 Patent between concentrations of 0.1 N sodium hydroxide, which are expressed in whole numbers, and concentrations of other excipients, which are expressed in tenths of a percent. Second, it recognizes that the concentration of 0.1 N sodium hydroxide can be varied over a relatively broad range without affecting the function of the excipient in the formulation. (*Id.*). Third, it meaningfully distinguishes the range of 0.1 N sodium hydroxide disclosed in Claim 9 ("about 1% to about 3%") from the range disclosed in the other claims ("1% to about 5%") by selecting the mid-point (4%) between the upper limits of

33

the two ranges. (*Id*.). Finally, it provides the term "about 3%" with a "reasonable scope" since the difference between 3% and 3.99% is less than 0.004 grams (or 0.004% of the total formulation). *Modine*, 75 F.3d at 1554.

To be sure, Defendants assert that "about 3%" broadens the range disclosed in Claim 9 by no more than 10% of the upper limit. Under this theory, the claimed range includes no more than 3.3% of 0.1 N sodium hydroxide. This theory, however, completely ignores the distinction drawn by the '894 Patent (including Claim 9) between concentrations of 0.1 N sodium hydroxide (which are expressed in whole number percentages) and concentrations of other excipients (which are expressed in tenths of a percent). It also ignores the function of sodium hydroxide, which (as shown above) is not affected by different concentrations falling in a relatively broad range of 0.1 N sodium hydroxide. Finally, Defendants' theory rests on a distinction that is completely meaningless since the difference between the concentration of sodium hydroxide contained in 3.3% and, for example, 3.4% 0.1 N sodium hydroxide is effectively zero (*i.e.*, 0.0004% of the overall formulation).

Accordingly, in contrast to Defendants' theory, the construction proposed by Plaintiffs incorporates the distinctions drawn by the '894 Patent between the ranges for concentrations of sodium hydroxide and the ranges for concentrations of other

34

excipients.   It also recognizes the extent to which the sodium hydroxide concentration can be varied without changing its effect on the claimed invention. Finally, it provides a "reasonable meaning" for the phrase "about 3%" as it appears in Claim 9.   For these reasons, the Court should construe the phrase to include concentrations up to (but not including) 4% 0.1 N sodium hydroxide.

## VIII.  CLAIM 31 INCLUDES EMBODIMENTS WITH SODIUM HYDROXIDE

As noted earlier, the Certificate of Correction issue does not apply to Claims 31-42 because those claims do not list sodium hydroxide as a required element of the composition.  (Ex. A, 52:3-23).  Rather, Claim 31 describes the composition as "consisting essentially of" testosterone, isopropyl myristate, alcohol and a gelling agent in various specified ranges.  (*Id*.).

The same logic underlying the construction of Claim 1 applies to Claim 31. The phrase "consisting essentially of" indicates that the invention must include the listed ingredients, but can also include other unlisted ingredients if they do not materially affect the basic and novel properties of the invention.  *PPG Indus.*, 156 F.3d at 1354.   Consistent with this rule, Claim 31 does not identify sodium hydroxide as a required element because sodium hydroxide is not needed in every embodiment to neutralize the gelling agent.  On the contrary, some gelling agents do not require neutralization, while others can be neutralized by excipients other than sodium hydroxide.  (Ex. F, at ¶ 59).

Although sodium hydroxide is not a required element of Claim 31, the claim plainly includes embodiments with sodium hydroxide, since Table 5 specifically identifies sodium hydroxide in listing the excipients of the preferred embodiment (AndroGel®).

36

Nor does sodium hydroxide affect the "basic and novel properties of the invention." *PPG Indus.*, 156 F.3d at 1354.  To be sure, as noted earlier, this issue is generally not appropriate for resolution in a *Markman* proceeding if the patent is silent on the unlisted ingredient.  *Id*. at 1354-55.  In this case, however, the rule does not apply because the patent is not silent on the unlisted ingredient.  *AK Steel Corp.*, 334 F.3d at 1240-41.  In particular, in its description of the preferred AndroGel® formulation, the specification makes clear that sodium hydroxide can be used to neutralize a gelling agent whenever such neutralization is necessary. (Ex. A, 13:32).

In light of this teaching, Plaintiffs respectfully request that this Court hold as a matter of claim construction that Claim 31 includes embodiments using sodium hydroxide.  Alternatively, if the Court concludes that the '894 Patent is silent on whether sodium hydroxide affects the "novel and basic properties of the invention," Plaintiffs respectfully request that this issue be decided in the infringement stage of the proceeding.

37

## IX.   CONCLUSION

Because the constructions set forth above by Plaintiffs are fully supported by

the claim language, specification and prosecution history of the '894 Patent, in

accordance with Federal Circuit law, Plaintiffs respectfully request that this Court

construe the claims as set forth in this brief.

Dated:   July 25, 2005               Respectfully submitted,

UNIMED PHARMACEUTICALS, INC. and
LABORATORIES BESINS ISCOVESCO


By: /s/  James R. Ferguson
       One of their attorneys

Jerry B. Blackstock  Georgia Bar No. 061000
HUNTON & WILLIAMS
4100 Bank of America Plaza
600 Peachtree Street NE
Atlanta, Georgia 30308-2216
Telephone: (404) 888-4000
Facsimile:  (404) 888-4190

James R. Ferguson
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 782-0600
Facsimile:  (312) 701-7711

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNIMED PHARMACEUTICALS, INC.,      )
a Delaware corporation, and        )
LABORATORIES BESINS                )
ISCOVESCO, a Delaware corporation, )
               Plaintiffs,      )
                            )
v.                                 )      Nos.  1:03-CV-2501 TWT
                            )             1:03-CV-2503 TWT
WATSON PHARMACEUTICALS,            )
INC., a Nevada corporation, and    )
PADDOCK LABORATORIES, INC., a      )
Minnesota corporation,             )
               Defendants.      )

## CERTIFICATE OF SERVICE

     I hereby certify that on July 25, 2005, a true and correct copy of the foregoing document was filed electronically via CM/ECF in the United States District Court for the Northern District of Georgia, with notice of same being electronically served by the Court, addressed to:

| | |
|---|---|
| David A. Rabin<br>Morris, Manning & Martin LLP<br>1600 Atlanta Financial Center<br>3343 Peachtree Road, N.E.<br>Atlanta, Georgia 30326-1044<br>***Attorneys for the Defendant***<br>***Watson Pharmaceuticals, Inc.*** | Barry S. White<br>Frommer, Lawrence & Haug LLP<br>745 Fifth Avenue<br>New York, New York  10151<br><br>***Attorneys for the Defendant***<br>***Watson Pharmaceuticals, Inc.*** |
| Mark G. Trigg<br>Ernest L. Greer<br>Hayden Pace<br>Greenberg Traurig, LLP<br>The Forum Suite 400<br>3290 Northside Parkway, N.W.<br>Atlanta, Georgia 30327<br>***Attorneys for the Defendant***<br>***Paddock Laboratories, Inc.*** | Albert L. Jacobs, Jr.<br>Daniel A. Ladow<br>Greenberg Traurig, LLP<br>MetLife Building<br>200 Park Avenue<br>New York, NY 10166<br><br>***Attorneys for the Defendant***<br>***Paddock Laboratories, Inc.*** |

DATED:    July 25, 2005       By: /s/   James R. Ferguson