## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| UNIMED PHARMACEUTICALS, INC., | ) | |
| a Delaware corporation, and | ) | |
| LABORATORIES BESINS | ) | |
| ISCOVESCO, a Delaware corporation, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION FILE |
| | ) | |
| v. | ) | NO. 1:03-cv-2501-TWT |
| | ) | |
| WATSON PHARMACEUTICALS, INC., | ) | |
| a Nevada corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## WATSON'S MEMORANDUM OF LAW IN SUPPORT OF ITS
## MOTION FOR PARTIAL SUMMARY JUDGMENT

David A. Rabin
MORRIS, MANNING & MARTIN, LLP
Georgia Bar No. 591469
1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, Georgia 30326
Telephone: (404) 233-7000
Facsimile: (404) 365-9532

Of Counsel:
Barry S. White
Steven M. Amundson
John G. Taylor
Joyce W. Luk
Jennifer Chung
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, New York 10151
Telephone: (212) 588-0800
Facsimile: (212) 588-0500

Attorneys for Defendant
Watson Pharmaceuticals, Inc.

September 9, 2005

#1314599-v1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION AND SUMMARY .................................................................1

I.    BACKGROUND ........................................................................................2

      A.    Procedural Background .........................................................................2

      B.    The Prosecution of the '894 Patent and the Claims as Issued ..............4

      C.    The Certificate of Correction and the Claims as "Corrected" .............7

II.   The Applicable Law ......................................................................................9

      A.    Standards for Summary Judgment ........................................................9

      B.    The Requirements for Obtaining a Certificate of Correction ..............9

            1.    If the Correction Broadens the Claim Scope, the Mistake
                  Cannot Be One of "Minor Character" ......................................12

            2.    Mistakes of a "Clerical or Typographical" Nature ...................13

            3.    Broadening Corrections Are Permitted to Correct
                  Clerical or Typographical Errors Only if It Is Clearly
                  Evident That an Error Has Been Made and How the Error
                  Should Be Corrected .................................................................15

III.  Argument .......................................................................................................17

      A.    The Certificate of Correction Is Invalid to the Extent That It
            Adds the Term "0.1 N" to Claims 1, 9, 10, and 18 ............................17

            1.    The Correction Broadened the Claims and, Therefore, the
                  "Mistake" Was Not One of "Minor Character" ........................17

#1314599-v1

      2.     The "Mistake" at Issue Was Not a "Clerical" or "Typographical" Error That Can Be Corrected ........................20

   B.    The Court Should Not "Correct" the Alleged Error Omitting the Term "0.1 N" on Its Own ..................................................................25

IV.   CONCLUSION..............................................................................................27

#1314599-v1

# TABLE OF AUTHORITIES

C<small>ASES</small>

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986)......................................................................9

Arthocare Corp. v. Smith & Nephew, Inc.,
    406 F.3d 1365 (Fed. Cir. 2005) ....................................................15

Ball Corp. v. United States,
    729 F.2d 1429 (Fed. Cir. 1984) ....................................................13

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986)......................................................................9

Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,
    234 F.3d 558 (Fed. Cir. 2000) ......................................................16

Hewlett-Packard Co. v. Bausch & Lomb Inc.,
    882 F.2d 1556 (Fed. Cir. 1989) ....................................................11

In re Arnott,
    19 U.S.P.Q.2d 1049 (Comm'r Pat. & Trademarks 1991.................. 10, 12, 14

In re Graff,
    111 F. 3d 874 (Fed. Cir. 1997) .....................................................12

In re Rogoff,
    261 F.2d 601 (C.C.P.A. 1958)).................................................. 13, 14

L.E.A. Dynatech, Inc. v. Allina,
    49 F.3d 1527 (Fed. Cir. 1995) ......................................................12

Novo Indus., L.P. v. Micro Molds Corp.,
    350 F.3d 1348 (Fed. Cir. 2003) ................................................ 15, 16, 25, 26

#1314599-v1

Superior Fireplace v. Majestic Prods. Co.,
    270 F.3d 1358 (Fed. Cir. 2001) ............................................................ passim

Tillotson, Ltd. v. Walbro Corp.,
    831 F.2d 1033 (Fed. Cir. 1987) ...................................................................13

**STATUTES**

35 U.S.C. § 251 ............................................................................................. 10, 11

35 U.S.C. § 255 ............................................................................................. passim

**OTHER AUTHORITIES**

Manual of Patent Examining Procedure ("M.P.E.P.") § 1481 (8th ed. 2001 ..........10

**RULES**

Fed. R. Civ. P. 56(c).........................................................................................9

**REGULATIONS**

37 C.F.R. § 1.176 ..........................................................................................11

#1314599-v1

## INTRODUCTION AND SUMMARY

Defendant Watson Pharmaceuticals, Inc. moves for partial summary judgment that the December 16, 2003 certificate of correction to plaintiffs' U.S. Patent No. 6,503,894 is invalid for failing to meet the statutory requirements of 35 U.S.C. § 255 to the extent that it adds the term "0.1 N" to claims 1, 9, 10, and 18. Section 255 permits the Patent Office to correct, under certain circumstances, two types of patentee mistakes: (1) those of "minor character," and (2) those that are of a "clerical or typographical nature."

