# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| UNIMED PHARMACEUTICALS, INC., a Delaware corporation, and LABORATORIES BESINS ISCOVESCO, a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> WATSON PHARMACEUTICALS, INC., a Nevada corporation, and PADDOCK LABORATORIES, INC., a Minnesota corporation, <br><br> Defendants. | Nos.  1:03-CV-2501 TWT <br>         1:03-CV-2503 TWT |

### UNIMED PHARMACEUTICALS, INC.'S STATEMENT OF ADDITIONAL FACTS WHICH ARE MATERIAL AND <u>PRESENT A GENUINE ISSUE FOR TRIAL</u>

In accordance with local Civil Rule 56.1(b)(2)(b), Unimed Pharmaceuticals, Inc. and Laboratories Besins Iscovesco, (hereinafter "Unimed") contend that the following are material facts which present a genuine issue for trial.

**Disputed Facts**

1.  It would be clearly evident to one skilled in the art that the claims of the '894 patent that recite sodium hydroxide could not have been solid sodium hydroxide. (Ex. M, ¶ 3; Ex. L, ¶ 3).

2.  It would be clearly evident to one skilled in the art that the range of sodium hydroxide provided in the claims of the '894 patent should have been expressed as a solution of sodium hydroxide. (*Id.*).

3.  It would be clearly evident to one skilled in the art that using pure sodium hydroxide in the ranges specified in the '894 patent claims would require a concentration of sodium hydroxide 50-250 times greater than the concentration of sodium hydroxide described in the preferred embodiment. (*Id.*).

4.  One skilled in the art would know that a gel formulation that includes 1-5% pure sodium hydroxide solution would have a pH of approximately 13. (Ex. L, ¶ 4, 5; Ex. M, ¶ 5; Ex. F, at 8-10).

5.  One skilled in the art would know that a gel formulation that includes 1-5% pure sodium hydroxide would be caustic to human skin. (Ex. F, ¶ 20).

6.  One skilled in the art would know that a gel formulation with a pH of 13 would cause chemical burns when applied to a patient's skin. (Ex. M, ¶ 5; Ex. P, at 23; Ex. L, ¶ 5; Ex. F, at 9).

7. One skilled in the art of a gel formulation would not use a topical gel formulated with 1% pure sodium hydroxide for fear of burning patients. (Ex. M, ¶ 5; Ex. P, at 23).

8. It was clearly evident to one skilled in the art that the use of pure sodium hydroxide in the ranges set forth in the '894 patent claims would not result in the formation of a gel. (Ex. M, ¶ 6; Ex. P, at 23; Ex. L, ¶ 7).

9. It was clearly evident to one skilled in the art that the viscosity of carbomer decreases dramatically and will not form a gel at a pH above 10. (*Id.*).

10. The only normality for sodium hydroxide provided in the specification was 0.1 N. (Ex. A, 13:32).

11. The only support in the specification for the claims having a solution of sodium hydroxide with a particular normality is the reference to the preferred embodiment that includes a 0.1 N solution of sodium hydroxide. (*Id.*).

12. There is no support in the specification for the sodium hydroxide recited in the claims having a concentration other than 0.1 N. (Ex. A).

13. The correction to the claims of adding 0.1 N before the reference to sodium hydroxide was clearly evident from the specification, claims and prosecution history to one of skill in the art. (Ex. M, ¶¶ 9-10; Ex. P, at 24; Ex. L, ¶¶ 9-10; Ex. E, at 2-3).

14.     The mistake of failing to add 0.1 N before the reference to sodium hydroxide in the claims was clearly evident to one skilled in the art.  (Ex. M, ¶ 3; Ex. L, ¶ 3).

15.     One skilled in the art would recognize that the corrected range of about 1% to about 5% 0.1 N solution includes the preferred embodiment.  (Ex. L, ¶ 10; Ex. E, at 2-3; Ex. M, ¶¶ 4, 10; Ex. P, at 23, 24).

16.     One skilled in the art would recognize that the corrected range of about "1% to about 5% 0.1 N" solution represents the proper range for neutralizing the corresponding amounts of gelling agent specified in the patent claims.  (Ex. P, ¶¶ 37-39; Ex. L, ¶ 11).

