IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNIMED PHARMACEUTICALS, INC., )<br>a Delaware corporation, and )<br>LABORATORIES BESINS )<br>ISCOVESCO, a Delaware corporation, )<br>　　　　　　　　　　　　　　　　　)<br>　　　Plaintiffs, 　　　　　　　　　)<br>　　　　　　　　　　　　　　　　　)<br>　　　v. 　　　　　　　　　　　　　)<br>　　　　　　　　　　　　　　　　　)<br>WATSON PHARMACEUTICALS, INC., )<br>a Nevada corporation, 　　　　　　　)<br>　　　　　　　　　　　　　　　　　)<br>　　　Defendant. 　　　　　　　　　) | CIVIL ACTION FILE<br><br>NO. 1:03-CV-2501-TWT |

**WATSON'S RESPONSE TO PLAINTIFFS' STATEMENT
OF ADDITIONAL FACTS WHICH ARE MATERIAL
AND PRESENT A GENUINE ISSUE FOR TRIAL**

In accordance with Local Civil Rule 56.1 B.(3), movant Watson Pharmaceuticals, Inc. responds to Plaintiffs' Statement of Additional Facts Which Are Material and Present a Genuine Issue for Trial as follows:

**Paragraph 1 States:**   It would be clearly evident to one skilled in the art that the claims of the '894 patent that recite sodium hydroxide could not have been solid sodium hydroxide.  (Ex. M, ¶ 3; Ex. L, ¶ 3).

**RESPONSE:**

Objected to as not material and not in compliance with the provisions set out in LR 56.1 B.(1) because it states legal conclusions concerning claim construction and validity.

**Paragraph 2 States:** It would be clearly evident to one skilled in the art that the range of sodium hydroxide provided in the claims of the '894 patent should have been expressed as a solution of sodium hydroxide. (*Id.*).

**RESPONSE:**

Objected to as not material and not in compliance with the provisions set out in LR 56.1 B.(1) because it states legal conclusions concerning claim construction and validity.

**Paragraph 3 States:** It would be clearly evident to one skilled in the art that using pure sodium hydroxide in the ranges specified in the '894 patent claims would require a concentration of sodium hydroxide 50-250 times greater than the concentration of sodium hydroxide described in the preferred embodiment. (*Id.*).

**RESPONSE:**

Objected to as not material, including because no claim in the '894 patent is drawn to specifically claim the preferred embodiment, but instead the claims cover ranges of ingredients that can be varied to make numerous compositions.

**Paragraph 4 States:**   One skilled in the art would know that a gel formulation that includes 1-5% pure sodium hydroxide solution would have a pH of approximately 13. (Ex. L, ¶ 4, 5; Ex. M, ¶ 5; Ex. F, at 8-10).

**RESPONSE:**

Objected to as unclear because "pure" sodium hydroxide is a solid and not a "solution." To the extent that this paragraph was intended to refer to solid sodium hydroxide, it is objected to as not material, including because it simply refers to a gel formulation that includes 1-5% pure sodium hydroxide with no reference to the other ingredients in the formulation.

**Paragraph 5 States:**   One skilled in the art would know that a gel formulation that includes 1-5% pure sodium hydroxide would be caustic to human skin (Ex. F, ¶ 20).

**RESPONSE:**

Objected to as not material, including because it simply refers to a gel formulation that includes 1-5% pure sodium hydroxide with no reference to the other ingredients in the formulation.

**Paragraph 6 States:**   One skilled in the art would know that a gel formulation with a pH of 13 would cause chemical burns when applied to a patient's skin. (Ex. M, ¶ 5; Ex. P, at 23; Ex. L, ¶ 5; Ex. F, at 9).

**RESPONSE:**

Objected to as not material, including because there is no claim in the '894 patent that recites a gel formulation with a pH of 13.

**Paragraph 7 States:** One skilled in the art of a gel formulation would not use a topical gel formulated with 1% pure sodium hydroxide for fear of burning patients. (Ex. M, ¶ 5; Ex. P, at 23).

