# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

UNIMED PHARMACEUTICALS, )
INC., a Delaware corporation, and )
LABORATORIES BESINS )
ISCOVESCO, a Delaware )
corporation, )
       )
       Plaintiffs, )
       )
v. )     Nos.   **1:03-CV-2501 TWT**
       )               **1:03-CV-2503 TWT**
WATSON PHARMACEUTICALS, )
INC., a Nevada corporation, and )
PADDOCK LABORATORIES, )
INC., a Minnesota corporation, )
       )
       Defendants. )

## PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTIONS FOR
## PARTIAL SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-30

Jerry B. Blackstock
HUNTON & WILLIAMS
4100 Bank of America Plaza
600 Peachtree Street NE
Atlanta, Georgia 30308-2216
Telephone:  (404) 888-4000
Facsimile:   (404) 888-4190

Of Counsel:
James R. Ferguson
Robert S. Rigg
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 782-0600
Facsimile:   (312) 701-7711

Attorneys for Plaintiffs
Unimed Pharmaceuticals, Inc. and
Laboratories Besins Iscovesco

December 19, 2005

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. ii

I. INTRODUCTION ..................................................................................1

II. THE CLAIMED INVENTION ..............................................................4

    A. AndroGel® and the Prior Art "Skin Patches" ...................................4

    B. The AndroGel® Formulation ............................................................5

    C. Sodium  Hydroxide ...........................................................................6

        1. pH and viscosity ........................................................................9

        2. pH and the concentrations of carbomer and 0.1 N sodium
           hydroxide ................................................................................12

III. THE PATENT IN SUIT .....................................................................14

IV. GOVERNING LEGAL PRINCIPLES .................................................16

    A. Summary Judgment ........................................................................16

    B. Burden of Proof:  Clear and Convincing Evidence ...........................16

    C. The Written Description Requirement ..............................................17

V. DEFENDANTS RELY ENTIRELY ON ATTORNEY ARGUMENT ......20

VI. DEFENDANTS' ARGUMENTS DO NOT ADDRESS
     PLAINTIFFS' EVIDENCE ....................................................................22

    A. A Skilled Chemist Would Recognize That The Specification
       Contains Adequate Support for the Claimed Sodium Hydroxide
       Ranges ...........................................................................................23

    B. Plaintiffs' Evidence Refutes Defendants' Attorney Arguments ........26

    C. Defendants' Own Witnesses Refute Their Attorney Arguments ......28

    D. The Cases Cited by Defendants Support Plaintiffs' Position ............29

VII. PLAINTIFFS' EVIDENCE RAISES DISPUTED FACTUAL
      ISSUES ............................................................................................31

VIII. CONCLUSION .................................................................................35

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003) ................................................................20, 21

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................16, 17

*ATD Corp. v. Lydall, Inc.*,
  159 F.3d 534 (Fed. Cir. 1998) ........................................................................32

*Brooktree Corp. v. Advanced Micro Devices, Inc.*,
  977 F.2d 1555 (Fed. Cir. 1993) ................................................................16, 17

*Capon v. Eshhar*,
  418 F.3d 1349 (Fed. Cir. 2005) ........................................................18, 19, 27

*Fujikawa v. Wattansin*,
  93 F.3d 1559 (Fed. Cir. 1996) ........................................................................17

*In re Lukach*,
  442 F.2d 967 (C.C.P.A. 1971) ........................................................................29

*In re MacLean*,
  454 F.2d 756 (C.C.P.A. 1972) ........................................................................29

*In re Wertheim*,
  541 F.2d 257 (C.C.P.A. 1976) ........................................................................29

*Invitrogen Corp. v. Clontech Labs, Inc.*,
  429 F.3d 1052 (Fed. Cir. 2005) ......................................................................22

*Johnston v. IVAC Corp.*,
  885 F.2d 1574 (Fed. Cir. 1989) ......................................................................22

*Kennecott Corp. v. Kyocera Int'l, Inc.*,
  835 F.2d 1419 (Fed. Cir. 1987) ......................................................................18

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Lewis v. Zilog,*
908 F. Supp. 931 (N.D. Ga. 1995)....................................................32

*Moba, B.V. v. Diamond Automation, Inc.,*
325 F.3d 1306 (Fed. Cir. 2003) .......................................................18

*Ralston Purina Co. v. Far-Mar-Co., Inc.,*
772 F.2d 1570 (Fed. Cir. 1985) ...................................... 19, 26, 29, 30

*Rockwell Int'l Corp. v. United States,*
147 F.3d 1358 (Fed. Cir. 1998) ..................................................16, 22

*Schering Corp. v. Amgen, Inc.,*
222 F.3d 1347 (Fed. Cir. 2002) .......................................................18

*Scripps Clinic & Research Found. v. Genentech, Inc.,*
927 F.2d 1565 (Fed. Cir. 1991) .......................................................34

*Union Oil Co. v. Atlantic Richfield Co.,*
208 F.3d 989 (Fed. Cir. 2000) ........................... 17, 19, 20, 21, 24, 34

*Vas-Cath, Inc. v. Mahurkar,*
935 F.2d 1555 (Fed. Cir. 1991) ...................... 17, 18, 19, 22, 24, 26, 34

## Statutes

35 U.S.C. § 112 ..........................................................................1, 17

Fed. R. Civ. P. 56.............................................................................16

## Other Authorities

M.P.E.P. 2163.05 ...............................................................................17

## I.    INTRODUCTION

This case involves a patent covering the formulation for a transdermal testosterone gel known as AndroGel®.  Defendants have filed summary judgment motions challenging the validity of Claims 1-30 of the patent under the "written description" requirement of 35 U.S.C. § 112.  In their motions, Defendants argue that the specification of the '894 Patent does not contain an adequate written description of the sodium hydroxide ranges which were added to the claims by amendment.

