# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |  |
|---|---|---|
| UNIMED PHARMACEUTICALS, INC., a Delaware corporation, and LABORATORIES BESINS ISCOVESCO, a Delaware corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION FILE |
| vs. | ) ) | NO. 1:03-cv-2501-TWT |
| WATSON PHARMACEUTICALS, INC., a Nevada corporation, | ) ) ) | |
| Defendant. | ) | |

## WATSON'S RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS WHICH ARE MATERIAL AND PRESENT A GENUINE ISSUE FOR TRIAL

In accordance with Local Civil Rule 56.1 B.(3), movant Watson

Pharmaceuticals, Inc. responds to Plaintiffs' Statement of Additional Facts Which

Are Material and Present a Genuine Issue for Trial as follows:

**Paragraph 1 States:**  AndroGel® is the first testosterone gel ever approved

by the FDA, and the first gel ever shown to produce normal levels of testosterone

in hypogonadal men over a sustained period. (Ex. B, ¶¶ 42, 67).

**RESPONSE:**

Objected to as not material.

**Paragraph 2 States:**  Male hypogonadism is a chronic clinical condition

that affects an estimated 4 million men in the United States. (Ex. B, at 5).

**RESPONSE:**

Objected to as not material.

**Paragraph 3 States:**  Male hypogonadism is characterized by low levels of

serum testosterone and a variety of symptoms, including depression, fatigue,

decreased bone density, reduced lean body mass, decreased libido and regression

of secondary sexual characteristics. (Ex. A, 2:33-36; Ex. B, at 6).

**RESPONSE:**

Objected to as not material.

**Paragraph 4 States:**  Prior to the development of AndroGel®, physicians

relied primarily on testosterone injections or transdermal patches to increase serum

testosterone levels in hypogonadal patients. (Ex. A, 3:64-7:53).

**RESPONSE:**

Objected to as not material.

1374065 v01

**Paragraph 5 States:**  The testosterone patches utilize an external, "rate-limiting membrane" to regulate both the rate of delivery and the quantity of testosterone that penetrates the skin. (Ex. C, at 21-23).

**RESPONSE:**

Objected to as not material.

**Paragraph 6 States:**  In contrast to the patch, AndroGel® is a testosterone gel that does not utilize an external, rate-limiting membrane. (*Id.*).

**RESPONSE:**

Objected to as not material.

**Paragraph 7 States:**  AndroGel® surprisingly facilitates the ability of the skin to act as its own "patch" by retaining the testosterone in the outer layer known as the stratum corneum. (*Id.*).

**RESPONSE:**

Objected to as not material.

**Paragraph 8 States:**  AndroGel® enables testosterone to penetrate into the stratum corneum and then remain within that layer, so that the stratum corneum becomes a kind of "reservoir" for the hormone. (*Id.*).

**RESPONSE:**

Objected to as not material.

**<u>Paragraph 9 States</u>:**  Ultimately, the testosterone begins to slowly diffuse through the remaining layers of the skin and into the circulatory system where it is then transported to other areas of the body. (*Id.*).

**<u>RESPONSE:</u>**

Objected to as not material.

**<u>Paragraph 10 States</u>:**  AndroGel® produces a prolonged release of testosterone into the bloodstream — *i.e.*, a sustained-release effect. (*Id.*).

**<u>RESPONSE:</u>**

Objected to as not material.

**<u>Paragraph 11 States</u>:**  In clinical trials on hypogonadal men, AndroGel® was shown to produce "steady-state" testosterone levels within the normal physiologic range over a sustained period of time. (Ex. A, 14:25-25:48).

**<u>RESPONSE:</u>**

Objected to as not material.

**<u>Paragraph 12 States</u>:**  The maintenance of this "steady-state" profile over a prolonged treatment period represented a remarkable technological achievement. (Ex. C, ¶ 23).

**<u>RESPONSE:</u>**

Objected to as not material.