A mistake that would broaden a claim if corrected cannot be considered a "mistake of minor character." Here, as plaintiffs concede, the certificate of correction's addition of the term "0.1 N" before "sodium hydroxide" in claims 1, 9, 10, and 18 broadened the scope of those claims. Accordingly, the error the certificate of correction purports to correct is not a "mistake of minor character."

In order for a mistake of a "clerical or typographical nature" to be correctable under § 255, it must be "clearly evident" that such an error was made and equally evident how that error should be corrected. Here, it is not "clearly evident" that a mistake was made because the claims make sense without the "0.1 N" term. Even assuming that it is apparent that a mistake was made, it is not "clearly evident" how the mistake should be corrected because there is more than

one way to correct it.  Indeed, it appears from the patent and prosecution history that the certificate of correction changed the claims in a way that is contrary to what the patentees intended when they added the sodium hydroxide limitations during prosecution.

For these reasons, the Court should hold that the December 16, 2003 certificate of correction is invalid to the extent that it adds the term "0.1 N" to claims 1, 9, 10, and 18.

## I.     BACKGROUND

A.     Procedural Background

In May 2003, Watson Pharmaceuticals, Inc., through its wholly owned subsidiary, Watson Laboratories, Inc. (collectively "Watson"), submitted an Abbreviated New Drug Application ("ANDA") to the U.S. Food and Drug Administration ("FDA") to obtain approval to market a generic testosterone gel.  In August 2003, Unimed Pharmaceuticals, Inc. and Laboratories Besins Iscovesco (collectively "Unimed") filed suit against Watson, alleging that Watson's proposed product will infringe Unimed's U.S. Patent No. 6,503,894 ("the '894 patent").

On July 25, 2005, Watson and Unimed exchanged principal claim-construction briefs regarding the construction of various claim terms and phrases that the parties had previously identified as being in dispute.  In its principal claim-

#1314599-v1

construction brief, Watson stated its belief that Unimed's post-lawsuit certificate of correction is invalid, and advised the Court that Watson intended to submit a motion for partial summary judgment on this issue.  (7/25/05 Watson Br. at 34) Unimed unexpectedly and improperly argued the certificate of correction's validity in its principal claim-construction brief.  (7/25/05 Unimed Br. at 19-29)  In its reply claim-construction brief, Watson explained that the certificate of correction's validity is not a "claim-construction" issue and asked the Court to defer its consideration of the issue until after full briefing of this motion for partial summary judgment.  (8/12/05 Watson Br. at 26-28)  Watson also separately moved to strike the section of Unimed's principal claim-construction brief that concerns the certificate of correction.  In its response to Watson's motion to strike, Unimed agreed to withdraw from claim construction issues concerning the certificate of correction.  (8/26/05 Unimed Br. at 2-3)

In its principal claim-construction brief, Unimed also argued that the certificate of correction applies to this action because patent infringement is a continuing tort.  (7/25/05 Unimed Br. at 26)  Watson concedes for purposes of this motion that patent infringement is a continuing tort and that it has not withdrawn its ANDA for a generic testosterone gel.  To further the interests of judicial economy and to narrow the issues for trial, Watson here seeks a partial summary

- 3 -

judgment invalidating the certificate of correction because the Patent Office improperly issued it.

B.      The Prosecution of the '894 Patent and the Claims as Issued

The '894 patent issued on January 7, 2003.  (Ex. 1 at 1 [WA1])[1]  As issued, claims 1, 10, and 18 defined testosterone formulations including "about 1% to about 5% sodium hydroxide," while claim 9 defined a hydroalcoholic gel including "about 1% to about 3% sodium hydroxide."  The claimed percentages are relative to the composition's weight.  (Ex. 2, col. 49, ll. 59-67; col. 50, ll. 1-2, 27-48; col. 51, ll. 1-20 [WA79-81])  As explained below, and as Unimed admits, the phrase "sodium hydroxide" in the claims as issued means pure, solid sodium hydroxide. See infra, pp. 15-16; 7/25/05 Unimed Br. at 19.