17.     The person of ordinary in the art is an individual with a degree in chemistry or pharmaceutical sciences who has had at least 1-2 years of experience in developing gels, creams, lotions or other similar delivery forms for human applications.  (Ex. F, ¶ 4; Ex. C, ¶ 6).

18.     AndroGel® is the first testosterone gel ever approved by the FDA, and the first gel ever shown to produce normal levels of testosterone in hypogonadal men over a sustained period.  (Ex. B, ¶¶ 42, 67).

19.     Male hypogonadism is a chronic clinical condition that affects an estimated 4 million men in the United States.  (Ex. B, at 5).

20. Male hypogonadism is characterized by low levels of serum testosterone and a variety of symptoms, including depression, fatigue, decreased bone density, reduced lean body mass, decreased libido and regression of secondary sexual characteristics.  (Ex. A, 2:33-36; Ex. B, at 6).

21. Prior to the development of AndroGel®, physicians relied primarily on testosterone injections or transdermal patches to increase serum testosterone levels in hypogonadal patients.  (Ex. A, 3:64-7:53).

22. The testosterone patches utilize an external, "rate-limiting membrane" to regulate both the rate of delivery and the quantity of testosterone that penetrates the skin.  (Ex. C, at 21-23).

23. The rate-limiting membrane is a key feature of the patch system because it prevents the testosterone from being immediately absorbed into the skin and then traveling directly to the bloodstream.  (*Id.*).

24. If the testosterone is immediately absorbed into the bloodstream, the patient receives only a few hours of benefit because of testosterone's short half-life (approximately 60 minutes) in the body.  (*Id.*).

25. In contrast to the patch, AndroGel® is a testosterone gel that does not utilize an external, rate-limiting membrane.  (*Id.*).

26. AndroGel® surprisingly facilitates the ability of the skin to act as its own "patch" by retaining the testosterone in the outer layer known as the stratum corneum. (*Id.*).

27. AndroGel® enables testosterone to penetrate into the stratum corneum and then remain within that layer, so that the stratum corneum becomes a kind of "reservoir" for the hormone. (*Id.*).

28. Ultimately, the testosterone begins to slowly diffuse through the remaining layers of the skin and into the circulatory system where it is then transported to other areas of the body. (*Id.*).

29. AndroGel® produces a prolonged release of testosterone into the bloodstream – *i.e.*, a sustained-release effect. (*Id.*).

30. In clinical trials on hypogonadal men, AndroGel® was shown to produce "steady-state" testosterone levels within the normal physiologic range over a sustained period of time. (Ex. A, 14:25-25:48).

31. The maintenance of this "steady-state" profile over a prolonged treatment period represented a remarkable technological achievement. (Ex. C, at 23).

32.  Daily use of AndroGel® not only increased testosterone to normal levels, but also maintained those levels by replacing testosterone at approximately the same rate as the hormone was being used (and eliminated) by the body.  (*Id.*).

33.  If AndroGel® had produced testosterone levels below the normal range (*i.e.*, "sub-therapeutic" levels), it would have had no clinical value in the treatment of hypogonadal patients.  (Ex. C).

34.  Conversely, if AndroGel® had produced levels materially above the normal range (*i.e.*, "supraphysiologic" levels), it would have raised significant questions of safety.  (Ex. C, at 24).

35.  Two years ago, the FDA rejected the application of a competitive testosterone gel because it produced supraphysiologic levels of testosterone that could not be safely managed through dose titration.  (*Id.*).

36.  AndroGel®'s ability to achieve and maintain "steady-state" testosterone levels over a prolonged treatment period is a direct result of its novel formulation.  (*Id.* at ¶ 14).

37.  In that formulation, an active ingredient (testosterone) is administered transdermally through a combination of an alcohol (ethanol) and a so-called "penetration enhancer" known as isopropyl myristate.  (*Id.*).

38.   This penetration-enhancing system is directly responsible for the steady-state blood levels that result from the daily administration of AndroGel®. (*Id.*).

39.   The AndroGel® formulation is administered in the form of a gel which results when sodium hydroxide (NaOH) neutralizes a gelling agent in the presence of water. (Ex. M, ¶¶ 7-8; Ex. P, at 8-10, 23).