**RESPONSE:**

Objected to as not material, including because it simply refers to a gel formulation that includes 1% pure sodium hydroxide with no reference to the other ingredients in the formulation.

**Paragraph 8 States:** It was clearly evident to one skilled in the art that the use of pure sodium hydroxide in the ranges set forth in the '894 patent claims would not result in the formation of a gel. (Ex. M, ¶ 6; Ex. P, at 23; Ex. L, ¶ 7).

**RESPONSE:**

Objected to as not material, including because it simply refers to a gel that includes 1-5% or 1-3% pure sodium hydroxide with no reference to the other ingredients in the formulation. Also objected to as not material and not in compliance with the provisions set out in LR 56.1 B.(1) because it states a legal conclusion concerning claim construction.

**Paragraph 9 States:** It was clearly evident to one skilled in the art that the viscosity of carbomer decreases dramatically and will not form a gel at a pH above 10. (*Id.*).

**RESPONSE:**

Objected to as not material, including because there is no claim in the '894 patent that recites a gel formulation with a pH above 10.

**Paragraph 10 States:** The only normality for sodium hydroxide provided in the specification was 0.1 N. (Ex. A, 13:32).

**RESPONSE:**

To the extent that this paragraph is meant to state that the specification provides that only 0.1 N sodium hydroxide can be used, it is objected to as not supported by the evidence. It is conceded that the only reference to sodium hydroxide in the specification is in Table 5, which sets forth the AndroGel® formula, and the amount of sodium hydroxide stated is 4.72 grams of 0.1 N sodium hydroxide.

**Paragraph 11 States:** The only support in the specification for the claims having a solution of sodium hydroxide with a particular normality is the reference to the preferred embodiment that includes a 0.1 N solution of sodium hydroxide. (*Id.*).

**RESPONSE:**

Objected to as not in compliance with the provisions set out in LR 56.1 B.(1) because it states a legal conclusion concerning claim construction. To the extent that this paragraph is meant to state that the specification provides that only 0.1 N sodium hydroxide can be used, it is objected to as not supported by the evidence. It is conceded that the only reference to sodium hydroxide in the specification is in Table 5, which sets forth the AndroGel® formula, and the amount of sodium hydroxide stated is 4.72 grams of 0.1 N sodium hydroxide.

**Paragraph 12 States:** There is no support in the specification for the sodium hydroxide recited in the claims having a concentration other than 0.1 N. (Ex. A).

**RESPONSE:**

Objected to as not material. Objected to as not in compliance with the provisions set out in LR 56.1 B.(1) because it states a legal conclusion concerning claim construction. To the extent that this paragraph is meant to state that the specification provides that only 0.1 N sodium hydroxide can be used, it is objected to as not supported by the evidence. It is conceded that the only reference to sodium hydroxide in the specification is in Table 5, which sets forth the

AndroGel® formula, and the amount of sodium hydroxide stated is 4.72 grams of 0.1 N sodium hydroxide.

**Paragraph 13 States:** The correction to the claims of adding 0.1 N before the reference to sodium hydroxide was clearly evident from the specification, claims and prosecution history to one of skill in the art. (Ex. M, ¶¶ 9-10; Ex. P, at 24; Ex. L, ¶¶ 9-10; Ex. E, at 2-3).

**RESPONSE:**

Objected to as not in compliance with the provisions set out in LR 56.1 B.(1) because it states a legal conclusion concerning validity.

**Paragraph 14 States:** The mistake of failing to add 0.1 N before the reference to sodium hydroxide in the claims was clearly evident to one skilled in the art. (Ex. M, ¶ 3; Ex. L, ¶ 3).

**RESPONSE:**

Objected to as not in compliance with the provisions set out in LR 56.1 B.(1) because it states a legal conclusion concerning validity.