On this issue, the Federal Circuit has made clear that the ranges set forth in a patent claim do *not* have to correspond exactly to disclosures in the original patent application.  Rather, the relevant inquiry is whether "one skilled in the art could *derive* the claim limitations from the [original disclosure]."  This issue is "intensely factual" and must be decided on a case-by-case basis.  Nevertheless, Defendants now argue that this issue raises no genuine disputes of material fact.  This argument should be rejected for at least four reasons.

*First*, Defendants ignore the relevant standard by failing to submit any substantive evidence showing how a skilled artisan would understand the information disclosed in the originally-filed patent.  Indeed, Defendants do not provide any explanation of the relevant science or even cite the testimony of their

1

own experts and fact witnesses.  Instead, as with their summary judgment motions on the Certificate of Correction issue, Defendants rely entirely on a series of attorney arguments that purport to interpret certain aspects of the prosecution history.  It is well settled that attorney argument is no substitute for competent evidence as support for a summary judgment motion.  On this ground alone, the motions should be denied.

*Second*, Defendants ignore the teachings of the prior art, which are a critical component in any written description analysis.  Indeed, the Federal Circuit has squarely held that the failure to consider the "existing scientific and technologic knowledge" in a written description case can be reversible error.  In this case, the teachings of the prior art are directly relevant to the question of whether the information in the originally-filed application "reasonably conveys" to a skilled artisan the claimed sodium hydroxide ranges.

*Third*, Defendants ignore the entire body of Plaintiffs' evidence showing that a skilled artisan could easily derive the sodium hydroxide ranges from the information disclosed in the originally-filed application.  This evidence (which includes the testimony of two highly-regarded experts in pharmaceutical science, as well as the admissions of Defendants' own scientists) shows that a skilled artisan could derive the ranges based on (1) the teachings of the prior art; (2) the

specific concentrations and ranges set forth in the originally-filed application; and (3) the express statement in the application that a skilled artisan could vary the concentration of the ingredients in the formulation (including sodium hydroxide), yet still remain within the scope of the invention.

*Fourth*, even if Defendants' attorney arguments could somehow be viewed as evidence, it would serve only to underscore the material factual disputes created by Plaintiffs' evidence.   The Federal Circuit has repeatedly held that issues involving differences of expert credibility or scientific opinion cannot be resolved on summary judgment, particularly in cases involving written description issues which are "intensely factual" in nature.   These decisions control here.

## II.     THE CLAIMED INVENTION

### A.     AndroGel® and the Prior Art "Skin Patches"

AndroGel® is the first testosterone gel ever approved by the FDA, and the first gel ever shown to produce normal levels of testosterone in hypogonadal men over a sustained period.  Prior to the development of AndroGel®, physicians relied primarily on testosterone injections or transdermal patches to increase serum testosterone levels in hypogonadal patients.  The testosterone patches utilize an external, "rate-limiting membrane" to regulate both the rate of delivery and the quantity of testosterone that penetrates the skin.  (Ex. C, ¶ 21-23).[1]

By contrast, AndroGel® is a testosterone gel that does *not* utilize an external, rate-limiting membrane.  (*Id*.).   Instead, AndroGel® surprisingly facilitates the ability of the skin to act as its own "patch" by retaining the testosterone in the outer layer known as the stratum corneum. (*Id*.).  In particular, AndroGel® enables testosterone to penetrate into the stratum corneum and then remain within that layer, so that the stratum corneum becomes a kind of "reservoir" for the hormone.  (*Id*.).  Ultimately, the testosterone begins to slowly diffuse through the remaining layers of the skin and into the circulatory system

---

[1]     This memorandum incorporates by reference the exhibits submitted in Plaintiffs' Response to Defendants' earlier motions for summary judgment on the validity of the Certificate of Correction.   The memorandum will refer to the exhibits using the same letters as Plaintiffs' earlier Response.

where it is then transported to other areas of the body. (*Id.*). The formulation thus produces a prolonged release of testosterone into the bloodstream – *i.e.*, a sustained-release effect.

In clinical trials on hypogonadal men, AndroGel® was shown to produce "steady-state" testosterone levels within the normal physiologic range over a sustained period of time. (Ex. A, 14:25-25:48). The maintenance of this "steady-state" profile over a prolonged treatment period represented a remarkable technological achievement. (Ex. C, ¶ 23). It showed that the daily use of AndroGel® not only *increased* testosterone to normal levels, but also *maintained* those levels by replacing testosterone at approximately the same rate as the hormone was being used (and eliminated) by the body. (*Id.*).

## B.    The AndroGel® Formulation

AndroGel®'s ability to achieve and maintain "steady-state" testosterone levels over a prolonged treatment period is a direct result of its novel formulation. In that formulation, an active ingredient (testosterone) is administered transdermally through a combination of an alcohol (ethanol) and a so-called "penetration enhancer" known as isopropyl myristate. (Ex. C, ¶ 14). This penetration-enhancing system is directly responsible for the steady-state blood levels that result from the daily administration of AndroGel®. (*Id.*). The

AndroGel® formulation is administered in the form of a gel that results when a strong base known as sodium hydroxide (NaOH) neutralizes a chemical gelling agent known as a "carbomer."  (Ex. P, ¶¶ 15-20).  The formulation thus consists of six ingredients in the following concentrations:

**AndroGel®**

| Testosterone | 1% |
|---|---|
| Alcohol (Ethanol) | 72.5% |
| Isopropyl Myristate | 0.5% |
| 0.1 N NaOH | 4.72% |
| Gelling Agent (Carbomer) | 0.9% |
| Water | 20.38% |

(Ex. A, 13:25-35).   A person skilled in the art would recognize that the concentrations of the above constituents could be varied within certain ranges and still fall within the scope of the invention.  (*Id.*, 13:36-43).  These ranges are the subject of the claims of the '894 Patent.