1374065 v01

**Paragraph 13 States:**  Daily use of AndroGel® not only increased testosterone to normal levels, but also maintained those levels by replacing testosterone at approximately the same rate as the hormone was being used (and eliminated) by the body. (*Id.*).

**RESPONSE:**

Objected to as not material.

**Paragraph 14 States:**  AndroGel®'s ability to achieve and maintain "steady-state" testosterone levels over a prolonged treatment period is a direct result of its novel formulation. (*Id.* at ¶ 14).

**RESPONSE:**

Objected to as not material.

**Paragraph 15 States:**  In that formulation, an active ingredient (testosterone) is administered transdermally through a combination of an alcohol (ethanol) and a so-called "penetration enhancer" known as isopropyl myristate. (*Id.*).

**RESPONSE:**

Objected to as not material and as not supported by the evidence because the AndroGel® formula set forth in Table 5 lists several ingredients in addition to the ones identified in this paragraph.

1374065 v01

**Paragraph 16 States:**  This penetration-enhancing system is directly responsible for the steady-state blood levels that result from the daily administration of AndroGel®. (*Id.*).

**RESPONSE:**

Objected to as not material.

**Paragraph 17 States:**  AndroGel® formulation is administered in the form of a gel that results when a strong base known as sodium hydroxide (NaOH) neutralizes a chemical gelling agent known as a "carbomer." (Ex. P, ¶¶ 15-20).

**RESPONSE:**

Objected to as not material.

**Paragraph 18 States:**  The formulation thus consists of six ingredients in the following concentrations:

**AndroGel®**

| | |
|---|---|
| Testosterone | 1% |
| Alcohol (Ethanol) | 72.5% |
| Isopropyl Myristate | 0.5% |
| 0.1 N NaOH | 4.72% |
| Gelling Agent | 0.9% |
| Water | 20.38% |

(Ex. A, 13:25-35).

**RESPONSE:**

Objected to as not material.  Objected to as not supported by the evidence with respect to ethanol because Table 5 shows that the ethanol in AndroGel® is 95% ethanol by volume, which corresponds to 67 grams of ethanol or 67% of a 100 grams.  Objected to as not supported by the evidence with respect to "gelling agent" because Table 5 specifies Carbopol 980.

**Paragraph 19 States:**  A person skilled in the art would recognize that the concentrations of the above constituents could be varied within specific ranges and still serve the intended purpose of the invention. (*Id.*; 13:36-43).

**RESPONSE:**

Objected to as not material and as not supported by the evidence because the cited portion of the patent specification does not include sodium hydroxide as one of the above listed constituents that can have its concentration varied and there is no discussion of varying the concentration of sodium hydroxide anywhere else in the patent specification.

**Paragraph 20 States:**  Formation of a gel utilizing sodium hydroxide and a gelling agent cannot occur unless the sodium hydroxide is first mixed in an aqueous (i.e., water-based) solution that causes the sodium hydroxide to dissociate

into charged molecules called "ions" ($Na^+$ and $OH^-$). (Ex. M, ¶¶ 7-8; Ex. P, at 8-10, 23).

**RESPONSE:**

Objected to as not material.

**Paragraph 21 States:**  The sodium hydroxide in the Androgel formulation is used to cause the formation of a gel by partially neutralizing the carbomer. (Ex. P, ¶ 7).

**RESPONSE:**

Objected to as not material.

**Paragraph 22 States:**  The OH- ions then neutralize the molecules of the gelling agent, which leads to a lengthening of the molecules and the formation of a gel. (*Id.*; Ex. M, ¶ 7; Ex. P, at 9-10).

**RESPONSE:**

Objected to as not material.

**Paragraph 23 States:**  The partial neutralization of a gelling agent increases the thickness of the composition, which is measured by the "viscosity" of the composition. (Ex. P, ¶¶ 21-22).