Unimed filed its application for the '894 patent on August 30, 2000.  (Ex. 3 [WA246-357])  None of the application's claims mentioned sodium hydroxide. (Ex. 3 [WA323-327])  The application's written description included Table 5, which detailed the specific composition of AndroGel® as one embodiment of the

---

[1]   References to "Ex. __" are to exhibits included in the appendix filed with Watson's Principal Claim-Construction Brief dated July 25, 2005.

invention.  (Ex. 3 at 26 [WA277])  The same Table 5 appears in the issued patent

and is reproduced below:

### TABLE 5

Composition of AndroGel ®

| SUBSTANCE | AMOUNT (w/w) PER 100 g OF GEL |
|---|---|
| Testosterone | 1.0 g |
| Carbopol 980 | 0.90 g |
| Isopropyl myristate | 0.50 g |
| 0.1 N NaOH | 4.72 g |
| Ethanol (95% w/w) | 72.5 g* |
| Purified water (qsf) | 100 g |

*corresponding to 67 g of ethanol.

(Ex. 1, col. 13, ll. 23-35 [WA57])  In the technical literature and in the '894 patent,

"NaOH" is the chemical formula for sodium hydroxide.

According to Table 5, one of the ingredients in AndroGel® is 0.1 N sodium

hydroxide.  The paragraph following Table 5 in the '894 patent application and the

issued patent states:

> One skilled in the art will appreciate that the constituents of this
> formulation may be varied in amounts yet continue to be within
> the spirit and scope of the present invention.  For example, the
> composition may contain about 0.1 to about 10.0 g of
> testosterone, about 0.1 to about 5.0 g Carbopol, about 0.1 to
> about 5.0 g isopropyl myristate, and about 30.0 to about 98.0 g
> ethanol.

- 5 -

(Ex. 1, col. 13, ll. 36-43 [WA57]; Ex. 3 at 26 [WA277])

On October 29, 2001, Unimed filed an amendment and response to an Office action that canceled certain claims and added others.  (Ex. 3 [WA429-451])  New dependent claims 45 and 64 recited sodium hydroxide.  (Ex. 3 at 4, 6 [WA432-434]).  The remarks in Unimed's submission did not mention dependent claims 45 and 64 or sodium hydroxide.  (Ex. 3 at 4, 6 [WA432-34])

On December 21, 2001, Unimed filed a supplemental amendment.  (Ex. 3 [WA480-494])  Among other things, this amendment canceled dependent claims 45 and 64 and added new claims.  (Ex. 3 at 1, 6-8 [WA480-487])  The new claims did not mention sodium hydroxide, nor did the remarks.  (Ex. 3 [WA480-94])  Accordingly, none of the then-pending claims recited a range for sodium hydroxide or even mentioned sodium hydroxide.

On February 8, 2002, Unimed filed a second supplemental amendment. (Ex. 3 [WA496-541])  Among other things, this amendment changed all independent claims but one (nos. 47, 61, 78, and 97 [new] but not 110 [new]) to recite ranges for sodium hydroxide, i.e., "about 1% to about 5%" and "about 1% to about 3%."  (Ex. 3 at 15-19 [WA510-514])  As support for these ranges, Unimed cited Table 5 and stated, "Note that 4.72g of 0.1 N NaOH = about 1.8g NaOH in

- 6 -

100g of gel, or about 1.8%." (Ex. 3 at 26 [WA521])  The remarks did not

otherwise mention sodium hydroxide.  (Ex. 3 at 24-27 [WA519-522])

      Unimed filed additional responses and amendments after February 8, 2002,

but none of them changed the sodium hydroxide limitations or even mentioned

sodium hydroxide.  (Ex. 3 [WA615-21, WA643-47])  Moreover, none of the

interview summaries or Office actions in the prosecution history ever mentioned

sodium hydroxide.  (Ex. 3 [WA409-18, WA467, WA562, WA563, WA587-94,

WA610, WA639])

      The patent then issued on January 7, 2003.

C.    The Certificate of Correction and the Claims as "Corrected"

      On June 12, 2003—more than five months after the '894 patent issued—

Unimed filed a request for a certificate of correction to, among other things,

change claims 1, 9, 10, and 18 by inserting the term "0.1 N" before the phrase

"sodium hydroxide."  (Ex. 3 [WA705-713])  On December 16, 2003, the Patent

Office issued the requested certificate of correction.  (Ex. 3 [WA719-720])

      The term "N" means normality and is defined as the number of equivalents

of solute per liter of solution.  (Ex. 28, Chemistry: The Central Science (2nd Ed.

1981), at 348 [WA3413])  One equivalent of sodium hydroxide (the solute)

amounts to 40 grams of sodium hydroxide.  Thus, a 0.1 N solution of sodium

hydroxide is one in which 4 grams of pure, solid sodium hydroxide are dissolved in one liter of water (the solution).  In other words, 0.1 N sodium hydroxide is a very dilute solution of sodium hydroxide as opposed to pure, solid sodium hydroxide.