40.   The formulation thus consists of six ingredients in the following concentrations:

**AndroGel®**

| Testosterone | 1% |
|---|---|
| Alcohol (Ethanol) | 72.5% |
| Isopropyl Myristate | 0.5% |
| 0.1 N NaOH | 4.72% |
| Gelling Agent | 0.9% |
| Water | 20.38% |

(Ex. A, 13:25-35).

41.   A person skilled in the art would recognize that the concentrations of the above constituents could be varied within specific ranges and still serve the intended purpose of the invention. (*Id.*).

42. Formation of a gel utilizing sodium hydroxide and a gelling agent cannot occur unless the sodium hydroxide is first mixed in an aqueous (i.e., water-based) solution that causes the sodium hydroxide to dissociate into charged molecules called "ions" ($NA^+$ and $OH^-$).  (Ex. M, ¶¶ 7-8; Ex. P, at 8-10, 23).

43. The OH- ions then neutralize the molecules of the gelling agent, which leads to a lengthening of the molecules and the formation of a gel.  (Ex. M, ¶ 7; Ex. P, at 9-10).

44. A "0.1 N" solution of sodium hydroxide and water is a highly diluted solution that is frequently used in pharmaceutical practice.   (Ex. F, ¶ 17).

45. The ranges of 1% to 5% and 1% to 3% 0.1 N sodium hydroxide solution specified in the patent claims represent the ranges of the concentration of the solution needed to neutralize the corresponding ranges of gelling agent specified in the same claims.  (Ex. P, ¶¶ 37-39; Ex. L, ¶ 11).

46. If a materially greater amount of sodium hydroxide were used in the solution, it would prevent the formation of the gel and produce a highly caustic solution that could "rapidly destroy tissues."  (Ex. S, at 1047).

Dated:   October 17, 2005

Respectfully submitted,

UNIMED PHARMACEUTICALS, INC. and
LABORATORIES BESINS ISCOVESCO

By: /s/  Robert S. Rigg
         One of their attorneys

Jerry B. Blackstock  Georgia Bar No. 061000
HUNTON & WILLIAMS
4100 Bank of America Plaza
600 Peachtree Street NE
Atlanta, Georgia 30308-2216
Telephone:  (404) 888-4000
Facsimile:  (404) 888-4190

James R. Ferguson
Robert S. Rigg
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 782-0600
Facsimile:  (312) 701-7711

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| UNIMED PHARMACEUTICALS, INC., ) <br> a Delaware corporation, and ) <br> LABORATORIES BESINS ) <br> ISCOVESCO, a Delaware corporation, ) <br>                Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> WATSON PHARMACEUTICALS, ) <br> INC., a Nevada corporation, and ) <br> PADDOCK LABORATORIES, INC., a ) <br> Minnesota corporation, ) <br>                Defendants. ) | Nos.  1:03-CV-2501 TWT <br>        1:03-CV-2503 TWT |

### CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2005, a true and correct copy of the foregoing document was filed electronically via CM/ECF in the United States District Court for the Northern District of Georgia, with notice of same being electronically served by the Court, addressed to:

| | |
|---|---|
| David A. Rabin <br> Morris, Manning & Martin LLP <br> 1600 Atlanta Financial Center <br> 3343 Peachtree Road, N.E. <br> Atlanta, Georgia 30326-1044 <br> ***Attorneys for the Defendant*** <br> ***Watson Pharmaceuticals, Inc.*** | Barry S. White <br> Frommer, Lawrence & Haug LLP <br> 745 Fifth Avenue <br> New York, New York  10151 <br><br> ***Attorneys for the Defendant*** <br> ***Watson Pharmaceuticals, Inc.*** |
| Mark G. Trigg <br> Ernest L. Greer <br> Hayden Pace <br> Greenberg Traurig, LLP <br> The Forum Suite 400 <br> 3290 Northside Parkway, N.W. <br> Atlanta, Georgia 30327 <br> ***Attorneys for the Defendant*** <br> ***Paddock Laboratories, Inc.*** | Albert L. Jacobs, Jr. <br> Daniel A. Ladow <br> Greenberg Traurig, LLP <br> MetLife Building <br> 200 Park Avenue <br> New York, NY 10166 <br><br> ***Attorneys for the Defendant*** <br> ***Paddock Laboratories, Inc.*** |

Dated:  October 17, 2005           /s/  Robert S. Rigg
_____

1301433