**Paragraph 15 States:** One skilled in the art would recognize that the corrected range of about 1% to about 5% 0.1 N solution includes the preferred embodiment. (Ex. L, ¶ 10; Ex. E, at 2-3; Ex. M, ¶¶ 4, 10; Ex. P, at 23, 24).

**RESPONSE:**

Objected to as unclear because it does not specify an ingredient.  To the extent this paragraph is meant to refer to sodium hydroxide, it is objected to as not material.  It is conceded that the preferred embodiment set forth in Table 5 includes 4.72 grams of 0.1 N sodium hydroxide.

**Paragraph 16 States:**   One skilled in the art would recognize that the corrected range of about "1% to about 5% 0.1 N" solution represents the proper range for neutralizing the corresponding amounts of gelling agent specified in the patent claims. (Ex. P, ¶¶ 37-39; Ex. L, ¶ 11).

**RESPONSE:**

Objected to as unclear because it does not specify an ingredient.  To the extent this paragraph is meant to refer to sodium hydroxide, it is objected to as not material.

**Paragraph 17 States:**   The person of ordinary in the art [sic] is an individual with a degree in chemistry or pharmaceutical sciences who has had at least 1-2 years of experience in developing gels, creams, lotions or other similar delivery forms for human applications. (Ex. F, ¶ 4; Ex. C, ¶ 6).

**RESPONSE:**

Objected to as not material.

**Paragraph 18 States:** AndroGel® is the first testosterone gel ever approved by the FDA, and the first gel ever shown to produce normal levels of testosterone in hypogonadal men over a sustained period. (Ex. B, ¶¶ 42, 67).

**RESPONSE:**

Objected to as not material.

**Paragraph 19 States:** Male hypogonadism is a chronic clinical condition that affects an estimated 4 million men in the United States.  (Ex. B, at 5).

**RESPONSE:**

Objected to as not material.

**Paragraph 20 States:** Male hypogonadism is characterized by low levels of serum testosterone and a variety of symptoms, including depression, fatigue, decreased bone density, reduced lean body mass, decreased libido and regression of secondary sexual characteristics. (Ex. A, 2:33-36; Ex. B, at 6).

**RESPONSE:**

Objected to as not material.

**Paragraph 21 States:** Prior to the development of AndroGel®, physicians relied primarily on testosterone injections or transdermal patches to increase serum testosterone levels in hypogonadal patients.  (Ex. A, 3:64-7:53).

**RESPONSE:**

Objected to as not material.

**Paragraph 22 States:**   The testosterone patches utilize an external, "rate-limiting membrane" to regulate both the rate of delivery and the quantity of testosterone that penetrates the skin. (Ex. C, at 21-23).

**RESPONSE:**

Objected to as not material.

**Paragraph 23 States:**   The rate-limiting membrane is a key feature of the patch system because it prevents the testosterone from being immediately absorbed into the skin and then traveling directly to the bloodstream. (*Id.*).

**RESPONSE:**

Objected to as not material.

**Paragraph 24 States:**   If the testosterone is immediately absorbed into the bloodstream, the patient receives only a few hours of benefit because of testosterone's short half-life (approximately 60 minutes) in the body. (*Id.*).

**RESPONSE:**

Objected to as not material.

**Paragraph 25 States:**   In contrast to the patch, AndroGel® is a testosterone gel that does not utilize an external, rate-limiting membrane. (*Id.*).

**RESPONSE:**

Objected to as not material.

**Paragraph 26 States:**   AndroGel® surprisingly facilitates the ability of the skin to act as its own "patch" by retaining the testosterone in the outer layer known as the stratum corneum. (*Id.*).

**RESPONSE:**

Objected to as not material.

**Paragraph 27 States:**   AndroGel® enables testosterone to penetrate into the stratum corneum and then remain within that layer, so that the stratum corneum becomes a kind of "reservoir" for the hormone. (*Id.*).

**RESPONSE:**

Objected to as not material.