## C.    Sodium Hydroxide

Defendants' summary judgment motions challenge the adequacy of the written description for the ranges of sodium hydroxide in the claimed formulation. In that formulation, the sodium hydroxide is used to cause the formation of a gel by partially neutralizing the carbomer.  (Ex. P, ¶ 7).  This occurs when the sodium

hydroxide is mixed in an aqueous (*i.e.*, water-based) solution that causes the sodium hydroxide to dissociate into charged molecules called "ions" ($Na^+$ and $OH^-$).  (*Id*.).   The $OH^-$ ions then neutralize the molecules of the gelling agent, which leads to a lengthening of the molecules and the formation of a uniform gel.  (*Id*.).  This chemical reaction is depicted below:



The partial neutralization of a gelling agent increases the thickness of the mixture, which is measured by the "viscosity" of the composition. (Ex. P, ¶¶ 21-22). Because each of the claims of the '894 Patent require the use of a "gelling agent," a skilled chemist would recognize that the claimed formulation should have

8

a suitable viscosity. (*Id*., ¶¶ 21-22, 28, 40-42). As shown below, the viscosity of a partially-neutralized carbomer depends on the concentrations of both the carbomer and the sodium hydroxide.

### 1.     pH and viscosity

When a carbomer is partially neutralized by sodium hydroxide, the reaction changes the "pH" of the resulting composition. (*Id*., ¶ 28). The pH scale (which ranges from 0 to 14) measures the acidity or alkalinity of a solution. (*Id*.). When the pH is 7, it  indicates neutrality, while a pH below 7 is acidic and a pH above 7 is alkaline. (*Id*.).

For many years, it has been known that gels with the highest viscosity result when the partial neutralization of the carbomer produces a pH between approximately 4 and approximately 10 (with the exact range depending on the structure and concentration of the carbomer). (*Id*., ¶ 28; Ex. CC, ¶¶ 5-6). This range is sometimes known as the "plateau range" because the viscosity remains high enough to maintain the gel structure as the pH increases from about 4 to about 10. (*Id*.). The plateau range reflects the fact that the carbomer is a weak acid that

acts as a so-called "buffer" in its reaction with sodium hydroxide (a strong base).[2] (Ex. CC, ¶ 7; Ex. DD, ¶ 7).

The importance of the plateau range is illustrated by the following chart, which was published by a leading manufacturer of carbomers prior to the filing of the patent application in this case.  (Ex. II).  The chart depicts the relationship between pH and viscosity for three carbomers, including the different "plateau ranges" for each of the three gelling agents:

_____

[2]      A "buffer" is a solution that resists changes to pH when neutralized by the addition of an acid or base.  (Ex. CC, ¶¶ 26-29; Ex. DD, ¶ 28).





(*Id.*).  The breadth of the plateau ranges depends on the structure and concentration of the specific carbomer.  (*Id.*; Ex. C, ¶ 10; Ex, D, ¶ 10; Ex. P, ¶ 28).  However, in all cases, the viscosity of the gel sharply declines when the pH of the neutralized carbomer falls outside the relevant plateau range.  (*Id.*).

The pH of the carbomer-sodium hydroxide mixture can be altered by changing the concentrations of sodium hydroxide and carbomer. (*Id*., ¶ 35). By making such adjustments, a skilled artisan can produce a pH that falls within the relevant "plateau range" and thus create a gel with suitable viscosity.[3] (*Id*., ¶¶ 36-37). In this process, the structure and concentration of the carbomer dictates the range of the viscosity plateau, and the sodium hydroxide is then used to assure an appropriate pH value within the plateau region. (Ex. CC, ¶ 15; Ex. DD, ¶¶ 15).

Accordingly, by virtue of the very nature of the neutralization process, the concentrations of carbomer and sodium hydroxide are directly and necessarily linked, with the concentration of sodium hydroxide dependent on the concentration of carbomer. (*Id*.).

### 2. pH and the concentrations of carbomer and 0.1 N sodium hydroxide

Consistent with these principles, formulation chemists have long been able to determine the pH of a carbomer-sodium hydroxide solution based on the

---

[3]     It bears noting that in determining appropriate ranges for neutralizing a carbomer, the range of the sodium hydroxide concentrations can be *narrower* than the range of the carbomer concentrations. (Ex. CC, ¶ 23; Ex. DD, ¶ 23). For example, in this case, the range of the sodium hydroxide concentrations claimed in Claims 1-30 of the '894 Patent varies by a factor of only 3-5 (*e.g.*, "about 1% to about 5%"), while the range of the carbomer concentrations varies by a factor of 50 ("about 0.1% to about 5%"). (Ex. A, 49:62-67).

concentrations of the two reactants.  (Ex. CC, ¶ 16; Ex. DD, ¶ 16).  This is done

through a simple calculation using basic knowledge taught in freshman chemistry

classes across the country.  (*Id.*).

        To illustrate, in this case, a skilled chemist could easily calculate the pH of

the AndroGel® formulation (*i.e.*, 5.4) based on the concentrations of carbomer

(0.9%) and sodium hydroxide (4.72%) disclosed in the specification of the '894

Patent.  (*Id.*).  Similarly, a chemist could calculate the pH of the compositions

resulting from the ranges of carbomer and sodium hydroxide concentrations set

forth in the claims of the '894 Patent (*i.e.*, "about 0.1% to about 5%" carbomer and

"about 1% to about 5%" 0.1 N sodium hydroxide), as shown in the following table:

|  | 1% 0.1 N NaOH | 3% 0.1 N NaOH | 5% 0.1 N NaOH |
|---|---|---|---|
| 0.1% carbomer | pH  5.7 | pH  6.3 | pH  6.6 |
| 0.5% carbomer | pH  5.0 | pH  5.5 | pH  5.7 |
| 0.9% carbomer | pH  4.7 | pH  5.2 | pH  5.4 |
| 1.0% carbomer | pH  4.7 | pH  5.2 | pH  5.4 |
| 2.0% carbomer | pH  4.4 | pH  4.9 | pH  5.1 |
| 3.0% carbomer | pH  4.2 | pH  4.7 | pH  4.9 |
| 5.0% carbomer | pH  4.0 | pH  4.5 | pH  4.7 |

(Ex. P, ¶ 34).