1374065 v01

**RESPONSE:**

Objected to as not material because, among other things, no claim includes viscosity limitations and, other than claim 9, no claim requires a gel.

**Paragraph 24 States:**  A "0.1 N" solution of sodium hydroxide and water is a highly diluted solution that is frequently used in pharmaceutical practice. (Ex. F, ¶ 17).

**RESPONSE:**

Conceded that a "0.1 N" solution of sodium hydroxide is a highly diluted solution.  Statement that a "0.1 N" solution of sodium hydroxide is frequently used in pharmaceutical practice objected to as not material.

**Paragraph 25 States:**  Because each of the claims of the '894 Patent require the use of a "gelling agent," a skilled chemist would recognize that the claimed formulation should have a suitable viscosity. (Ex. P, ¶¶ 21-22, 28, 40-42).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes viscosity limitations.  Objected to as not supported by the evidence with respect to claim 9 because that claim does not recite "gelling agent."

**Paragraph 26 States:**  The person of ordinary skill in the art is an individual with a degree in chemistry or pharmaceutical sciences who has had at

least 1-2 years of experience in developing gels, creams, lotions or other similar delivery forms for human applications. (Ex. F, ¶ 4; Ex. C, ¶ 6).

**RESPONSE:**

Objected to as not material.

**Paragraph 27 States:**  When a carbomer is partially neutralized by sodium hydroxide, the reaction changes the "pH" of the resulting composition. (*Id.*, ¶¶ 21-22, 28, 40-42).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes a pH limitation and no claim, other than claim 9, requires a carbomer.

**Paragraph 28 States:**  For many years, it has been known that gels with the highest viscosity result when the partial neutralization of the carbomer produces a pH between approximately 4 and approximately 10 (with the exact range depending on the structure and concentration of the carbomer). (*Id.*, ¶ 28; Ex. CC, ¶¶ 5-6).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes viscosity or pH limitations and no claim, other than claim 9, requires a gel or a carbomer.

- 10 -

**Paragraph 29 States:**  This range is sometimes known as the "plateau range" because the viscosity remains high enough to maintain the gel structure as the pH increases from about 4 to about 10. (*Id.*).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes viscosity or pH limitations and no claim, other than claim 9, requires a gel.

**Paragraph 30 States:**  The plateau range reflects the fact that the carbomer is a weak acid that acts as a so-called "buffer" in its reaction with sodium hydroxide (a strong base).[1] (Ex. CC, ¶ 7; Ex. DD, ¶ 7).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes viscosity or pH limitations and no claim, other than claim 9, requires a carbomer.

**Paragraph 31 States:**  The importance of the plateau range is illustrated by the following chart, which was published by a leading manufacturer of carbomers prior to the filing of the patent application in this case. (Ex. II).

---

[1]   A "buffer" is a solution that resists changes to pH when neutralized by the addition of an acid or base.  (Ex. CC, ¶¶ 26-29; Ex. DD, ¶ 28).

1374065 v01



**RESPONSE:**

Objected to as not material because, among other things, no claim includes viscosity or pH limitations and no claim, other than claim 9, requires a carbomer.

**Paragraph 32 States:**  The breadth of the plateau ranges depends on the structure and concentration of the specific carbomer. (*Id.*; Ex. C, ¶ 10; Ex, D, ¶ 10;

1374065 v01

Ex. P, ¶ 28). However, in all cases, the viscosity of the gel sharply declines when the pH of the neutralized carbomer falls outside the relevant plateau range. (*Id.*).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes viscosity or pH limitations and no claim, other than claim 9, requires a carbomer.

**Paragraph 33 States:**  The pH of the carbomer-sodium hydroxide mixture can be altered by changing the concentrations of sodium hydroxide and carbomer. (*Id.*, ¶ 35).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes pH limitations and no claim, other than claim 9, requires a carbomer.