In its request for a certificate of correction, Unimed alleged that the "mistakes were made in good faith and that the proper language is contained throughout the specification, see, for example, column 13, Table 5 ('0.1 N NaOH' (sodium hydroxide))."  (Ex. 3 [WA707])  Unimed also stated that "the above-proposed correction would not introduce any new matter and would not alter the substance of the patent in any way that would necessitate reevaluation by an Examiner."  Id.

In its principal claim-construction brief, Unimed states that the "PTO recognized this obvious clerical error and issued a certificate to correct the error by inserting the term '0.1 N' before the phrase 'sodium hydroxide,'" but Unimed does not explain that the certificate issued in response to Unimed's request.  (7/25/05 Unimed Br. at 20)  This misleadingly implies that the Patent Office recognized the omission of the "0.1 N" term as an obvious error on its own and issued the certificate of correction *sua sponte*, which, of course, is not true.

#1314599-v1

## II.    THE APPLICABLE LAW

A.    <u>Standards for Summary Judgment</u>

Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  Summary judgment should be granted when no reasonable fact finder could return a verdict for the nonmovant.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986).

B.    <u>The Requirements for Obtaining a Certificate of Correction</u>

Section 255 of the Patent Act governs certificates of correction based on a patentee's mistakes and provides that

> Whenever a mistake of a clerical or typographical nature, or of minor character . . . appears in a patent . . . the Director may . . . issue a certificate of correction, if the correction does not involve such changes in the patent as would constitute new matter or would require reexamination.

35 U.S.C. § 255.  If the first requirement is not met, because the mistake is not of the "proper type for correction," the second statutory requirement need not be addressed.  <u>In re Arnott</u>, 19 U.S.P.Q.2d 1049, 1052 (Comm'r Pat. & Trademarks 1991).

#1314599-v1

Thus, a certificate of correction is appropriate to correct patentee mistakes that are of "minor character." However, a mistake that would broaden a claim if corrected cannot be considered a "mistake of minor character." Arnott, 19 U.S.P.Q.2d at 1053; Superior Fireplace v. Majestic Prods. Co., 270 F.3d 1358, 1375-76 (Fed. Cir. 2001).

A certificate of correction may also be used to correct patentee mistakes that are of a "clerical or typographical nature."  However, if the clerical or typographical correction would broaden a claim, it can only be corrected by a certificate of correction if it is "clearly evident" from the specification and the prosecution history that an error has been made and equally evident how the error should be corrected.  See Superior Fireplace, 270 F.3d 1358, 1370, 1372, 1373, 1376 (Fed. Cir. 2001).

Unless a patentee can satisfy both requirements in § 255, a certificate of correction should not issue, and a patentee must initiate a reissue proceeding to correct the patent.  "Usually, any mistake affecting claim scope must be corrected by reissue."  Manual of Patent Examining Procedure § 1481 (8th ed. 2001); see also Superior Fireplace, 270 F.3d at 1370-71; 35 U.S.C. § 251.  "Reissue is essentially a reprosecution of all claims."  Hewlett-Packard Co. v. Bausch & Lomb Inc., 882 F.2d 1556, 1563 (Fed. Cir. 1989).  A reissue application is "examined in

- 10 -

the same manner as a non-reissue, non-provisional application." 37 C.F.R. §

1.176.  That is, the patent examiner will conduct a new prior art search and review

all claims for patentability in light of the prior art as if it were the original

application.  In re Graff, 111 F. 3d 874, 875 (Fed. Cir. 1997).  Thus, a patentee, by

seeking reissue, exposes all patent claims to potential rejection on any statutory

ground.  L.E.A. Dynatech, Inc. v. Allina, 49 F.3d 1527, 1530-31 (Fed. Cir. 1995).

    1.    If the Correction Broadens the Claim Scope,
           the Mistake Cannot Be One of "Minor Character"

Any mistake that, if corrected, would change or broaden the scope of a claim

cannot be of "minor character" and cannot be corrected under § 255.  Arnott, 19

U.S.P.Q.2d at 1053; Superior Fireplace, 270 F.3d at 1375-76.  In Superior

Fireplace, the Federal Circuit applied the concept of broadening as used in

connection with reissue applications.  Id. at 1370-71.  In the context of a reissue

application under 35 U.S.C. § 251, a reissue claim is considered to be "broader in

scope than the original claims if it contains within its scope any conceivable

apparatus or process which would not have infringed the original patent."

Tillotson, Ltd. v. Walbro Corp., 831 F.2d 1033, 1037 n.2 (Fed. Cir. 1987)

(citations omitted); see also Ball Corp. v. United States, 729 F.2d 1429, 1438 (Fed.