**Paragraph 28 States:**   Ultimately, the testosterone begins to slowly diffuse through the remaining layers of the skin and into the circulatory system where it is then transported to other areas of the body. (*Id.*).

**RESPONSE:**

Objected to as not material.

**Paragraph 29 States:**   AndroGel® produces a prolonged release of testosterone into the bloodstream - i.e., a sustained-release effect. (*Id.*).

**RESPONSE:**

Objected to as not material.

**Paragraph 30 States:**    In clinical trials on hypogonadal men, AndroGel® was shown to produce "steady-state" testosterone levels within the normal physiologic range over a sustained period of time. (Ex. A, 14:25-25:48).

**RESPONSE:**

Objected to as not material.

**Paragraph 31 States:**    The maintenance of this "steady-state" profile over a prolonged treatment period represented a remarkable technological achievement. (Ex. C, at 23).

**RESPONSE:**

Objected to as not material.

**Paragraph 32 States:**    Daily use of AndroGel® not only increased testosterone to normal levels, but also maintained those levels by replacing testosterone at approximately the same rate as the hormone was being used (and eliminated) by the body. (*Id.*).

**RESPONSE:**

Objected to as not material.

**Paragraph 33 States:** If AndroGel® had produced testosterone levels below the normal range (i.e., "sub-therapeutic" levels), it would have had no clinical value in the treatment of hypogonadal patients. (Ex. C).

**RESPONSE:**

Objected to as not material.

**Paragraph 34 States:** Conversely, if AndroGel® had produced levels materially above the normal range (i.e., "supraphysiologic" levels), it would have raised significant questions of safety. (Ex. C, at 24).

**RESPONSE:**

Objected to as not material.

**Paragraph 35 States:** Two years ago, the FDA rejected the application of competitive testosterone gel because it produced supraphysiologic levels of testosterone that could not be safely managed through dose titration. (*Id.*)

**RESPONSE:**

Objected to as not material.

**Paragraph 36 States:** AndroGel®'s ability to achieve and maintain "steady-state" testosterone levels over a prolonged treatment period is a direct result of its novel formulation. (*Id.* at ¶ 14).

**RESPONSE:**

Objected to as not material.

**Paragraph 37 States:**   In that formulation, an active ingredient (testosterone) is administered transdermally through a combination of an alcohol (ethanol) and a so-called "penetration enhancer" knows as isopropyl myristate. (*Id.*).

**RESPONSE:**

Objected to as not material and not supported by the evidence because the AndroGel® formula set forth in Table 5 lists several ingredients in addition to the ones identified in this paragraph.

**Paragraph 38 States:**   This penetration-enhancing system is directly responsible for the steady-state blood levels that result from the daily administration of AndroGel®. (*Id.*).

**RESPONSE:**

Objected to as not material.

**Paragraph 39 States:**   The AndroGel® formulation is administered in the form of a gel which results when sodium hydroxide (NaOH) neutralizes a gelling agent in the presence of water. (Ex. M, ¶¶ 7-8; Ex. P, at 8-10, 23).

**RESPONSE:**

Objected to as not material.

**Paragraph 40 States:**   The formulation thus consists of six ingredients in the following concentrations:

### AndroGel®

| Testosterone | 1% |
|---|---|
| Alcohol (Ethanol) | 72.5% |
| Isopropyl Myristate | 0.5% |
| 0.1 N NaOH | 4.72% |
| Gelling Agent | 0.9% |
| Water | 20.38% |

(Ex. A, 13:25-35).

**RESPONSE:**

Conceded with respect to the concentrations of testosterone, isopropyl myristate, sodium hydroxide, gelling agent, and water. Objected to as not supported by the evidence with respect to ethanol because Table 5 shows that the ethanol in AndroGel® is 95% ethanol by volume, which corresponds to 67 grams of ethanol or 67%.