Likewise, using the same calculations, a skilled chemist could determine the concentration of sodium hydroxide needed to neutralize a specific concentration of carbomer to obtain a specific pH.  (Ex. CC, ¶ 18; Ex. DD, ¶ 18).  For example, if the chemist wanted to partially neutralize 1% carbomer to obtain a solution having a pH of 5.4, he could quickly determine that 5% 0.1 N sodium hydroxide would be an appropriate concentration, as reflected in the above table.  (*Id.*).

Accordingly, based on this knowledge, a formulation chemist could easily calculate the concentration of sodium hydroxide needed to partially neutralize a specific concentration of carbomer to obtain a suitable pH for the formation of the gel – *i.e.*, a pH falling within the "plateau range" for the relevant concentration of the specific carbomer.  (Ex. CC, ¶¶ 19-20; Ex. DD, ¶¶ 19-20).  This knowledge (which was part of the prior art when the '894 application was filed in August 2000) provides the scientific backdrop to Defendants' written description claims.  (*Id.*).

## III.   THE PATENT IN SUIT

The '894 Patent contains two broad categories of claims:  Claims 1-17 are directed to a pharmaceutical composition, and Claims 18-42 are directed to methods for using the composition.  The composition claims recite the constituents of a formulation for a transdermal testosterone gel.  (Ex. A, 49:59-50:67).  Each of

the composition claims sets forth a range for the sodium hydroxide concentration, which was added by amendment after the filing of the application. (*Id.*).

The method claims disclose specific blood levels of testosterone resulting from a daily dose of the composition. (Ex. A, 51:1-52:60). The method claims generally recite the same compositions set forth in the formulation claims, except for Claims 31-42, which do not recite sodium hydroxide as a required element. (*Id.*, 52:3-23). As a result, Defendants' motions for partial summary judgment under § 112 do not affect Claims 31-42.

In Table 5, the specification expressly recites the specific concentration of each of the constituents in the AndroGel® formulation. (*Id.*, 13:25-35). Immediately beneath the table, the specification (1) discloses that the listed constituents can be varied in concentration; and (2) provides specific examples of such ranges, including a range for the gelling agent ("Carbopol"):

> One skilled in the art will appreciate that *the constituents of this formulation may be varied in amounts* yet continue to be within the spirit and scope of the present invention. For example, the composition may contain about 0.1 to about 10.0 g of testosterone, *about 0.1 to about 5.0 g Carbopol*, about 0.1 to about 5.0 g isopropyl myristate, and about 30.0 to about 98.0 g ethanol.

(*Id.*, 13:36-42) (emphasis added).

15

As shown below, the written description issue focuses on whether these disclosures "reasonably convey" to one skilled in the art that the invention described in the specification encompassed the claimed ranges of sodium hydroxide.

## IV.   GOVERNING LEGAL PRINCIPLES

### A.   Summary Judgment

Summary judgment is appropriate only if the moving party can prove that the evidence raises no genuine issue of material fact.  Fed. R. Civ. P. 56 (c).  In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-movant, drawing all justifiable inferences in the non-movant's favor and giving due respect to the *moving party's substantive burden of proof*.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1361-62 (Fed. Cir. 1998).

### B.   Burden of Proof:  Clear and Convincing Evidence

The law is clear that the "clear and convincing" evidence standard applies to all challenges to the adequacy of the written description of a patent specification. *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1574-75 (Fed. Cir. 1993).  This rigorous standard reflects the courts' presumption that the PTO has correctly done its job in (*inter alia*) determining that an adequate written

16

description exists for any new claim adding a numerical range.  *Id.*; M.P.E.P. 2163.05.  (Ex. HH).  For this reason, a PTO decision permitting an amendment of a patent claim is "entitled to an especially weighty presumption of correctness." *Brooktree Corp.*, 977 F.2d at 1574-75.

Consequently, on summary judgment, Defendants must show not only that the material facts are undisputed, but also that the undisputed facts provide clear and convincing evidence that the specification fails to comply with the written description requirement.  *Anderson*, 477 U.S. at 255.

## C.    The Written Description Requirement

The written description requirement provides that the specification of a patent must "contain a written description of the invention. . . . ."  35 U.S.C. § 112.  Consistent with this language, the test for compliance with the written description requirement is whether the specification "*reasonably conveys* to persons skilled in the art that the inventor had possession of the subject matter in question."  *Fujikawa v. Wattansin*, 93 F.3d 1559, 1570 (Fed. Cir. 1996); *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991).

This test does not require that the applicant "describe exactly the subject matter claimed; [instead] the description must clearly allow persons of ordinary skill in the art to recognize that [he or she] invented what is claimed."  *Union Oil*

*Co. v. Atlantic Richfield Co.*, 208 F.3d 989, 997 (Fed. Cir. 2000) ("*Unocal*").  Nor does the written requirement test require a "particular form of disclosure."  *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1321 (Fed. Cir. 2003).

To the contrary, the Federal Circuit has long recognized that "an invention may be described in different ways and still be the same invention."  *Kennecott Corp. v. Kyocera Int'l, Inc.*, 835 F.2d 1419, 1422 (Fed. Cir. 1987).  Indeed, the written description requirement can be satisfied by showing that the original specification *inherently* disclosed the later-claimed subject matter.  *Schering Corp. v. Amgen, Inc.,* 222 F.3d 1347, 1352 (Fed. Cir. 2002).