**Paragraph 34 States:**  By making such adjustments, a skilled artisan can produce a pH that falls within the relevant "plateau range" and thus create a gel with suitable viscosity. (*Id.*, ¶¶ 36-37). In this process, the structure and concentration of the carbomer dictates the range of the viscosity plateau, and the sodium hydroxide is then used to assure an appropriate pH value within the plateau region. (Ex. CC, ¶ 15; Ex. DD, ¶¶ 15).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes viscosity or pH limitations and no claim, other than claim 9, requires a gel or a carbomer.

**Paragraph 35 States:**  Accordingly, by virtue of the very nature of the neutralization process, the concentrations of carbomer and sodium hydroxide are directly and necessarily linked, with the concentration of sodium hydroxide dependent on the concentration of carbomer. (*Id.*).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes viscosity or pH limitations and no claim, other than claim 9, requires a gel or a carbomer.

**Paragraph 36 States:**  In determining appropriate ranges for neutralizing a carbomer, the range of the sodium hydroxide concentrations can be *narrower* than the range of the carbomer concentrations. (Ex. CC, ¶ 23; Ex. DD, ¶ 23).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes viscosity or pH limitations and no claim, other than claim 9, requires a gel or a carbomer.

**Paragraph 37 States:**  Formulation chemists have long been able to determine the pH of a carbomer-sodium hydroxide solution based on the concentrations of the two reactants. (Ex. CC, ¶ 16; Ex. DD, ¶ 16).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes pH limitations and no claim, other than claim 9, requires a carbomer.

**Paragraph 38 States:**  This is done through a simple calculation using basic knowledge taught in freshman chemistry classes across the country. (*Id.*).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes pH limitations and no claim, other than claim 9, requires a carbomer.

**Paragraph 39 States:**  A skilled chemist could easily calculate the pH of the AndroGel® formulation (*i.e.*, 5.4) based on the concentrations of carbomer (0.9%) and sodium hydroxide (4.72%) disclosed in the specification of the '894 Patent. (*Id.*).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes pH limitations and no claim, other than claim 9, requires a carbomer.

**Paragraph 40 States:**  Similarly, a chemist could calculate the pH of the compositions resulting from the ranges of carbomer and sodium hydroxide concentrations set forth in the claims of the '894 Patent (*i.e.*, "about 0.1% to about 5%" carbomer and "about 1% to about 5%" 0.1 N sodium hydroxide), as shown in the following table:

|  | 1% 0.1 N NaOH | 3% 0.1 N NaOH | 5% 0.1 N NaOH |
|---|---|---|---|
| 0.1% carbomer | pH  5.7 | pH  6.3 | pH  6.6 |
| 0.5% carbomer | pH  5.0 | pH  5.5 | pH  5.7 |
| 0.9% carbomer | pH  4.7 | pH  5.2 | pH  5.4 |
| 1.0% carbomer | pH  4.7 | pH  5.2 | pH  5.4 |
| 2.0% carbomer | pH  4.4 | pH  4.9 | pH  5.1 |
| 3.0% carbomer | pH  4.2 | pH  4.7 | pH  4.9 |
| 5.0% carbomer | pH  4.0 | pH  4.5 | pH  4.7 |

(Ex. P, ¶ 34).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes pH limitations.  Objected to as not supported by the evidence because no claim, other than claim 9, requires a carbomer.

1374065 v01

**Paragraph 41 States:**  Likewise, using the same calculations, a skilled chemist could determine the concentration of sodium hydroxide needed to neutralize a specific concentration of carbomer to obtain a specific pH. (Ex. CC, ¶ 18; Ex. DD, ¶ 18).  For example, if the chemist wanted to partially neutralize 1% carbomer to obtain a solution having a pH of 5.4, he could quickly determine that 5% 0.1 N sodium hydroxide would be an appropriate concentration, as reflected in the above table. (*Id.*).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes pH limitations and no claim, other than claim 9, requires a carbomer.