Cir. 1984) ("It is well-settled that a claim is broadened . . . if it is so changed as to

bring within its scope any structure which was not within the scope of the original claim, even though it may be narrowed in other respects.") (quoting <u>In re Rogoff</u>, 261 F.2d 601, 603-04 (C.C.P.A. 1958)).

        2.     <u>Mistakes of a "Clerical or Typographical" Nature</u>

A clerical or typographical mistake is one that, absent very unique circumstances, is "manifest from the contents of the file of the patent sought to be corrected." <u>See</u> <u>Arnott</u>, 19 U.S.P.Q.2d at 1053. An example of a clerical error is where "a specification refers to degrees in Celsius and the claims recite merely degrees." <u>Id.</u> Another example of a clerical error would be the applicant's omission of a reference from a prior-art submission form, where the examiner discusses the reference in an Office action, yet the reference is not printed on the patent's face due to the omission. The error would be apparent from the file because the reference was discussed. <u>Id.</u> An example of a typographical error is an obvious misspelling that would be immediately apparent. <u>Superior Fireplace</u>, 270 F.3d at 1370.

In <u>Arnott</u>, the patentee requested a certificate of correction for an alleged error in a patent claim and asserted that claim 8 mistakenly had been made dependent from claim 1 rather than claim 7. 19 U.S.P.Q.2d at 1053. The patentee asserted that the intention had been to make claim 8 depend from claim 7, but that

- 12 -

an error must have been made when typing claim 8 from handwritten notes.  Id. at 1053.  The Patent Office denied the patentee's request.  Id.  It ruled that there was no evidence that a clerical or typographical error had been made because claim 8 read fine on its face and nothing in the file indicated the existence of an error with respect to the dependency of claim 8.  Id.

> 3.     Broadening Corrections Are Permitted to Correct Clerical
>        or Typographical Errors Only if It Is Clearly Evident That an
>        Error Has Been Made and How the Error Should Be Corrected

In Superior Fireplace, the Federal Circuit considered whether a patentee may make broadening corrections under § 255.  The court concluded that § 255 does allow for broadening corrections of clerical or typographical errors but only where it is "clearly evident" from the specification, drawings, and prosecution history that an error has been made and "clearly evident" how the error should be corrected. 270 F.3d at 1370, 1372, 1373, 1376; see also Arthocare Corp. v. Smith & Nephew, Inc., 406 F.3d 1365, 1374-75 (Fed. Cir. 2005); Novo Indus., L.P. v. Micro Molds Corp., 350 F.3d 1348, 1356-57 (Fed. Cir. 2003).

Applying these principles in Superior Fireplace, the Federal Circuit affirmed the district court's ruling that a certificate of correction changing "rear walls" to "rear wall" was invalid.  The claim as issued used the terms "rear wall" and "rear walls" in two separate limitations.  Id. at 1373.  Although it was clear that one of

these limitations contained a mistake, it was not evident from the claim language which one was wrong.  Id.  There was also conflicting material in the written description and prosecution history—some supporting "rear wall" as the correct term and some supporting "rear walls" as the correct term.  Id. at 1373-74. Accordingly, the Federal Circuit concluded that it was not "clearly evident" from the claims, written description, and drawings that "rear walls" was incorrect and "rear wall" was correct.  Id. at 1375.  Hence, it held that the alleged mistake was not a clerical or typographical error that could be corrected under § 255.  Id.  The court also held that the corrected claim reciting "rear wall" was broader than the uncorrected claim reciting "rear walls," and therefore was not a mistake of minor character that could be corrected under § 255.  Id. at 1375-76.

The above-described law governing a certificate of correction's validity serves an important public policy, namely, making "the notice function of patent claims" of "paramount" importance.  Superior Fireplace, 270 F.3d at 1371-72 (quoting Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 234 F.3d 558, 575 (Fed. Cir. 2000) (en banc)).  In Superior Fireplace, the Federal Circuit noted (a) "the propriety of independently considering the public notice function in interpreting the patent statutes" and (b) "the clear intent of Congress to protect the public against the unanticipated broadening of a claim after the grant of the patent

- 14 -

by the PTO."  Id.  In short, the patent laws place on the applicant the burden of making sure that the application is correct, and allow corrections only when they comport with the public notice function of patents.