**Paragraph 41 States:** A person skilled in the art would recognize that the concentrations of the above constituents could be varied within specific ranges and still serve the intended purpose of the invention. (*Id.*).

**RESPONSE:**

Objected to as not material.

**Paragraph 42 States:** Formulation of a gel utilizing sodium hydroxide and a gelling agent cannot occur unless the sodium hydroxide is first mixed in an aqueous (i.e., water-based) solution that causes the sodium hydroxide to dissociate into charged molecules called "ions" ($NA^+$ and $OH^-$). (Ex. M, ¶¶ 7-8; Ex. P, at 8-10, 23).

**RESPONSE:**

Objected to as not material.

**Paragraph 43 States:** The OH- ions then neutralize the molecules of the gelling agent, which leads to a lengthening of the molecules and the formation of a gel. (Ex. M, ¶ 7; Ex. P, at 9-10).

**RESPONSE:**

Objected to as not material.

**Paragraph 44 States:**   A "0.1 N" solution of sodium hydroxide and water is a highly diluted solution that is frequently used in pharmaceutical practice. (Ex. F, ¶ 17).

**RESPONSE:**

Conceded that a "0.1 N" solution of sodium hydroxide and water is a highly diluted solution.  Statement that a "0.1 N" solution of sodium hydroxide is frequently used in pharmaceutical practice objected to as not material.

**Paragraph 45 States:**   The ranges of 1% to 5% and 1% to 3% 0.1 N sodium hydroxide solution specified in the patent claims represent the ranges of the concentration of the solution needed to neutralize the corresponding ranges of gelling agent specified in the same claims. (Ex. P, ¶¶ 37-39; Ex. L, ¶ 11).

**RESPONSE:**

Objected to as not material.

**Paragraph 46 States :**   If a materially greater amount of sodium hydroxide were used in the solution, it would prevent the formation of the gel and produce a highly caustic solution that could "rapidly destroy tissues." (Ex. S, at 1047).

**RESPONSE:**

Objected to as not material.

|  |  |
|---|---|
|  | MORRIS, MANNING & MARTIN, LLP<br>Attorneys for Defendant<br>Watson Pharmaceuticals, Inc. |
| Dated:  November 11, 2005 | By:   s/David A. Rabin<br>David A. Rabin<br>Georgia Bar No. 591469 |

1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, Georgia 30326
Telephone: (404) 233-7000
Fax: (404) 365-9532

Of Counsel:

Barry S. White, Esq.
Steven M. Amundson, Esq.
John G. Taylor, Esq.
Joyce W. Luk, Esq.
Jennifer Chung, Esq.
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, New York  10151
Telephone: (212) 588-0800
Fax: (212) 588-0500

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **UNIMED PHARMACEUTICALS, INC.,** ) <br> **a Delaware corporation, and** ) <br> **LABORATORIES BESINS** ) <br> **ISCOVESCO, a Delaware corporation,** ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> **WATSON PHARMACEUTICALS, INC.,** ) <br> **a Nevada corporation,** ) <br> ) <br> Defendant. ) | **CIVIL ACTION FILE** <br><br> **NO. 1:03-CV-2501-TWT** |

## CERTIFICATE OF SERVICE

I hereby certify that on November 11, 2005, a true and correct copy of the foregoing document was filed electronically via CM/ECF in the United States District Court for the Northern District of Georgia, with notice of same being electronically served by the Court, addressed to:

>   Jerry B. Blackstock, Esq.
>   HUNTON & WILLIAMS LLP
>   4100 Bank of America Plaza
>   600 Peachtree Street NE
>   Atlanta, Georgia  30308
>
>   James R. Ferguson, Esq.
>   MAYER, BROWN, ROWE & MAW LLP
>   71 South Wacker Drive
>   Chicago, Illinois  60606

This 11th day of November, 2005.

s/David A. Rabin
David A. Rabin
Georgia Bar No. 591469

MORRIS, MANNING & MARTIN, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326-1044
(404) 233-7000