The key inquiry in resolving a written description issue focuses on the perspective of "one skilled in the art" – *i.e.*, does the original disclosure "reasonably convey" to a *skilled artisan* that the inventor had possession of the later-claimed subject matter.  *Vas-Cath*, 935 F.2d at 1561.  For this reason, in any written description case, the district court must begin by first taking into account the prior art – *i.e.*, the "scientific and technologic knowledge" available to the skilled artisan.  *Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005).  Indeed, if a court finds a patent invalid on written description grounds without considering the existing knowledge available to skilled artisans, the court commits reversible error.  *Id*. at 1357-58.  This is true, moreover, even though the law does not require

the patent itself to provide a "re-description of what was already known." *Id.* at 1357.

In applying these principles to "ranges" added by amendment, the Federal Circuit has expressly rejected the assertion that "ranges found in the applicant's claim language must correspond exactly to ranges disclosed in the original disclosure." *Ralston Purina Co. v. Far-Mar-Co., Inc.*, 772 F.2d 1570, 1575 (Fed. Cir. 1985). Rather, the relevant inquiry is whether "one skilled in the art could *derive* the claim limitations from the [original disclosure]." *Vas-Cath*, 935 F.2d at 1566 (emphasis added). Under this standard, the original disclosure does not have to "*necessarily exclude* all [possibilities] other than those within the claimed range." *Id.* (emphasis added). Instead, it is enough if the original disclosure describes the invention in sufficient detail to show that it "encompasses" the later-claimed limitation. *Id.* at 1561.

Finally, the above authorities establish that compliance with the written description requirement is a question of fact that must be decided on a case-by-case basis. *Id.* at 1563-64. Indeed, the Federal Circuit has squarely held that in written description cases the "primary consideration is *factual* and depends on the nature of the invention and the amount of knowledge imparted to those skilled in the art by the disclosure." *Unocal*, 208 F.3d at 996, 999 n.5 (Fed. Cir. 2000). The focus

19

of the factual inquiry thus centers on both the "nature of the invention claimed" and the "understanding of the ordinary skilled artisan."  *Amgen, Inc. v. Hoechst Marion Roussel, Inc*., 314 F.3d 1313, 1330 (Fed. Cir. 2003).

Thus, under the Federal Circuit's standard, the written description issue turns ultimately on a question of fact that must be decided on a case-by-case basis: Can Defendants show by clear and convincing evidence that the specification did not "reasonably convey" to "one skilled in the art" that the inventors were in possession of the claimed invention at the time the application was filed?

## V.   DEFENDANTS RELY ENTIRELY ON ATTORNEY ARGUMENT

Before turning to the merits, it is again necessary to address the nature of the "evidence" submitted by Defendants in support of their summary judgment motions.   As shown above, like the validity of a Certificate of Correction, the written description issue does not present an abstract question of law that can be resolved without considering the evidence of record.   Instead, it raises an "intensely factual" issue that focuses on both the "nature of the invention and the amount of knowledge imparted to those skilled in the art by the disclosure." *Unocal*, 208 F.3d at 999 n.5.

Yet, in their respective memoranda, Defendants cite *no* evidence – not a single treatise, article or expert report – showing how a skilled artisan would

understand either the "nature of the invention" or the originally-filed disclosure. *Unocal*, 108 F.3d at 999 n.5; *Amgen*, 314 F.3d at 1330. Indeed, Defendants do not even attempt to explain the relevant science underlying the sodium hydroxide issue.

Instead, as with their summary judgment motions on the Certificate of Correction issue, Defendants seek summary judgment based entirely on a series of attorney arguments that purport to interpret certain aspects of the intrinsic record, with no support from any substantive evidence. For example, relying entirely on attorney argument (and drawing all inferences *against* the non-movant Plaintiffs), Defendants assert that the specification provides only a "single data point" as support for the claimed sodium hydroxide ranges. (Watson Br., at 14; Paddock Br., at 18).

At no point, however, do Defendants cite any evidence showing how a *skilled artisan* would read the same intrinsic record. Indeed, Defendants do not even cite the testimony of their *own* experts – or their own fact witness employees – to support their attorney arguments on the adequacy of the support for the sodium hydroxide ranges.

It is well settled that attorney argument is no substitute for competent evidence, particularly when such arguments are used to support a summary

21

judgment motion on a written description issue. *Invitrogen Corp. v. Clontech Labs, Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005); *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1581 (Fed. Cir. 1989). It is equally well settled that, on summary judgment, all justifiable inferences must be drawn in favor of the non-movant. *Rockwell*, 147 F.3d at 1361-62. In this case, Defendants' summary judgment motions violate both principles, while failing to cite *any* substantive evidence showing how a skilled artisan would understand either the nature of the invention or the disclosures in the specification. For these reasons alone, the summary judgment motions should be denied.

## VI. DEFENDANTS' ARGUMENTS DO NOT ADDRESS PLAINTIFFS' EVIDENCE

In addition to their reliance on attorney argument, Defendants fail to address any of Plaintiffs' evidence showing that the specification "reasonably conveys" to a skilled chemist that, at the time of filing, the inventors "had possession" of the sodium hydroxide ranges disclosed in the patent claims. *Vas-Cath*, 935 F.2d at 1563-64.

This evidence includes the detailed reports and affidavits of two well-known and highly-regarded experts in pharmaceutical science – Dr. Christopher Bowman of the University of Colorado (currently on sabbatical at M.I.T.), and Dr. Norman Weiner of the University of Michigan – who have a combined total of more than

40 years of experience in the chemical and pharmaceutical fields.  (Exs. E, P, CC, DD).  The evidence also includes the admissions of Defendants' own experts and scientists, who recognized that the sodium hydroxide concentrations could be derived from the specified concentrations of gelling agent.  (Exs. EE, FF, GG).

Nowhere in their briefs do Defendants discuss any of this evidence, even though it directly refutes each of their major factual assertions.  As a result, this evidence provides a wholly independent ground for denying the summary judgment motions.