**Paragraph 42 States:**  Based on this knowledge, a formulation chemist could easily calculate the concentration of sodium hydroxide needed to partially neutralize a specific concentration of carbomer to obtain an appropriate pH for the formation of the gel – i.e., a pH falling within the "plateau range" for the relevant concentration of the specific carbomer. (Ex. CC, ¶¶ 19-20; Ex. DD, ¶¶ 19-20).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes pH limitations and no claim, other than claim 9, requires a gel or a carbomer.

**Paragraph 43 States:**  This knowledge (which was part of the prior art when the '894 application was filed in August 2000) provides the scientific backdrop to Defendants' written description claims. (*Id.*).

**RESPONSE:**

Objected to on the ground that it is not understandable.  To the extent the paragraph is meant to refer to the information in paragraph 42, it is objected to as not material because, among other things, no claim includes pH limitations and no claim, other than claim 9, requires a gel or a carbomer.

**Paragraph 44 States:**  The sole purpose of sodium hydroxide in the claimed formulation is to partially neutralize the carbomer to obtain a proper pH for a suitable viscosity. (Ex. CC, ¶¶ 9, 12-15; Ex. DD, ¶¶ 9, 12-15).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes viscosity or pH limitations and no claim, other than claim 9, requires a carbomer.

**Paragraph 45 States:**  The specification of the '894 Patent expressly sets forth the concentrations of the ingredients in the AndroGel® formulation. (Ex. A, 13:25-35).

**RESPONSE:**

Objected to as not material because, among other things, some of the '894

patent claims encompass formulations other than AndroGel® and other claims do

not cover AndroGel®.

**Paragraph 46 States:**  The specification expressly states that the listed

concentrations (including the sodium hydroxide concentration) can be "varied in

amounts yet continue to be within the spirit and scope of the present invention".

(*Id.*, 13:36-43).

**RESPONSE:**

Objected to as not material and as not supported by the evidence because the

cited section of the patent specification does not mention sodium hydroxide and

there is no discussion of varying the concentration of sodium hydroxide anywhere

else in the patent specification.

**Paragraph 47 States:**  The specification provides an example containing

specific ranges for the other ingredients in the formulation, including the gelling

agent (*i.e.*, "about 0.1 to about 5.0g Carbopol").  (*Id.*).

**RESPONSE:**

Objected to as not material and as not supported by the evidence because the only example in the '894 patent is the AndroGel® formulation in Table 5, which does not include ranges.

**Paragraph 48 States:**  In the claimed invention, the concentration of sodium hydroxide depends on the concentration of the gelling agent. (Ex. CC, ¶¶ 12-15; Ex. DD), ¶¶ 12-15).

**RESPONSE:**

Objected to as not supported by the evidence because, among other things, as Unimed's expert Dr. Bowman admits, the claimed "gelling agent" could be nonacidic, in which case it would not need neutralization by sodium hydroxide. (Ex. 48 at 4:23-49:22, 90:4-93.5)  Also objected to as not in compliance with the provisions set out in LR 56.1 B.(1) as it calls for a legal conclusion since a patent claim defines an invention and the '894 patent includes claims defining various inventions.

**Paragraph 49 States:**  In light of these facts — and in light of the teachings of the prior art — the specification of the '894 Patent "reasonably conveys" to skilled artisans that the formulation described in the specification "encompassed" the claimed sodium hydroxide ranges. (*Id.*)

1374065 v01

**RESPONSE:**

Objected to as not in compliance with the provisions set out in LR 56.1 B.(1) because it states an issue or legal conclusion concerning validity.

**Paragraph 50 States:**  A skilled artisan would recognize that the range of carbomer expressly disclosed in the specification ("about 0.1% to about 5%") *necessitates* a related range of sodium hydroxide.  (Ex. CC, ¶ 9; Ex. DD, ¶ 9).

**RESPONSE:**

Objected to as not material because, among other things, no claim, other than claim 9, requires a carbomer and claim 9 specifies a range of carbomer of about 0.5% to about 2%.