### III.  ARGUMENT

A.  The Certificate of Correction Is Invalid to the Extent
    That It Adds the Term "0.1 N" to Claims 1, 9, 10, and 18

    1.  The Correction Broadened the Claims and, Therefore,
    the "Mistake" Was Not One of "Minor Character"

As issued, claims 1, 10, and 18 defined testosterone formulations including "about 1% to about 5% sodium hydroxide," while claim 9 defined a hydroalcoholic gel including "about 1% to about 3% sodium hydroxide."  (Ex. 2, col. 49, l. 59 to col. 50, l. 2, col. 50, ll. 27-35, col. 50, ll. 38-47, col. 51, ll. 1-12 [WA79-81])  The written description does not define expressly or by implication the term "sodium hydroxide."  In these instances, a technical dictionary or treatise is often useful to assist in understanding the common meaning of the word.  The '894 patent cites Remington's: The Science & Practice of Pharmacy, (20th ed. 2000).  (Ex. 1, col. 12, ll. 66-67 [WA56])  Remington's describes "sodium hydroxide" as "fused masses, small pellets, flakes, sticks, and other forms, hard and brittle."  (Ex. 24 Remington's at 1047 [WA3317])  The '894 patent contains no contradictory definition, or any definition at all.  Indeed, Unimed concedes in its principal claim-

- 15 -

construction brief that the term "sodium hydroxide" in the claims as issued means

"*pure* sodium hydroxide."  (7/25/05 Unimed Br. at 19)  Thus, to a person of

ordinary skill in the art, the term "sodium hydroxide" means the pure, solid

material with the chemical formula "NaOH."

In its principal claim-construction brief, Watson argues that claims 1, 9, 10,

and 18 are product claims—as opposed to process claims or product-by-process

claims—that are drawn to particular compositions that contain specified

ingredients within recited weight-percentage ranges.  (7/25/05 Watson Br. at 35,

37-38)  In other words, each of the listed ingredients must be present in the final

composition in the stated forms and amounts and are not merely components used

to make the product.  For example, compositions covered by claims 1, 10, and 18

must contain 1% to 5% pure, solid sodium hydroxide (claims as issued) or 1% to

5% of a diluted 0.1 N sodium hydroxide solution (claims as "corrected").

Similarly, compositions covered by claim 9 must contain 1% to 3% pure, solid

sodium hydroxide (claim as issued) or 1% to 3% of a diluted 0.1 N sodium

hydroxide solution (claim as "corrected").

In the alternative, Watson argues that claims 1, 9, 10, and 18 should be

construed to mean that the claimed compositions must be made using the listed

ingredients in the forms and amounts recited.  (7/25/05 Watson Br. at 36, 37-38)

#1314599-v1

Thus, claims 1, 10, and 18 only encompass compositions made using 1% to 5% pure, solid sodium hydroxide (claims as issued) or 1% to 5% of a diluted 0.1 N sodium hydroxide solution (claims as "corrected").  Similarly, claim 9 only encompasses compositions made using 1% to 3% pure, solid sodium hydroxide (claim as issued) or 1% to 3% of a diluted 0.1 N sodium hydroxide solution (claim as "corrected").

Under either construction, the changes to the form of sodium hydroxide in claims 1, 9, 10, and 18 are broadening corrections because the claims as altered include within their scope subject matter that was not included within the scope of the original claims.  Under Watson's first proposed construction, Unimed's insertion of the term "0.1 N" before "sodium hydroxide" in claims 1, 9, 10, and 18 changed the claimed inventions to cover formulations that contain a diluted 0.1 N sodium hydroxide solution in the final product rather than pure, solid sodium hydroxide as required by the originally issued claims.  Under Watson's alternative proposed construction, the addition of the term "0.1 N" changed the claimed inventions to cover formulations that employ a diluted 0.1 N sodium hydroxide solution in making the claimed products rather than pure, solid sodium hydroxide as required by the originally issued claims.

- 17 -

Accordingly, the "corrected" claims cover subject matter not embraced by the claims as issued and the "correction" adding the term "0.1 N" must be considered broadening.  Indeed, Unimed conceded that this "correction" broadened the affected claims when it argued that certain broadening corrections of ministerial errors are permissible under § 255.  (7/25/05 Unimed Br. at 22; 8/12/05 Unimed Br. at 10)  Therefore, since the addition of the term "0.1 N" is a broadening correction, the omission of the term "0.1 N" from the claims as originally issued cannot be a "mistake . . . of minor character" that is correctable under § 255.

    2.    The "Mistake" at Issue Was Not a "Clerical" or <u>"Typographical" Error That Can Be Corrected</u>

Because the correction was invalid under the "mistake of minor character" test, the certificate of correction can only be upheld if it is "clearly evident" both that (1) a clerical or typographical error was made and (2) the addition of "0.1 N" to the claims was the only proper way to correct the error.  <u>See</u> <u>Superior Fireplace</u>, 270 F.3d at 1370, 1372, 1373, 1376.

Here, it is not apparent from the language of the claims as issued that a mistake was made because the sodium hydroxide limitations make sense without the "0.1 N" term.  A person of ordinary skill in the art would have understood the

#1314599-v1

references to "sodium hydroxide" to mean pure, solid sodium hydroxide.  And as Unimed's expert agrees, even if a person having ordinary skill used a solution of sodium hydroxide, that person could use various concentrations of sodium hydroxide, i.e., 0.05 N or 0.2 N, to achieve the claimed amount of sodium hydroxide.  <u>See</u> Expert Report of Norman Weiner, Ph.D. dated April 21, 2005, ¶ 45 (Unimed Ex. D)[2]  In short, on the face of the '894 patent as issued, there was nothing to indicate that a clerical or typographical error was made, much less that the omission of the term "0.1 N" before "sodium hydroxide" was such an error.