### A.     A Skilled Chemist Would Recognize That The Specification Contains Adequate Support for the Claimed Sodium Hydroxide Ranges

The sole issue raised by Defendants' motions is whether the specification of the '894 Patent complies with the written description requirement for the ranges of sodium hydroxide set forth in the claims.  On this issue, the testimony of Plaintiffs' experts shows that the specification "reasonably conveys" to skilled artisans[4] that the original invention encompassed the claimed ranges of sodium hydroxide.  In reaching this conclusion, the experts emphasize five undisputed facts:

---

[4]     As Plaintiffs have shown elsewhere, the relevant skilled artisan in this case is an individual with a degree in chemistry or pharmaceutical sciences who has had at least 1-2 years of experience in developing gels, creams, lotions or other similar delivery forms for human applications.  (Ex. F, at 2-3).  Consistent with this definition, Plaintiffs will refer to the relevant skilled artisan as a "skilled chemist."

(1)    the sole purpose of sodium hydroxide in the claimed formulation is to partially neutralize the gelling agent and thereby increase the viscosity of the composition;

(2)    the specification of the '894 Patent expressly sets forth the concentrations of the ingredients in the AndroGel® formulation;

(3)    the specification expressly states that the listed concentrations (including the sodium hydroxide concentration) can be "varied in amounts yet continue to be within the spirit and scope of the present invention";

(4)    the specification provides an example containing specific ranges for the other ingredients in the formulation, including the gelling agent (*i.e.*, "about 0.1 to about 5.0g Carbopol"); and

(5)    the concentration of sodium hydroxide depends on the concentration of the gelling agent.

(Ex. A, 13:25-42; Ex. CC,¶¶ 12-15; Ex. DD,¶¶ 12-15).

In light of these facts – and in light of the teachings of the prior art – the specification of the '894 Patent "reasonably conveys" to skilled artisans that the formulation described in the specification "encompassed" the claimed sodium hydroxide ranges. *Unocal*, 208 F.3d at 997; *Vas-Cath*, 935 F.2d at 1563-64. This conclusion rests on three separate predicates.

*First*, as Plaintiffs' experts explain, a skilled artisan would recognize that the range of carbomer expressly disclosed in the specification ("about 0.1% to about 5%") *necessitates* a related range of sodium hydroxide. (Ex. CC, ¶ 9; Ex. DD, ¶ 9). As noted earlier, the sole purpose of sodium hydroxide in the claimed

24

formulation is to partially neutralize the carbomer to obtain a proper pH for a suitable viscosity. (*Id*.). In this reaction, any material change in the concentration of the carbomer (relative to the sodium hydroxide) will result in a change in the pH. (Ex. CC, ¶¶ 12-15; Ex. DD, ¶¶ 12-15). As a result, if the concentration of the carbomer is varied within a specified range, the variance will *necessarily* entail a related variance in the sodium hydroxide concentration to maintain the same pH. (Ex. CC, ¶ 9; Ex. DD, ¶ 9). Indeed, the very fact that the carbomer-sodium hydroxide mixture acts as a "buffer" demonstrates that the specified range of carbomer *inherently* entails a related range of sodium hydroxide. (*Id*.).

*Second*, a skilled artisan could easily derive the claimed limits of the sodium hydroxide range from the specific range of carbomer disclosed in the specification. (Ex. CC, ¶¶ 19-20; Ex. DD, ¶¶ 19-20). As noted earlier, the prior art disclosed the ranges of pH necessary to form a gel with a suitable viscosity based on the structure and concentration of the carbomer. (*Id*.). Using this knowledge, a formulation chemist could determine by simple calculations that the range of sodium hydroxide needed to neutralize the specified range of carbomer concentrations would *necessarily* encompass the ranges of sodium hydroxide recited in the claims. (*Id*.; Ex. P, ¶¶ 40-42).

*Third*, if any validation were needed, the chemist could easily calculate the pH of the AndroGel® formulation based on the concentrations of carbomer (0.9%) and sodium hydroxide (4.72% 0.1 N) set forth in the specification. (Ex. CC, ¶ 21; Ex. D, ¶ 21). The resulting pH (*i.e.*, 5.4) falls well within the same "plateau range" taught by the prior art which also includes the pH values resulting from the claimed sodium hydroxide and carbomer ranges. (*Id.*, Ex. P, ¶ 40).

Thus, the testimony of Plaintiffs' experts shows that "one skilled in the art could derive the [sodium hydroxide] limitations from the [original disclosure]." *Ralston Purina*, 772 F.2d at 1575. This disclosure is more than sufficient to satisfy the written description requirement, particularly since the original disclosure does not have to "necessarily exclude" *all* possibilities other than the concentrations within the claimed range. *Vas-Cath*, 935 F.2d at 1566.

## B.     Plaintiffs' Evidence Refutes Defendants' Attorney Arguments

This evidence squarely refutes Defendants' attorney argument that the specification provides only a "single data point" (*i.e.*, the sodium hydroxide concentration in the AndroGel® formulation) for the claimed sodium hydroxide ranges. (Paddock Br., at 18; Watson Br., at 14-15). As Plaintiffs' experts make clear, Defendants' argument ignores (1) the specific range of carbomer set forth in the specification (which necessarily entails a related range of sodium hydroxide);

and (2) the specific sodium hydroxide concentration set forth in the AndroGel® formulation (which also entails a broader range of sodium hydroxide concentration); and (3) the express language of the specification (which states that the ingredients in the AndroGel® formulation can be varied yet still remain within the scope of the invention).[5]  (Ex. E, ¶ 72-72; Ex. P, ¶¶ 40-42).