**Paragraph 51 States:**  In this reaction, any material change in the concentration of the carbomer (relative to the sodium hydroxide) will result in a change in the pH. (Ex. CC, ¶¶ 12-15; Ex. DD, ¶¶ 12-15).

**RESPONSE:**

To the extent the term "this reaction" in this paragraph is meant to refer to the AndroGel® formulation, it is objected to as not material because, among other things, no claim includes pH limitations and no claim, other than claim 9, requires a carbomer.

1374065 v01

**Paragraph 52 States:**  As noted earlier, the prior art disclosed the ranges of pH necessary to form a gel with a suitable viscosity based on the structure and concentration of the carbomer. (Ex. CC, ¶¶ 19-20; Ex. DD, ¶¶ 19-20).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes viscosity or pH limitations and no claim, other than claim 9, requires a gel or a carbomer.

**Paragraph 53 States:**  As a result, if the concentration of the carbomer is materially varied within a specified range, the variance will *necessarily* entail a related variance in the sodium hydroxide concentration to maintain the same pH. (Ex. CC, ¶ 9; Ex. DD, ¶ 9).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes pH limitations and no claim, other than claim 9, requires a carbomer.

**Paragraph 54 States:**  Indeed, the very fact that the carbomer-sodium hydroxide mixture acts as a "buffer" demonstrates that the specified range of carbomer *inherently* entails a related range of sodium hydroxide. (*Id.*).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes pH limitations and no claim, other than claim 9, requires a carbomer.

**Paragraph 55 States:**  A skilled artisan could easily derive the claimed limits of the sodium hydroxide range from the specific range of carbomer disclosed in the specification. (Ex. CC, ¶¶ 19-20; Ex. DD, ¶¶ 19-20).

**RESPONSE:**

Objected to as not material because, among other things, no claim, other than claim 9, requires a carbomer.  Objected to as not supported by the evidence with respect to claim 9 because claim 9 recites a different carbomer range than the one disclosed in the patent specification.

**Paragraph 56 States:**  Using this knowledge, a formulation chemist could determine by simple calculations that the range of sodium hydroxide needed to neutralize the specified range of carbomer concentrations would necessarily encompass the "about 1% to about 5%" 0.1 N sodium hydroxide recited in the claims. (*Id.*, Ex. P, ¶¶ 40-42).

**RESPONSE:**

Objected to as not material because no claim, other than claim 9, requires a carbomer.  Objected to as not supported by the evidence with respect to claim 9

1374065 v01

because claim 9, as corrected, recites a range of about 1% to about 3% 0.1 N sodium hydroxide.

**Paragraph 57 States:**  If any validation were needed, the chemist could easily calculate the pH of the AndroGel® formulation based on the concentrations of carbomer (0.9%) and sodium hydroxide (4.72% 0.1 N) set forth in the specification. (Ex. CC, ¶ 21; Ex. DD, ¶ 21).

**RESPONSE:**

Objected to as not material because, among other things, some of the '894 patent claims encompass formulations other than AndroGel® and other claims do not cover AndroGel®.

**Paragraph 58 States:**  The resulting pH (*i.e.*, 5.4) falls well within the same "plateau range" taught by the prior art which also includes the pH values resulting from the claimed sodium hydroxide and carbomer ranges. (*Id.*; Ex. P, ¶ 40).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes pH limitations and no claim, other than claim 9, requires a carbomer.

**Paragraph 59 States:**  Paddock's expert freely admitted that the amount of sodium hydroxide "*depends on the amount of carbomer used and is adjusted to*

achieve the desired viscosity and aesthetic appearance." (Ex. FF, at 82) (emphasis added). The expert then provided a specific example to illustrate the point:

> Q. So if you knew that there was 5 percent carbomer in – if you were using 5 percent carbomer in the formulation, you could determine the amount of the neutralizer [sodium hydroxide]?
>
> A. The 5 percent is pretty high, but yes, *you could determine that empirically. There are some tables that you can use to calculate how you can do* it, but what I've always done is – in the laboratory, done it empirically and calculate then, based upon the amount of neutralizer that was used to get the viscosity that I want, then that would go into the formula.