Further evidence that the "error" was not "clearly evident" is how long it took for the applicants to discover the "error."  Unimed argues that the "error" was obvious.  (7/25/05 Unimed Br. at 20-22)  Yet, the patent was prosecuted for almost one year after Unimed's second supplemental amendment added the sodium hydroxide limitations.  During that time there were several Office actions, responsive communications from Unimed, and interviews with the examiner, and yet no one noticed the allegedly obvious "error."  (Ex. 3 [WA562, WA563,

---

[2]   References to "Unimed Ex. __" are to exhibits included in the appendix that Unimed filed with its Memorandum on Claim Construction dated July 25, 2005.

#1314599-v1

WA587-94, WA610, WA615-21, WA639, WA643-47])  It was not until five months after the '894 patent issued that Unimed noticed the "error" and sought a certificate of correction.

Even if it is assumed that it is "clearly evident" that a clerical or typographical error was made with respect to the sodium hydroxide limitations in claims 1, 9, 10, and 18, it is not "clearly evident" that the addition of the term "0.1 N" was the proper way to correct the error.  Indeed, it appears from the prosecution history that addition of the term "0.1 N" changed the claims in a way that Unimed did not intend when it added the sodium hydroxide limitations in the first place.

In its February 8, 2002 second supplemental amendment, Unimed supported its newly claimed ranges for sodium hydroxide of 1%-5% and 1%-3% by citing to the AndroGel® formulation in Table 5 and noting that "4.72g of 0.1N NaOH = about 1.8g NaOH in 100g of gel, or about 1.8%."  (Ex. 3 at 26 [WA521]) Although Unimed miscalculated by a factor of 100, its conversion of the 4.72 grams of 0.1 N sodium hydroxide in the embodiment in Table 5 to grams of pure, solid sodium hydroxide indicates that it intended to express the ranges of sodium hydroxide in the claims in terms of pure, solid sodium hydroxide rather than a diluted 0.1 N sodium hydroxide solution.

#1314599-v1

Thus, there are at least two different ways that the alleged clerical or typographical error could have been corrected—by claiming pure, solid sodium hydroxide or a diluted solution of 0.1 N sodium hydroxide.  Consequently, the error is uncorrectable under <u>Superior Fireplace</u> since it is not "clearly evident" how it should be corrected.  270 F.3d at 1370, 1372, 1373, 1376.

In fact, while a possible choice, it appears that inserting the term "0.1 N" into claims 1, 9, 10, and 18 changes the claims in a way that is contrary to what Unimed intended during prosecution.  As Unimed admits, it intended to claim ranges of sodium hydroxide that included the amount contained in AndroGel®. (7/25/05 Unimed Br. at 28-29; 8/12/05 Unimed Br. at 13)  This is evident from Unimed's use of the AndroGel® formulation in Table 5 to support the claimed sodium hydroxide ranges during prosecution—including the range recited in claim 9.  (Ex. 3 at 26 [WA521]).  Yet, by inserting the term "0.1 N," claim 9 now recites a range of 1% to 3% 0.1 N sodium hydroxide and does not cover AndroGel®, which contains  4.72% 0.1 N sodium hydroxide according to Table 5.

Accordingly, not only was there more than one way to correct the alleged error in claims 1, 9, 10, and 18, it appears from the patent and prosecution history that the addition of the term "0.1 N" was not what Unimed intended. Consequently, it certainly is not "clearly evident" how Unimed's alleged error

- 21 -

should be corrected and, under <u>Superior Fireplace</u>, the alleged error was not properly correctable through a certificate of correction.

Because any alleged errors in the sodium hydroxide limitations claimed in the '894 patent were uncorrectable by certificate of correction under § 255, Unimed should have sought a reissue patent to correct errors to claims 1, 9, 10, and 18. As discussed above, however, a patentee seeking reissue exposes all patent claims to rejection on any statutory ground. <u>See</u> <u>supra,</u> pp. 10-11. Instead of seeking reissue, Unimed attempted an end run around the reissue statute by obtaining a certificate of correction that failed to comply with statutory requirements.