Defendants' argument also ignores the teachings of the prior art.  As noted earlier, in resolving a written description issue a district court *must* consider the "scientific and technologic knowledge" available to skilled artisans at the time of the patent application, even though such knowledge is not explicitly set forth in the application.  *Capon*, 413 F.3d at 1357.  In this case, the existing knowledge established that (1) the purpose of the "gelling agent" and sodium hydroxide in the claimed formulation was to increase the viscosity of the composition; and (2) a suitable viscosity could be attained when sodium hydroxide partially neutralized the gelling agent within a "plateau range" of pH values.  (Ex. P, ¶ 40-42).  As described above, this knowledge would enable a skilled chemist to derive the

---

[5]    Contrary to Watson's assertions, Plaintiffs never "admitted" that the sodium hydroxide concentration in the AndroGel® formulation could not support a broader range of sodium hydroxide.  (Watson Br., at 13).  Rather, Plaintiffs only denied that they are relying on the obviously *erroneous* calculation in the cited note to support a range.

claimed sodium hydroxide ranges from the specified carbomer ranges based on the pH values disclosed by the prior art.  (*Id.*)

### C.    Defendants' Own Witnesses Refute Their Attorney Arguments

Finally, Defendants' arguments also ignore the testimony of their own experts and scientists, who acknowledged that the concentration of sodium hydroxide could be derived from the known concentration of gelling agent.  For example, Paddock's expert freely admitted that the amount of sodium hydroxide "*depends on the amount of carbomer used* and is adjusted to achieve the desired viscosity and aesthetic appearance."  (Ex. FF, at 82) (emphasis added).  The expert then provided a specific example to illustrate the point:

> Q.    So if you knew that there was 5 percent carbomer in – if you were using 5 percent carbomer in the formulation, you could determine the amount of the neutralizer [sodium hydroxide]?
>
> A.    The 5 percent is pretty high, but yes, *you could determine that empirically.  There are some tables that you can use to calculate how you can do* it, but what I've always done is – in the laboratory, done it empirically and calculate then, based upon the amount of neutralizer that was used to get the viscosity that I want, then that would go into the formula.

(*Id.*, at 83) (emphasis added).

Equally compelling is the evidence showing that both Defendants determined the sodium hydroxide concentration of AndroGel® based on their

knowledge of the amount of carbomer used in the formulation.  For example, after learning the correct concentration of carbomer in AndroGel®, a Paddock scientist wrote that Paddock could now determine the correct amount of sodium hydroxide "*by default*" because sodium hydroxide was simply used to adjust to the proper pH. (Ex. GG) (emphasis added).  (*See also* Ex. KK).  Similarly, one of Watson's leading scientists acknowledged that Watson determined the sodium hydroxide concentration "empirically" by matching the sodium hydroxide concentration to the amount of carbomer needed to "get the right viscosity and right pH."  (Ex. EE, at 116) (emphasis added).  (*See also* Ex. JJ).

Thus, as was true with the Certificate of Correction issue, Defendants' own witnesses provide powerful, pre-litigation, "real world" evidence refuting Defendants' own positions.

### D.   The Cases Cited by Defendants Support Plaintiffs' Position

Plaintiffs' evidence also shows why the written description cases cited by Defendants actually support Plaintiffs' position.  *See*, *e.g.*, *In re MacLean*, 454 F.2d 756 (C.C.P.A. 1972); *In re Lukach*, 442 F.2d 967 (C.C.P.A. 1971).  In each of these cases the Court made clear that the lack of literal support for claimed ranges is not enough to establish invalidity under the written description requirement. *Ralston Purina*, 772 F.2d at 1575; *In re Wertheim*, 541 F.2d 257, 265 (C.C.P.A.

1976).  Rather, in each case, the key issue was whether "one skilled in the art could derive the claim limitations from the [original disclosure]."  *Ralston Purina*, 772 F.2d at 1575.

For example, in *Ralston Purina*, the Federal Circuit found that some of the claimed ranges were not supported by certain calculations that were standard in the art.  *Id*.  As to these ranges, the court found a violation of the written description requirement because a skilled artisan could not derive the ranges from the original disclosure.  *Id*.

By contrast, in this case, the evidence unequivocally shows that a skilled chemist could easily derive the sodium hydroxide limitations from the original disclosure based on the prior art, the specified concentration of the carbomer, and the specified concentration of sodium hydroxide in AndroGel®.  *Id*.  This, indeed, is the testimony of both Plaintiffs' experts and Defendants' own witnesses who admit that a skilled artisan could easily derive the sodium hydroxide concentration from a specified carbomer concentration.  (Ex. FF, at 82-83).

The same evidence also shows that the sodium hydroxide ranges were *necessarily* encompassed by the original disclosure – and not merely that they would have been "obvious" to a skilled person, as Paddock now claims.  (Paddock Br., at 17).  Indeed, as shown above, by virtue of the very nature of the

neutralization process, the concentrations of carbomer and sodium hydroxide are necessarily and inextricably linked, with a concentration of sodium hydroxide dependent on the concentration of carbomer. As a result, the specified range of carbomer necessarily entailed a sodium hydroxide range whose limits could be easily calculated.

Finally, Plaintiffs' evidence refutes Paddock's attorney-argument that the claimed sodium hydroxide ranges "evidently" resulted from the error in converting the original concentration in AndroGel® to pure sodium hydroxide. (Paddock Br., at 20). As the above evidence makes clear, Defendants' theory cannot explain why the allegedly "botched" ranges just happened to encompass the correct concentrations for neutralizing the specified amounts of carbomer. (Ex. P, ¶ 42). Indeed, the very fact that the inventors chose a sodium hydroxide range that was *narrower* than the specified carbomer range shows that the claimed ranges were no mistake or accident, as Defendants now claim. (*See*, *e.g.*, Ex. CC, ¶ 23; Ex. DD, ¶ 23).

## VII.  PLAINTIFFS' EVIDENCE RAISES DISPUTED FACTUAL ISSUES

As shown above, in their opening briefs, Defendants failed to submit any substantive evidence showing how one skilled in the art would understand either the nature of the claimed invention or the disclosures in the specification.