(*Id.*, at 83) (emphasis added).

## RESPONSE:

Objected to as not material because, among other things, no claim includes viscosity or pH limitations and no claim, other than claim 9, requires a carbomer.

**Paragraph 60 States:**  Defendants determined the sodium hydroxide concentration of AndroGel® based on their knowledge of the amount of Carbomer used in the formulation. (Ex. GG; Ex. KK; Ex. EE, at 116; Ex. JJ).

## RESPONSE:

Objected to as not material because, among other things, some of the '894 patent claims encompass formulations other than AndroGel® and other claims do not cover AndroGel®.

- 25 -

**Paragraph 61 States:**  After learning the correct concentration of carbomer in AndroGel®, a Paddock scientist wrote that Paddock could now determine the correct amount of sodium hydroxide "*by default*" because sodium hydroxide was simply used to adjust to the proper pH. (Ex. GG) (emphasis added). (*See also* Ex. KK).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes pH limitations and no claim, other than claim 9, requires a carbomer.

**Paragraph 62 States:**.   One of Watson's leading scientists acknowledged that Watson determined the sodium hydroxide concentration "empirically" by matching the sodium hydroxide concentration to the amount of carbomer needed to "get the right viscosity and right pH." (Ex. EE, at 116) (emphasis added). (*See also* Ex. JJ).

**RESPONSE:**

Objected to as not material because, among other things, no claim includes viscosity or pH limitations and no claim, other than claim 9, requires a carbomer.

**Paragraph 63 States:**  The "single data point" conveyed in the specification coupled with the knowledge of those skilled in the art supports the sodium hydroxide ranges claimed in the '894 patent. (Ex. CC, ¶ 21).

**RESPONSE:**

Objected to as not in compliance with the provisions set out in LR 56.1 B.(1)

because it states an issue or legal conclusion concerning validity.


Dated:  January 19, 2006

MORRIS, MANNING & MARTIN, LLP
Attorneys for Defendant
Watson Pharmaceuticals, Inc.


By:  /s/  David A. Rabin
    David A. Rabin
    Georgia Bar No. 591469


1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, Georgia 30326
Telephone: (404) 233-7000
Fax: (404) 365-9532

Of Counsel:

Barry S. White, Esq.
Steven M. Amundson, Esq.
John G. Taylor, Esq.
Joyce W. Luk, Esq.
Jennifer Chung, Esq.
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, New York  10151
Telephone: (212) 588-0800
Fax: (212) 588-0500

1374065 v01

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| UNIMED PHARMACEUTICALS, INC., <br> a Delaware corporation, and <br> LABORATORIES BESINS <br> ISCOVESCO, a Delaware corporation, <br> <br> Plaintiffs, <br> <br> vs. <br> <br> WATSON PHARMACEUTICALS, INC., <br> a Nevada corporation, <br> <br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | CIVIL ACTION FILE <br> <br> NO. 1:03-cv-2501-TWT |

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2006, a true and correct copy of the foregoing document was filed electronically via CM/ECF in the United States District Court for the Northern District of Georgia, with notice of same being electronically served by the Court, addressed to:

> Jerry B. Blackstock, Esq.
> HUNTON & WILLIAMS LLP
> 4100 Bank of America Plaza
> 600 Peachtree Street NE
> Atlanta, Georgia  30308

James R. Ferguson, Esq.
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois  60606

/s/  David A. Rabin
David A. Rabin
Georgia Bar No. 591469

MORRIS, MANNING & MARTIN, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326-1044
Phone: (404) 233-7000
Fax: (404) 365-9532

1374065 v01