B.     The Court Should Not "Correct" the Alleged
       <u>Error Omitting the Term "0.1 N" on Its Own</u>

Unimed argues, in the alternative, that if the certificate of correction does not apply, this Court can "correct" claims 1, 9, 10, and 18 on its own by inserting the term "0.1 N" and apply those "corrected" claims in this case. (7/25/05 Unimed Br. at 27-29) Although district courts do have the authority to correct obvious minor errors in claims, that authority has been limited by the enactment of § 255. <u>See</u> <u>Novo</u>, 350 F.3d at 1356. District courts have less authority to correct errors than the Patent Office. <u>Id.</u> For the same reasons that the Patent Office should not

have issued the certificate of correction, this Court should refrain from changing

claims 1, 9, 10, and 18 to include the term "0.1 N."

In <u>Novo</u>, the Federal Circuit recently considered whether Congress intended

to deny limited correction authority to district courts by enacting § 255.  <u>Id.</u> at

1355-57.  It held that district courts can continue to correct "obvious minor

typographical and clerical errors" in patents—and apply the correction

retroactively—where no certificate of correction has been issued.  <u>Id.</u> at 1357.  The

Federal Circuit decided, however, that Congress did not intend for "district courts

to have the authority to correct any and all errors" that the Patent Office can

correct.  <u>Id.</u> at 1356.  The Federal Circuit, therefore, restricted a district court's

authority to correct obvious minor errors to circumstances where "(1) the

correction is not subject to reasonable debate based on consideration of the claim

language and the specification and (2) the prosecution history does not suggest a

different interpretation of the claims."  <u>Id.</u> at 1357.

In <u>Novo</u>, the Federal Circuit held that the district court improperly corrected

the word "a" to read "and" in the phrase "stop means formed on a rotatable with

said support finger," and it invalidated the uncorrected claim for indefiniteness.  <u>Id.</u>

at 1357-58.  The court ruled that the "nature of the error is not apparent from the

face of the patent" and cited as evidence the fact that the patentee had suggested

two ways to correct the claim, the defendant suggested a third, and the district court corrected it in yet a fourth way suggested by neither party.  Id. at 1357.

Here, as discussed above, the specification and prosecution history suggest at least two different ways that the alleged error could be corrected, and it appears that adding the term "0.1 N" actually was not what Unimed intended.  Thus, the appropriateness of the correction urged by Unimed is "subject to reasonable debate" and the prosecution history does suggest a "different interpretation of the claims."  Accordingly, this Court—with more limited authority to correct errors than the Patent Office—should not "correct" claims 1, 9, 10, and 18 by inserting the term "0.1 N" and apply its "correction" retroactively to this case.

# IV.   CONCLUSION

For the foregoing reasons, this Court should grant Watson's motion for

partial summary judgment and hold the certificate of correction invalid to the

extent that it adds the term "0.1 N" to claims 1, 9, 10, and 18 in the '894 patent.

Respectfully submitted,
MORRIS, MANNING & MARTIN, LLP
Attorneys for Defendant
Watson Pharmaceuticals, Inc.


Dated:  September 9, 2005          /s  David A. Rabin
                                      David A. Rabin
                                      Georgia Bar No. 591469
                                   1600 Atlanta Financial Center
                                   3343 Peachtree Road, NE
                                   Atlanta, Georgia 30326
                                   Telephone: (404) 233-7000
                                   Fax: (404) 365-9532

Of Counsel:

Barry S. White, Esq.
Steven M. Amundson, Esq.
John G. Taylor, Esq.
Joyce W. Luk, Esq.
Jennifer Chung, Esq.
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, New York  10151
Telephone: (212) 588-0800
Fax: (212) 588-0500

- 25 -

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Rule 7.1D of the Local Civil Rules of the

United States District Court for the Northern District of Georgia, that this brief has

been prepared with one of the font and point selections approved by the Court in

LR 5.1C.

/s David A. Rabin
David A. Rabin
Georgia Bar No. 591469

#1314599-v1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **UNIMED PHARMACEUTICALS, INC.,**<br>**a Delaware corporation, and**<br>**LABORATORIES BESINS**<br>**ISCOVESCO, a Delaware corporation,** | ) )<br>)<br>)<br>) | |
| | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION FILE** |
| | ) | |
| **v.** | ) | **NO. 1:03-cv-2501-TWT** |
| | ) | |
| **WATSON PHARMACEUTICALS, INC.,**<br>**a Nevada corporation,** | )<br>) | |
| | ) | |
| **Defendant.** | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2005, a true and correct copy of the

foregoing document was filed electronically via CM/ECF in the United States

District Court for the Northern District of Georgia, with notice of same being

electronically served by the Court, addressed to:

> Jerry B. Blackstock, Esq.
> Hunton & Williams, LLP
> 4100 Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia 30308-2216

James R. Ferguson, Esq.
Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, Illinois 60606

/s David A. Rabin
_____
David A. Rabin
Georgia Bar No. 591469

MORRIS, MANNING & MARTIN, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326-1044
(404) 233-7000

– 2 –