Nevertheless, even if Defendants' attorney arguments could somehow be viewed as evidence — or even if Defendants could submit new evidence in their reply briefs[6] — such evidence would serve only to underscore the material factual disputes created by Plaintiffs' evidence.   This conflict between Defendants' arguments and Plaintiffs' evidence can be summarized as follows:

---

[6]    The law is clear that a summary judgment movant cannot submit new evidence (or new arguments) in its reply brief.  *See ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 551 (Fed. Cir. 1998); *Lewis v. Zilog*, 908 F. Supp. 931, 959 (N.D. Ga. 1995); *United States v. Georgia Dept. of Nat'l Res.*, 897 F. Supp. 1464 (N.D. Ga. 1995).

| FACTUAL ISSUE | DEFENDANTS' EVIDENCE | PLAINTIFFS' EVIDENCE |
|---|---|---|
| Does the specification "reasonably convey" to a skilled chemist the claimed sodium hydroxide ranges? | Attorney Argument (Watson Br., at 14; Paddock Br., at 18) | Dr. Bowman Report, Affidavit; Dr. Weiner Reports, Affidavit; Paddock, Watson depositions (Exs. E, P, CC, DD, EE, FF, GG) |
| Does the specification convey only a "single data point" supporting the sodium hydroxide ranges? | Attorney Argument (Watson Br., at 14; Paddock Br., at 18) | Dr. Bowman Report, Affidavit; Dr. Weiner Reports, Affidavit; Paddock, Watson depositions (Exs. E, P, CC, DD, EE, FF, GG) |
| Does the prior art establish the purpose of the gelling agent and the sodium hydroxide? | None | Dr. Bowman Report, Affidavit; Dr. Weiner Reports, Affidavit (Exs. E, P, CC, DD) |
| Does the prior art show how sodium hydroxide and the gelling agent should be combined? | None | Dr. Bowman Report, Affidavit; Dr. Weiner Reports, Affidavit (Exs. E, P, CC, DD) |
| Does the specified range of carbomer necessarily entail a range of sodium hydroxide? | None | Dr. Bowman Report, Affidavit; Dr. Weiner Reports, Affidavit; Paddock, Watson depositions (Exs. E, P, CC, DD) |
| Could a skilled chemist derive the claimed sodium hydroxide range from the specified carbomer range? | None | Dr. Bowman Report, Affidavit; Dr. Weiner Reports, Affidavit; Paddock, Watson depositions (Exs. E, P, CC, DD, EE, FF, GG) |

The Federal Circuit has long held that issues involving differences of scientific opinion or expert credibility cannot be resolved on summary judgment. *See, e.g., Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1578 (Fed. Cir. 1991). This rule applies with special force to written description issues, which are "intensely factual and should be dealt with on a case-by-case basis, without the application of wooden rules." *Unocal*, 208 F.3d at 1000. For this reason, the Court has held that summary judgment on a written description issue is "inappropriate where resolution of what the parent disclosure conveyed to those skilled in the art may require examination of experts, demonstrations and exhibits." *Vas-Cath*, 935 F.2d at 1567.

The same logic applies here. When the evidence is viewed in the light most favorable to Plaintiffs, and all reasonable inferences are drawn in Plaintiffs' favor, it creates numerous issues of material fact requiring an "examination of experts, demonstrations and exhibits." This is particularly true in light of Defendants' burden to show by clear and convincing evidence that the specification fails to "reasonably convey" to a skilled chemist the sodium hydroxide ranges set forth in the patent claims.

## VIII.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny

Defendants' motions for partial summary judgment of invalidity of Claims 1-30.

Dated:   December 19, 2005      Respectfully submitted,

UNIMED PHARMACEUTICALS, INC. and
LABORATORIES BESINS ISCOVESCO


By: /s/  James R. Ferguson
        One of their attorneys

Jerry B. Blackstock Georgia Bar No. 061000
HUNTON & WILLIAMS
4100 Bank of America Plaza
600 Peachtree Street NE
Atlanta, Georgia 30308-2216
Telephone: (404) 888-4000
Facsimile:  (404) 888-4190

James R. Ferguson
Robert S. Rigg
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 782-0600
Facsimile:  (312) 701-7711

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNIMED PHARMACEUTICALS, INC.,** a Delaware corporation, and **LABORATORIES BESINS ISCOVESCO,** a Delaware corporation, Plaintiffs, | ) ) ) ) ) ) | |
| v. | ) ) | Nos.  **1:03-CV-2501 TWT** **1:03-CV-2503 TWT** |
| **WATSON PHARMACEUTICALS, INC.,** a Nevada corporation, and **PADDOCK LABORATORIES, INC.,** a Minnesota corporation, Defendants. | ) ) ) ) ) ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2005, a true and correct copy of the foregoing document was filed electronically via CM/ECF in the United States District Court for the Northern District of Georgia, with notice of same being electronically served by the Court, addressed to:

| | |
|---|---|
| David A. Rabin<br>Morris, Manning & Martin LLP<br>1600 Atlanta Financial Center<br>3343 Peachtree Road, N.E.<br>Atlanta, Georgia 30326-1044<br>***Attorneys for the Defendant***<br>***Watson Pharmaceuticals, Inc.*** | Barry S. White<br>Frommer, Lawrence & Haug LLP<br>745 Fifth Avenue<br>New York, New York  10151<br><br>***Attorneys for the Defendant***<br>***Watson Pharmaceuticals, Inc.*** |
| Mark G. Trigg<br>Ernest L. Greer<br>Hayden Pace<br>Greenberg Traurig, LLP<br>The Forum Suite 400<br>3290 Northside Parkway, N.W.<br>Atlanta, Georgia 30327<br>***Attorneys for the Defendant***<br>***Paddock Laboratories, Inc.*** | Albert L. Jacobs, Jr.<br>Daniel A. Ladow<br>Greenberg Traurig, LLP<br>MetLife Building<br>200 Park Avenue<br>New York, NY 10166<br><br>***Attorneys for the Defendant***<br>***Paddock Laboratories, Inc.*** |

DATED:     December 19, 2005          By: /s/  James R. Ferguson